**AUBREY BALDWIN, OSB No. 060414**
abaldwin@lclark.edu
**ALLISON LAPLANTE, OSB No. 02361**
laplante@lclark.edu
**TOM BUCHELE, OSB No. 081560**
tbuchele@lclark.edu
Pacific Environmental Advocacy Center
10015 SW Terwilliger Blvd.
Portland, OR 97219
(503) 768-6929, (503) 768-6894, (503) 768-6736
(503) 768-6642 (fax)

Attorneys for All Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **SIERRA CLUB**, a non-profit corporation, **NORTHWEST ENVIRONMENTAL DEFENSE CENTER**, a non-profit corporation, **FRIENDS OF THE COLUMBIA GORGE**, a non-profit corporation, **COLUMBIA RIVERKEEPER**, a non-profit corporation, and **HELLS CANYON PRESERVATION COUNCIL**, a non-profit corporation, | Civil No.: 08-1136-HA |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| v. | **(Oral Argument Requested)** |
| **PORTLAND GENERAL ELECTRIC COMPANY**, an Oregon Corporation, | |
| Defendant. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. iii

INTRODUCTION ............................................................................................1

OVERVIEW OF THE CLEAN AIR ACT AND REGULATIONS ...........................................2

   I.   The Clean Air Act and State Implementation Plans...................................2

   II.  New Source Performance Standards ("NSPS") .......................................3

   III.  Prevention of Significant Deterioration ("PSD")......................................3

   IV.  Oregon's PSD Program ....................................................................5

   V.  Title V .......................................................................................5

STANDARD OF REVIEW....................................................................................6

ARGUMENT..................................................................................................7

   I.   Defendant's Various Challenges to the Sufficiency of Sierra Club's Pleading Under *Twombly* Must Fail Because the Complaint Satisfies FRCP 8. ....................................7

      A.  *Twombly* Did Not Fundamentally Alter the Notice Pleading Standard in the Federal Rules of Civil Procedure and the Court Should Reject PGE's Arguments that Sierra Club is Required to Plead with More Specificity....................................7

      B.  PGE's Attacks on Claims 1, 9, 11 and 12 Ignore Specific Allegations in the Complaint and Also Misapply *Twombly* and FRCP 8. ....................................9

      C.  Sierra Club Need Not List Every Actionable Violation in its Complaint....................11

   II.  The Sierra Club Complied with All Statutory and Regulatory Requirements for Pre-Suit Notice....................................................................................12

      A.  Sierra Club Met All Requirements for Pre-Suit Notice of PGE's Violations of the Oregon SIP and PGE's Title V Permit Reporting Requirements....................13

      B.  Sierra Club Included Sufficient Information in its Notice Regarding PGE's Modification Projects at the Boardman Facility....................15

   III.  The Statute of Limitations Does Not Bar Sierra Club's PSD Claims Because PGE's Failure to Comply with PSD Requirements and Operate with BACT Emission Limits Are Violations that Accrue Anew Each Day. ....................17

      A.  Under the CAA PGE Has an Ongoing Duty to Comply with PSD Requirements and Operate in Compliance with BACT Emission Limits. ....................18

      B.  Oregon's SIP Creates an Ongoing Duty to Meet PSD Requirements and Operate in Compliance with BACT Emission Limits. ....................20

      C.  Sierra Club's Suit is Timely Because PGE Violates the Law Each Day it Operates Without Complying with PSD Requirements. ....................23

      D.  Adoption of PGE's Arguments Would Create a Perverse Incentive for Facilities to Begin and Continue Construction in Violation of the CAA. ....................26

IV.    The Concurrent Remedy Doctrine Does Not Bar Sierra Club's Claims for Injunctive
      Relief. ...................................................................................................................28

V.    Sierra Club's PSD Claims are Proper as PGE Has Not Demonstrated that It Commenced
      Construction by the Regulatory Deadline as a Matter of Law.....................................31

  A.    EPA's 1975 Determination Fails to Prove PGE had "Commenced" Construction by
      June 1, 1975 as a Matter of Law............................................................................32

  B.    The 1975 NTEC Site Certification Agreement Did Not Constitute "All Necessary
      Preconstruction Approvals and Permits."...............................................................34

VI.    Changes that Significantly Increase Pollution from Existing Sources in Oregon are
      Subject to PSD, and PGE's Interpretation of the Oregon PSD Program's Definition of
      "Modification" is Antithetical to the Effective Operation of the Program...................35

  A.    The Language of the Oregon PSD Program Has Changed Significantly Since 1982, but
      has Always Regulated Increases in Pollution over Baseline. ..................................35

  B.    Interpreting Oregon's PSD Program to Ensure Regulation of Increases in Pollution
      Rather than Increases in Permit Limits Avoids Absurd Results and Uncontrolled
      Increases in Actual Pollution.................................................................................39

CONCLUSION....................................................................................................................43

## TABLE OF AUTHORITIES

### Cases

*Aktieselskabet v. Fame Jeans, Inc.*, 525 F.3d 8 (D.C.Cir. 2008)....................................................8

*Alabama Power Co. v. Costle*, 636 F.2d 332 (D.C. Cir. 1979)....................................3, 31, 35, 40

*American Cyanamid Co. v. United States EPA*, 810 F.2d 493 (5th Cir. 1987)...........................41

*Ashoff v. City of Ukiah*, 130 F.3d 409 (9th Cir. 1997)..............................................................12

*Ass'n of Irritated Residents v. C&R Vanderham Dairy*, 2006 WL 2644896 (E. D. Cal., Sept. 14, 2006) ........................................................................................................................................33

*Ass'n to Protect Hammersly, Eld, and Totten Inlets v. Taylor Res.*, 299 F.3d 1007 (9th Cir. 2002) ....................................................................................................................................................33

*Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007)................................6, 7, 8, 9, 11

*Cervantes v. United States*, 330 F.3d 1186 (9th Cir. 2003) .........................................................6

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) .............27

*Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy,* 305 F.3d 943 (9th Cir. 2002)......
.............................................................................................................................12, 14, 17

*Commonwealth of Pennsylvania v. Allegheny Energy, Inc*., No. Civ. A. 05-885, 2006 WL 1509061 (W.D. Pa. April 19, 2006).......................................................................................29

*Conley v. Gibson*, 355 U.S. 41 (1957) ........................................................................................7

*Cope v. Anderson*, 331 U.S. 461 (1947)..............................................................................28, 29

*Dyer v. United States*, 832 F.2d 1062 (9th Cir. 1987) ...............................................................42

*Envt'l Def. Fund v. E.P.A.,* 489 F.3d 1320 (D.C. Cir. 1979) ......................................................40

*Envt'l Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) .............................................................4

*Erikson v. Pardus*, 551 U.S 89, 127 S.Ct. 2197 (2007)..........................................................6, 8

*Fecht v. The Price Co.*, 70 F.3d 1078 (9th Cir., 1995)...............................................................32

*Fed. Election Comm'n v. Christian Coal.*, 965 F. Supp. 66 (D.D.C. 1997) ...............................29

*Fried v. Sungard Recovery Services, Inc.*, 900 F.Supp. 758 (E.D.Pa. 1995).............................16

*Hernandez de Anderson v. Gonzalez*, 497 F.3d 927 (9th Cir. 2007)..........................................36

*Johnson v. Riverside Healthcare System*, 534 F.3d 1116 (9th Cir. 2008) ....................................8

*Landgraf v USI Film Prods.*, 511 U.S. 244 (1994)....................................................................36

*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008) ...................................9

*Montana Power v. EPA*, 608 F.2d 334 (9th Cir. 1979)..................................................33

*Montecino v. Spherion Corp.*, 427 F.Supp.2d 965 (C.D. Cal. 2006)...........................11

*N.Y. v. Am. Elec. Power Serv. Corp.*, Nos. 2:04 CV 1098, 2:05 CV 360, 2006 WL 1331543 (S.D. Ohio March 21, 2006) ........................................................................29

*Nat'l Parks Conservation Ass'n v. TVA*, 480 F.3d 410 (6th Cir. 2007)................... 17, 18, 21, 24

*Nat'l Parks Conservation Ass'n v. TVA,* 502 F.3d 1316  (11th Cir. 2007).................... 14, 24, 30

*Navistar Int'l Transp. Corp. v. EPA*, 858 F.2d 282 (6th Cir. 1988), cert. denied, 490 U.S. 1039 (1989) ...........................................................................................41

*New York v. Niagara Mohawk Power*, 263 F.Supp.2d 650, (W.D.N.Y. 2003) .........................22

*Ohio Pub. Interest Research Group v. Whitman*, 386 F.3d 792 (6th Cir. 2004)...........................6

*Oregon Environmental Council v. Oregon Dept. of Environmental Quality*,  1992 WL 252123 (D. Or. Sept. 24, 1992) ...........................................................................36, 37

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946)....................................................28

*Public Interest Research Group, of New Jersey Inc. v. Hercules, Inc.*, 50 F.3d 1239 (3d Cir.1995) ...........................................................................................................14, 16

*Safe Air for Everyone v. U.S. E.P.A.*, 488 F.3d 1088 (9th Cir. 2007)...........................42

*San Francisco BayKeeper v. Tosco Corp.*, 309 F.3d 1153 (9th Cir. 2002) ........................13, 15

*Sierra Club v. Administrator, U.S. EPA*, 496 F.3d 1182 (11th Cir. 2007) .........................41

*Skaff v. Meridien North American Beverly Hills LLC,* 506 F.3d 832 (9th Cir. 2007)................6, 8

*U.S. v. Am. Elec. Power*, 137 F. Supp.2d 1060 (S.D. Ohio 2001)................................20

*U.S. v. Cinergy Corp.*, 397 F.Supp.2d 1025 (S.D. Ind. 2005)........................ 28, 29, 35

*U.S. v. Duke Energy,* 278 F.Supp. 2d 619 (M.D.N.C. 2003) .......................... 21, 22, 23

*U.S. v. E. Ky. Power Coop., Inc.*, 498 F.Supp.2d 976 (E.D. Ky.2007) .........................21

*U.S. v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996)................................19

*U.S. v. Telluride Co.*, 146 F.3d 1241 (10th Cir. 1998)..................................... 18, 28

*U.S. v. Windward Props.*, 821 F.Supp. 690 (N.D. Ga. 1993).........................................30

*Union Elec. Co. v. EPA*, 427 U.S. 246 (1976) ..........................................................3

*United States v. Louisiana-Pacific Corp.*, 682 F.Supp. 1122 (D.Colo.1987) .............................37

*United States v. Mead Corp.*, 533 U.S. 218 (2000) ...................................................27

*United States v. Miljus*, Slip op. 2008 WL 3539946 (D. Or. Aug. 11, 2008) .........................6, 11

*United Transp. Union v. Fla. E. Coast Ry. Co.*, 586 F.2d 520 (5th Cir. 1978)...........................30

*Waterkeepers Northern California v. AG Industrial Mfg., Inc.,* 375 F.3d 913 (9th Cir. 2004) ....12

*Weiler v. Chatham Forest Prods.*, 392 F.3d 532 (2nd Cir. 2004) ...............................................31

*Wis. Elec. Power Co. v. Reily*, 893 F.2d 901 (7th Cir. 1990)...........................................3, 4, 35

## Statutes

28 U.S.C. § 2462.....................................................................................................................17

42 U.S.C. § 7401.......................................................................................................................2

42 U.S.C. § 7408.......................................................................................................................3

42 U.S.C. § 7409.......................................................................................................................3

42 U.S.C. § 7410..................................................................................................................3, 41

42 U.S.C. § 7411..............................................................................................................3, 4, 19

42 U.S.C. § 7470.......................................................................................................................3

42 U.S.C. § 7471..................................................................................................................5, 41

42 U.S.C. § 7475.................................................................................................3, 4, 19, 20, 41

42 U.S.C. § 7479..................................................................................................................4, 19

42 U.S.C. § 7602.....................................................................................................................19

42 U.S.C. § 7604................................................................................................................12, 29

42 U.S.C. §§ 7470 – 7492........................................................................................................31

Pub. L. No. 95-95 § 127(a), 91 Stat. 685 (1977) .....................................................................34

## Federal Regulations

40 C.F.R. § 135.3.....................................................................................................................15

40 C.F.R. § 51.166.....................................................................................................................5

40 C.F.R. § 52.21.....................................................................................................................32

40 C.F.R. § 54.3.......................................................................................................................13

40 C.F.R. § 60.14..................................................................................................................3, 10

40 C.F.R. § 60.7.......................................................................................................................17

40 C.F.R. § 60.8.......................................................................................................................17

40 C.F.R. 51.166......................................................................................................................41

40 C.F.R. § 70.2.........................................................................................................................5

39 Fed. Reg. 42,510 (Dec. 5, 1974) ........................................................................................31

45 Fed. Reg. 52676 (Aug. 7, 1980) ...........................................................................................4

46 Fed. Reg. 54393 (Nov. 5, 1981)..........................................................................5

47 Fed. Reg. 35191 (Aug. 13, 1982).........................................................................5

57 Fed. Reg. 32314 (July 21, 1992).........................................................................5

68 Fed. Reg. 2891 (Jan. 22, 2003). ..................................................................37, 38

## Oregon Administrative Rules

OAR 340-020-225 (1997) .............................................................................36, 40

OAR 340-028-0110 (1997) ...........................................................................37, 40

OAR 340-028-1020 (1997). ................................................................................37

OAR 340-028-1940 (1997) ..................................................................................37

OAR 340-200-0020 ............................................................21, 37, 38, 39, 42

OAR 340-210-0215 .............................................................................................10

OAR 340-224-0010 .............................................................................................36

OAR 340-224-0030 .............................................................................................21

OAR 340-224-0070 ........................................................................................21, 36

## Agency Guidance

Eric Schaeffer, Reduced Penalties for Disclosures of Certain Clean Air Act Violations (Sept. 30,

    1999). .............................................................................................................27

Memorandum from Roger Strelowl, Assistant Administrator for Air and Waste Management,

    U.S. EPA, to Regional Administrators (April 1976) ..............................................32

U.S. EPA, Compliance and Enforcement National Priority: Clean Air Act, New Source Review/

    Prevention of Significant Deterioration (November 2004)....................................27

## Treatises

Wright & Miller § 1215 at 172-190.......................................................................12

## INTRODUCTION

Sierra Club, Northwest Environmental Defense Center, Friends of the Columbia Gorge, Columbia Riverkeeper, and Hells Canyon Preservation Council (referred to collectively as "Sierra Club") brought this action against Defendant Portland General Electric Co. ("PGE") because PGE constructed, modified and currently operates its coal-fired power plant in Boardman, Oregon ("PGE Boardman") in violation of the Clean Air Act ("CAA"), its implementing regulations and the Oregon State Implementation Plan ("SIP"). PGE Boardman is the largest single source of harmful air pollution in Oregon. PGE Boardman began operation in 1980 without a scrubber, and since that time has emitted and continues to emit massive amounts of sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), carbon dioxide ($CO_2$), particulate matter (PM), mercury, and other pollutants.

As alleged in Sierra Club's Complaint, PGE constructed and is operating multi-million dollar capital improvements at Boardman that constitute "modifications" under the Oregon PSD program. Compl. ¶¶ 236, 246. These improvements include a major upgrade of the main boiler that increased its steam capacity, and changes to the turbine and generator corresponding to greater electricity output. Compl. ¶¶ 236, 246. These changes significantly increased pollution from Boardman. Compl. ¶¶ 137, 216. As explained further below, PGE has illegally emitted hundreds of thousands of tons of pollutants over the years. PGE has never complied with CAA provisions that require pollution analyses and reductions to protect people's health, economic activities, and other interests. Compl. ¶¶ 237, 250.

These changes made various CAA requirements applicable to PGE Boardman. Sierra Club thus brought this suit to enforce, *inter alia*: the New Source Performance Standard ("NSPS") that became applicable to the plant in 1997 and, if properly implemented, would require up to 90% control of $SO_2$ emissions, Compl. ¶ 159; the Prevention of Significant

Deterioration ("PSD") program, that became applicable when PGE commenced construction on and subsequently modified PGE Boardman, and would require various analyses and continuous compliance with Best Available Control Technology ("BACT") emission limitations, Compl. ¶¶ 206, 218, 237 & 248; and various monitoring, testing and reporting requirements, Compl. ¶¶ 276, 283, 287.

PGE has moved to dismiss these claims. First, despite the comprehensive and detailed nature of Sierra Club's 30-page notice of intent to sue and Sierra Club's 70-page Complaint, PGE argues that the Sierra Club's claims are vague and non-specific. In so arguing, PGE asks this Court to adopt standards for notice and pleading which the case law simply does not support.

Second, PGE moves to dismiss Sierra Club's PSD claims, arguing that the statute of limitations bars claims for civil penalties, and the concurrent remedy doctrine bars claims for injunctive relief. Sierra Club's claims are timely, however, because the CAA and Oregon's SIP demonstrate that PGE has an ongoing duty – which PGE is *presently* violating – to meet PSD requirements and operate in compliance with BACT emission limitations.

Finally, PGE makes several arguments in support of dismissal of Sierra Club's claims based on the initial construction of the Boardman plant and subsequent modifications at the plant. These arguments must fail, however, because they are premised upon fundamental misinterpretations of the former and currently applicable law. For the reasons set forth below, PGE's motion should be denied in its entirety.

## OVERVIEW OF THE CLEAN AIR ACT AND REGULATIONS

I.    **The Clean Air Act and State Implementation Plans**

Congress enacted the CAA in 1970 "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of the population." 42 U.S.C. § 7401(b)(1). The heart of the 1970 CAA is the establishment of

National Ambient Air Quality Standards ("NAAQS") for pollutants that cause air pollution and

endanger public health or welfare, and the state-adopted and EPA approved plans to achieve

those minimum standards. *Alabama Power Co. v. Costle*, 636 F.2d 332, 346 (D.C. Cir. 1979);

42 U.S.C. §§ 7408(a), 7409(a). The states must submit State Implementation Plans ("SIPs") that

meet certain minimum criteria promulgated by the Environmental Protection Agency ("EPA").

*See* 42 U.S.C. § 7410(a)(1), (a)(2)(A), (k)(1). States may adopt standards that are more stringent

than these minimum criteria. *See Union Elec. Co. v. EPA*, 427 U.S. 246, 265 (1976).

## II.    New Source Performance Standards ("NSPS")

The 1970 CAA included the NSPS provisions. Those provisions directed EPA to

promulgate technology-based performance standards for new and modified facilities to ensure

that pollution from large sources will be controlled. 42 U.S.C. § 7411. The NSPS program

applies to new plants and certain physical or operational changes that are expected to increase

the maximum achievable hourly rate of emissions. 40 C.F.R. § 60.14(b) & (h); *Wis. Elec. Power

Co. v. Reily*, 893 F.2d 901, 913 (7th Cir. 1990) ("*WEPCO*").

## III.   Prevention of Significant Deterioration ("PSD")

The PSD program is designed to protect human health and welfare from the adverse

effects of reasonably anticipated air pollutants; preserve, protect, and enhance the air quality in

national parks and wilderness areas; and ensure that economic growth will occur in a manner

consistent with the preservation of existing air resources. 42 U.S.C. § 7470. Congress imposed

PSD requirements on existing sources that have been modified. *WEPCO*, 893 F.2d at 909.

Thus, it is illegal to construct and operate a new source or a major modification at an existing

source without satisfying PSD. 42 U.S.C. § 7475. PSD requirements include analysis of and

operation in compliance with a BACT emission limitation on a continuous basis, a demonstration

that the source will not cause or contribute to a violation of ambient air quality standards or PSD

increment, or interfere with air quality related values in federally protected parks and wilderness areas, issuance of a major source PSD permit following proper public participation requirements, and other obligations.  42 U.S.C. § 7475.  A new or modified source must obtain a PSD permit prior to commencing construction or modification, but, importantly, the permit contains restrictions (*e.g.* BACT emissions limits) on the source's operation post-construction.

The PSD program applies to new and "modified" sources.  The PSD program borrows the definition of "modification" from the NSPS program: "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."  *See* 42 U.S.C. §§ 7411(a)(4), 7479(2)(C).  The statute does not further define the terms within the definition of modification, including the crucial term "increases."  Whether an owner or operator's actions constitute a violation of the PSD program requires evidence of two essential elements: (1) a *change* occurred, resulting in (2) an *increase* in the amount of air pollution.  The requirement for a physical or operational change is a low bar; any physical or operational change qualifies.  *WEPCO* 893 F.2d at 905.  The second element, an emissions increase, depends upon a calculation of pre-change and post-change emissions.  *See Envt'l Def. v. Duke Energy Corp.*, 549 U.S. 561, 577 (2007).

EPA promulgated implementing regulations in 1980 that apply PSD requirements to changes that the owner or operator should reasonably expect to significantly increase total actual annual emissions on a tons per year basis.  EPA specifically emphasized that its 1980 PSD regulations were designed to focus on increases in *actual annual* emissions so as to capture impacts of source activities on the ambient air.  *See* 45 Fed. Reg. 52676, 52699-700, 52701 (Aug. 7, 1980).  PSD review is triggered if a change is expected to cause post-change emissions

to significantly increase compared to representative actual emissions in the past.  40 C.F.R. § 51.166(b)(40).  This requires a comparison of a unit's historical actual annual emissions before the change to the expected actual annual emissions following the change, without reference to the amount of emissions that the unit hypothetically could have emitted if the source had operated at its full "potential" or "allowable" emissions.  EPA has confirmed that this approach is necessary to determine a source's actual impact on ambient air under PSD.  57 Fed. Reg. 32314, 32316, 32331 (July 21, 1992).

**IV.    Oregon's PSD Program**

States may implement many of the CAA's provisions, including the PSD program.  Each state's SIP must contain emission limitations and other measures that are necessary to prevent significant deterioration of the air quality in each region designated as attainment or unclassifiable.  42 U.S.C. § 7471.  The regulation governing state PSD programs, 40 C.F.R. § 51.166, contains the specific minimum requirements for an approved PSD program.  EPA first approved Oregon's PSD program on November 5, 1981.  46 Fed. Reg. 54939 (Nov. 5, 1981).  However, it was quickly replaced with a new version of the program, which was approved August 13, 1982.  47 Fed. Reg. 35191 (Aug. 13, 1982).  The federal PSD program applied in Oregon from the time of its promulgation as a regulation in 1974, through November 5, 1981.  Since November 5, 1981, Oregon has administered an approved PSD program, which was significantly revised in 2003.  The Oregon SIP rules applicable to major modifications of stationary sources differ from the federal PSD rules, as discussed below in Section VI.

**V.    Title V**

Title V permits, which are often called "operating permits," incorporate the emission limitations created under the PSD and other CAA programs rather than creating their own emission limitations.  *See*, *e.g.*, 40 CFR § 70.2 (applicable requirements to be included in Title V

permits include terms or conditions of any preconstruction permit issued under the PSD

provisions which); *Ohio Pub. Interest Research Group v. Whitman*, 386 F.3d 792, 794 (6th Cir.

2004) (Title V does not impose new obligations; rather, it consolidates pre-existing requirements

into a single, comprehensive document for each source, which requires monitoring, record-

keeping, and reporting of the source's compliance with the CAA).

## STANDARD OF REVIEW

When ruling on a Rule 12(b)(6) motion, the Court must accept as true all factual

allegations in the complaint and construe the pleadings in the light most favorable to the

nonmoving party to determine whether the nonmoving party has stated a claim upon which relief

can be granted.  *Cervantes v. United States*, 330 F.3d 1186, 1187 (9th Cir. 2003).  The Court

must evaluate a complaint challenged under FRCP 12(b)(6) in light of FRCP 8(a)'s liberal notice

pleading requirement.  FRCP 8 "requires only 'a short plain statement of the claim showing that

the pleader is entitled to relief.'  *Specific facts are not necessary*; the statement need only 'give

the defendant fair notice of what the … claim is and the grounds upon which it rests.'"  *Erikson

v. Pardus,* 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (quoting FRCP 8(a) and *Bell Atlantic v.

Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007)) (emphasis added).  After *Erikson* and *Twombly*,

the Ninth Circuit has reiterated that Rule 8's liberal notice pleading requirements remain intact

and courts must not impose heightened pleading standards unless explicitly required by statutes

or rules.  *Skaff v. Meridien North American Beverly Hills, LLC,* 506 F.3d 832, 841-842 (9th Cir.

2007).  Additionally, this Court recently held that "the court 'presume[s] that general allegations

embrace those specific facts that are necessary to support the claim.'"  *United States v. Miljus*,

Slip op. 2008 WL 3539946, *2 (D. Or. Aug. 11, 2008) (Haggerty, C.J., adopting Findings and

Recommendations of Magistrate Judge Papak) (citations omitted).

**ARGUMENT**

**I.    Defendant's Various Challenges to the Sufficiency of Sierra Club's Pleading Under**
***Twombly* Must Fail Because the Complaint Satisfies FRCP 8.**

PGE's Memo is underpinned by attacks on Sierra Club's Complaint for failure to satisfy

the pleading requirements imposed in *Twombly*.[1]  PGE's challenges to the sufficiency of the

Complaint under *Twombly* must fail for three reasons.  First, *Twombly* did not alter the liberal

notice pleading standard of FRCP 8.  Second, Sierra Club's allegations are sufficient to satisfy

the standard as expressed in FRCP 8 and *Twombly* and its progeny.  Third, PGE's motion to

strike certain words from the Complaint is inappropriate given the rules allowing post-complaint

and pre-trial discovery.  Thus, this Court should not dismiss Sierra Club's claims.

**A.    *Twombly* Did Not Fundamentally Alter the Notice Pleading Standard in the**
**Federal Rules of Civil Procedure and the Court Should Reject PGE's**
**Arguments that Sierra Club is Required to Plead with More Specificity.**

FRCP 8 sets out the longstanding notice pleading standard for federal courts, and

*Twombly* did not alter the Rule or the underlying standard.  In *Twombly*, the plaintiff brought a

claim under the Sherman Act, 15 U.S.C. § 1, which requires proof of an agreement or conspiracy

in restraint of trade.  Evidence of parallel conduct by the defendants is not enough.  127 S.Ct. at

1964-66.  The plaintiff, however, only alleged facts showing parallel conduct and made a general

allegation of a conspiracy.  *Id*.  The court below allowed the claims to proceed, relying on

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) ("[A] complaint should not be dismissed…unless it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that

would entitle him to relief").  The Supreme Court reversed, explaining that while FRCP 8 does

not require particularized factual allegations, it does not excuse a plaintiff from pleading *any*

---

[1] These *Twombly* arguments are scattered through PGE's Memo, making it unclear which precise
allegations PGE contends fail to satisfy *Twombly*.  PGE Memo at 4, 8-9, 19-20, 27-28, and 33-
35; *Compare, e.g.* PGE Memo at 4 (Claims 9, 10, 11 and 12 violate *Twombly*) with PGE Memo
at 33 (Claims 11 and 12 and portions of Claims 1, 7, 8, 9 and 10 violate *Twombly*).  Sierra Club
has attempted to address PGE's arguments with respect to particular claims where possible.

facts, and a complaint must contain enough facts to show that a plaintiff's entitlement to relief is at least plausible, as opposed to merely speculative.  127 S. Ct. at 1964-1966 and n.3.  In *Twombly* this required the plaintiff to plead at least some facts that would be sufficient, as a matter of law, to show a plausible conspiracy.  Because the *Twombly* complaint failed to do so, the Supreme Court upheld the district court's dismissal.  *Id.* at 1970-74, and n.14.   Although *Twombly* discarded certain overbroad language from *Conley v. Gibson*, the Court did not change FRCP 8's basic notice pleading requirement.  *See, e.g.*, *Twombly*, 127 S. Ct. at 1965 n.3, 1973, n. 14 and 1974.  *Twombly* thus must be read in light of what it requires: at least some allegations of fact regarding the essential elements of a claim, and what it does not require: particularized or "heightened fact pleading of specifics." *Id.* at 1970-74, and n.14.

The federal appellate courts have generally agreed that *Twombly* did not change FRCP 8's basic notice pleading requirement.  *See, e.g.*, *Aktieselskabet v. Fame Jeans, Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008).  Indeed, many courts have pointed out that any ambiguity regarding *Twombly's* impact was resolved by the Supreme Court's decision in *Erikson v. Pardus*, 127 S. Ct. at 2200 (reversing the dismissal of a prisoner's 8th and 14th Amendment claims and noting that under FRCP 8, "[s]pecific facts are not necessary").  The Ninth Circuit also has, outside the context of antitrust claims, rejected the argument that certain claims should be subject to a heightened pleading requirement after *Twombly*.[2]  PGE fails to cite or discuss any of these

---

[2] *See Skaff*, 506 F.3d at 841-842  (ADA plaintiff not required to plead specifics about accessibility barriers);  *Johnson v. Riverside Healthcare System*, 534 F.3d 1116, 1122-23 (9th Cir. 2008) (heightened pleading requirement on racial discrimination claim inappropriate).

decisions.[3]  PGE offers no applicable law to support its general assertions that the Sierra Club

must provide more specific allegations.  Sierra Club's 70 pages of detailed allegations are more

than sufficient under FRCP 8 and *Twombly* to provide PGE with adequate notice.

**B.      PGE's Attacks on Claims 1, 9, 11 and 12 Ignore Specific Allegations in the Complaint and Also Misapply *Twombly* and FRCP 8.**

The standard announced in *Twombly* is consistent with notice pleading, and, while it

requires "plausibility" in pleading, it does not require particularized allegations or greater factual

specificity. 127 S. Ct. at 1974.  Sierra Club's lengthy allegations clearly satisfy the liberal notice

pleading requirements of FRCP 8.  PGE argues that certain of Sierra Club's claims are not

"plausible" under *Twombly* because key factual allegations are missing from the Complaint.  In

making these arguments, PGE either ignores allegations incorporated from elsewhere in the

Complaint or insists on a level of specificity that is inappropriate at the initial pleading stage.

PGE argues that Sierra Club's NSPS Claim[4] and the SIP Notice Claim are "implausible"

because certain key allegations are missing.  To ultimately succeed on these claims, Sierra Club

must demonstrate that PGE's modifications resulted in increased emissions.  *See, e.g.* 40 C.F.R.

---

[3] PGE cites only one post-*Twombly* Ninth Circuit case: *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008).  *Mendiondo* does not stand for the proposition that a plaintiff must allege specific examples of wrongful conduct to withstand a motion to dismiss, as PGE claims.  PGE Memo at 8-9.  Rather, FRCP 9 standards were not applied to retaliatory discharge claims and a claim based on "vague" references and general allegations of retaliatory discharge was upheld.  521 F.3d at 1104.  Thus, *Mendiondo* fully supports Sierra Club's position.
[4] PGE also argues that Sierra Club cannot state a claim for relief for NSPS modifications that made changes to equipment other than the main Boardman boiler, even if those modifications resulted in an increase in hourly emissions.  PGE Memo at 18-9.  Sierra Club does not plan to pursue NSPS modification claims for any modifications to equipment other than the main Boardman boiler.  This does not require dismissal of Sierra Club's Claim 1, however, because Sierra Club has alleged at least one modification to the main Boardman boiler.

§ 60.14(a); OAR 340-210-0215(2).[5]  PGE insists that Sierra Club has failed to allege "any *facts*"

supporting such increased emissions as required by *Twombly*.  *See* PGE Memo at 19-20

(emphasis in original); at 27-28 ("[the Sierra Club] does not even attempt to assert that any

changes increased the Plant's hourly potential to emit").  These arguments ignore several such

factual allegations in the Complaint and therefore have absolutely no merit.

The Complaint contains factual allegations in several paragraphs regarding increased

pollutant emissions after PGE's plant modifications, each of which is either within or

incorporated into the NSPS and SIP Notice claims.  The Complaint asserts that: "the

aforementioned modifications [set forth in ¶134] significantly increased net emissions of

pollutants.  The modifications also increased hourly maximum capacity."  Compl. ¶ 137.  This

allegation was expressly incorporated into the NSPS and SIP Notice claims.  *See* Compl. ¶ 144,

253.  The Complaint alleges that each change "increased the emissions rates of $SO_2$, NOx and

PM to the atmosphere, and are thus 'modifications' within the meaning of Section 111 of the

CAA, as provided by 40 C.F.R.§ 60.14(a)."  Compl. ¶ 164.  Sierra Club also alleged that "[e]ach

of these same physical changes also qualified as 'modifications' under 40 C.F.R. § 60.14(h)

because each increased the maximum hourly emissions[.]"  Compl. ¶ 165.  These allegations

were incorporated into the SIP Notice Claim.  Compl. ¶ 253.  Such allegations, inexplicably

ignored by PGE, are more than sufficient under FRCP 8 and *Twombly* to put PGE on notice of

Sierra Club's NSPS and SIP Notice Claims.

PGE also insists that *Twombly* requires greater specificity in the reporting violations

---

[5] Provisions of the Oregon Administrative Rules cited in this brief are the current *federally*
approved Oregon SIP provisions, unless otherwise noted.  These provisions are attached as
Exhibit A.  These provisions may differ from Oregon Administrative Rules currently in force as
a matter of *state* law.

alleged in Claims 11 and 12.  PGE Memo at 33-34.[6]  As described above, *Twombly* does not require "heightened pleading of specifics." 127 S.Ct at 1974.  Moreover, as this Court noted in *Miljus,* the court "presume[s] that general allegations embrace those specific facts necessary to support the claim." 2008 WL 3539946, *2 (internal citations omitted).  Further, PGE's argument simply ignores that Sierra Club's 60-day notice of intent to sue, attached to the Complaint, clearly informed PGE that their reporting violations occurred between 2003 and 2008.  *See* Compl. Ex. 1 at 8.  Such additional "detail" simply adds to the sufficiency of Sierra Club's allegations under Claims 11 and 12.

### C.    Sierra Club Need Not List Every Actionable Violation in its Complaint.

Finally, PGE relies on *Twombly* in asking the Court to strike allegations in the Complaint concerning "related projects" and other changes that PGE "may have made" to PGE Boardman, and to bar Sierra Club from conducting discovery regarding these projects or changes.  PGE Memo at 34-35.[7]  Nothing in *Twombly* or any other case cited by PGE even remotely supports these arguments, however.  In fact, the Court in *Twombly* specifically held that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." 127 S.Ct at 1969.

PGE's arguments turn the pre-suit notice requirement, FRCP 8, and the rules allowing post-complaint and pre-trial discovery, on their heads.[8]  A complaint is simply not the equivalent of a final pretrial order under FRCP 16.  "[I]t was the design of the [FRCP] rulemakers that the

---

[6] To the extent these arguments apply to any other claims (*see* PGE Memo at 33 n. 29) those arguments also fail for the same reasons.

[7] Motions to strike are "generally regarded with disfavor" and "a court must deny the motion to strike if any doubt exists whether the allegations in the pleadings might be relevant in the action." *Montecino v. Spherion Corp.*, 427 F.Supp.2d 965, 967 (C.D. Cal. 2006) (citations omitted).

[8] PGE makes a confusing but related argument regarding Sierra Club's 60-day notice of intent to sue.  *See* PGE Memo at 31-32.  Sierra Club addresses this argument in Section II below.

discovery procedures should give the parties an opportunity for securing an elaboration of the

allegations and that process and not the pleadings bears the burden of filling in the details of the

dispute for the parties and the court."  Wright & Miller § 1215 at 172-190.  The allegations PGE

seeks to strike actually go beyond the requirements of notice pleading and put PGE on notice that

Sierra Club believes discovery may disclose additional legal violations.  There is absolutely

nothing improper about including such allegations in the Complaint or about conducting

discovery before trial to identify additional violations.  PGE's argument thus has no merit.

## II.    The Sierra Club Complied with All Statutory and Regulatory Requirements for Pre-Suit Notice.

The CAA requires that citizens provide defendants and relevant government entities with

a notice of their intent to sue sixty days prior to filing suit for violations of an emission standard

or limitation.  42 U.S.C. § 7604(b)(1)(A).  EPA has promulgated regulations at 40 C.F.R. §

54.3(b) providing that a notice letter must contain:

> sufficient information to permit the recipient to identify the specific standard, limitation,
> or order which has allegedly been violated, the activity alleged to be in violation, the
> person or persons responsible for the alleged violation, the location of the alleged
> violation, the date or dates of such violation, and the full name and address of the person
> giving the notice.

"The key language in the notice regulation is the phrase 'sufficient information to permit the

recipient to identify' the alleged violations."  *Cmty. Ass'n for Restoration of the Env't v. Henry

Bosma Dairy,* 305 F.3d 943, 951 (9th Cir. 2002).[9]  The point of the notice requirements "is not to

*prove* violations, it is to inform the polluter 'about what it is doing wrong' and to allow it an

'opportunity to correct the problem.'"  *Waterkeepers Northern California v. AG Industrial Mfg.,

Inc.,* 375 F.3d 913, 920 (9th Cir. 2004) (emphasis by court).  In other words, the notice

---

[9] Although *Bosma Dairy* involved a citizen suit under the Clean Water Act ("CWA"), the
language of the citizen suit provisions of the CWA, the CAA, and the Resource Conservation
and Recovery Act ("RCRA"), are similar, and citizen suits brought under these statutes are used
to interpret one another.  *Ashoff v. City of Ukiah*, 130 F.3d 409, 413 (9th Cir. 1997).

requirements call for no more than "reasonable specificity." *San Francisco BayKeeper v. Tosco Corp.*, 309 F.3d 1153, 1158 (9th Cir. 2002) (citations omitted).

Here, Sierra Club's 30-page Notice of Intent to Sue ("Notice") identified particular statutory and regulatory requirements PGE allegedly violated, PGE's actions that led to those violations, and the dates of the violations. This information was sufficient to permit PGE to identify what it did wrong and what actions could have corrected these problems and averted this lawsuit. Accordingly, this Court should deny PGE's motion to dismiss Claims 11 and 12 based on the supposed deficiencies in Sierra Club's pre-suit Notice.

### A. Sierra Club Met All Requirements for Pre-Suit Notice of PGE's Violations of the Oregon SIP and PGE's Title V Permit Reporting Requirements.

PGE contends that the Notice "describes the full range of various reports possible under the Oregon SIP and the Title V permit," and that "Plaintiffs' approach is to throw as many reports as possible against the wall and see what, if any, stick." PGE Memo at 30. To the contrary, the Notice simply listed the specific provisions applicable to PGE that Sierra Club alleges it had violated. *See* Notice at 8. The Notice also stated that between 2003 and 2008 PGE failed to submit all required reports and those it did submit were incomplete because they did not contain the information required by OAR 340-028-1440 and Title V Permit Conditions 54–62. *Id.* Sierra Club also included specific examples of such violations. For instance, the Notice stated that PGE's 2005 and 2006 annual reports failed to include excess emissions upset logs or second semi-annual compliance certifications, in violation of Title V Permit Condition 54.b. *Id.* at 9. This is precisely what Sierra Club was required to do under 40 C.F.R. § 54.3(b).

The purpose of the notice letter is to provide the defendant and government agencies with information regarding "the cause and *type* of environmental laws or orders the defendant is allegedly violating so the agencies can step in, investigate, and bring the defendant into

compliance." *Bosma Dairy*, 305 F.3d at 953 (emphasis added). In enacting the notice requirement, "Congress did not mean to unduly burden citizens by requiring them to basically carry out the job of the agency." *Id.* Accordingly, plaintiffs need not "provide an exhaustive list of all violations." *Id.* at 951; *see also Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1247 (3rd Cir. 1995) (the notice regulation "does not require that the citizen identify every detail of a violation"). Rather, the question is whether the notice contained a reasonable amount of information. *Tosco,* 309 F.3d at 1158. As required, Sierra Club's Notice specifically identified the statutory and regulatory requirements PGE violated, provided a range of dates of those violations, and included specific examples.

PGE relies heavily on the Eleventh Circuit's decision in *Nat'l Parks Conservation Ass'n v. TVA* in contending that Section V of Sierra Club's Notice is inadequate because it cited regulations in a "shotgun manner." PGE Memo at 30. In *Nat'l Parks,* the Eleventh Circuit upheld the district court's dismissal of the plaintiff's NSPS claim because the notice alleged the defendants "violated all of the requirements of Subpart Da," while the complaint alleged only violations with respect to $SO_2$, not PM and $NO_X$. *Nat'l Parks Conservation Ass'n v. TVA,* 502 F.3d 1316, 1330 (11th Cir. 2007). The court concluded that the notice failed to provide TVA with enough information to identify the alleged violations. *Id.* at 1330. Sierra Club respectfully submits that the Eleventh Circuit misinterpreted the statutory and regulatory requirements for pre-suit notice under the CAA, and that *Nat'l Parks* is contrary to Ninth Circuit precedent on this issue. Indeed, the Eleventh Circuit's analysis leads to the illogical result that plaintiffs cannot choose to let go of claims which, though alleged in good faith at the notice stage, through pleading and discovery turn out to be unsupported. In other words, the case would require plaintiffs to *prove* all of their claims at the notice stage, a result the Ninth Circuit has explicitly

rejected.  *See Waterkeepers*, 375 F.3d at 920.  Therefore this Court should deny PGE's motion to dismiss Claims 11 and 12 for failure to provide sufficient notice of intent to sue.

      **B.**    **Sierra Club Included Sufficient Information in its Notice Regarding PGE's Modification Projects at the Boardman Facility.**

      Sierra Club identified specific modification projects that triggered permitting and reporting requirements and emission limits with which PGE failed to comply.  Notice at 12–17. The Notice specified the particular requirements allegedly violated, including PSD, NSPS Subpart Da, and specific provisions of Oregon's SIP and PGE's Title V permit.  *Id.*  Further, Sections VI, VII, and VIII of the Notice provided PGE with the specific standards allegedly violated, the activities that constituted the violations, and a time frame for those violations.  *Id*. PGE attacks the sufficiency of these allegations, however, because the Notice referred to "related projects" and other modifications that may have occurred at PGE Boardman but are currently unknown to Sierra Club.[10]

      PGE's argument fails because Sierra Club complied with all pre-suit notice requirements. In *Tosco*, the plaintiff simply alleged that certain CWA violations had occurred "on each day of ship loading."  *Tosco*, 309 F.3d at1158.  The Ninth Circuit held the notice was sufficient because the notice regulation does not require a plaintiff to provide the exact dates of alleged violation, but only requires "sufficient information *to permit the recipients* to identify… the date or dates." *Id.* at 1158–59 (quoting 40 C.F.R. § 135.3(a)) (emphasis by court).  The court concluded that as a practical matter, the defendant was "obviously in a better position than [the plaintiff] to identify the exact dates, or additional dates, of its own ship loading."  *Id*.  Likewise, PGE has specific knowledge of projects it conducted at the Boardman facility.  Thus, PGE is in the best position to know the specifics of the modification projects that triggered violations of reporting and

---

[10] As discussed above in Section I.C., Sierra Club does not fully understand whether PGE is attacking its Notice or its Complaint, but both are sufficient, and PGE's arguments must fail.

permitting requirements and emission limitations.

A district court reached a similar conclusion in the CAA context. In *Fried v. Sungard Recovery Servs., Inc.,* plaintiffs sent a notice letter alleging defendants violated the CAA by "repeatedly conducting renovations" at a specified location in violation of the "National Emissions Standard for Asbestos," and that these violations "occurred repeatedly between 1990 and 1994 and are continuing." 900 F.Supp. 758, 765 (E.D.Pa. 1995). The court held that plaintiff satisfied the notice requirements because the notice "provid[ed] enough information for the recipient to identify the specific standard allegedly violated…limit[ed] the alleged violations to discrete period of time… and [provided] the location of alleged violations." *Id.* at 765. Similarly, Sierra Club provided the specific standards PGE allegedly violated, limited the alleged violations to a particular period of time, and provided the location of the alleged violations.

Moreover, Sierra Club's reference to "related projects" in its Complaint does not improperly broaden the Notice. In *Hercules,* plaintiffs sent defendant notice of their intent to sue for 68 discharge violations of the Clean Water Act. Plaintiffs' complaint, however, also alleged monitoring and reporting violations and 87 discharge violations, 30 of which pre-dated the notice but were not included in the notice. 50 F.3d at 1241. The Third Circuit concluded that the district court had improperly placed the burden on the plaintiffs to identify any activity that may constitute a violation and every pre-complaint date on which there was a violation, rather than just the specific standard or limitation allegedly violated. *Id.* at 1247. The court noted that "[o]nce the discharge violation is noticed, any subsequently discovered monitoring, reporting or recordkeeping violation that is directly related to the discharge violation may be included in the citizen suit." *Id.* at 1248; *see also Bosma Dairy,* 305 F.3d at 953 (holding the plaintiffs could sue for violations not alleged in their notice because those violations "originated from the same

source, were of the same nature, and were easily identifiable") . Thus, Sierra Club could have alleged violations based on these "related projects" and other modification projects in its Complaint, *even without* referencing "related projects" in its Notice.  Thus, Sierra Club complied with pre-suit notice requirements with respect to the related modification projects.

## III.  The Statute of Limitations Does Not Bar Sierra Club's PSD Claims Because PGE's Failure to Comply with PSD Requirements and Operate with BACT Emission Limits Are Violations that Accrue Anew Each Day.

Under the CAA and Oregon's SIP, PGE has an ongoing duty to meet PSD requirements and operate in compliance with BACT emission limitations.  Sierra Club alleges that PGE is *presently* in violation of these requirements.  Sierra Club's claims are thus timely, and the Court should deny PGE's request to dismiss its fifth, sixth, seventh, and eighth claims for relief.[11]

Because the CAA does not contain a statute of limitations, the general federal statute of limitations, 28 U.S.C. § 2462, applies.  *Nat'l Parks Conservation Ass'n v. TVA*, 480 F.3d 410, 416-17 (6th Cir. 2007).  The statute provides in full:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within *five years from the date when the claim first accrued* if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462 (emphasis added).  The statute of limitations applies exclusively to legal

---

[11] PGE also moves to dismiss parts of Sierra Club's NSPS claim (Claim 1) based on the statute of limitations.  Sierra Club's Complaint alleges that, for each of the modifications at PGE Boardman that triggered the NSPS requirements, PGE was required to notify EPA before commencement of construction and conduct performance tests upon completion of construction.  Complaint at ¶¶ 166-67, citing 40 C.F.R. §§ 60.7, 60.8.  PGE moves to dismiss these aspects of Claim 1 with respect to those plant modifications that occurred before January 15, 2003.  PGE contends that the applicable regulations create one-time obligations, and thus the statute of limitations began to accrue for each at the commencement or completion of the modification respectively.  Sierra Club agrees that this aspect of its NSPS claim is limited to post-January 15, 2003 modifications.

remedies.  *See U.S. v. Telluride Co.*, 146 F.3d 1241, 1246-47 (10th Cir. 1998).[12]

PGE argues that Sierra Club's PSD claims are barred by the statute of limitations, reasoning that: (1) PSD permits must be obtained before construction; (2) because the CAA prohibits construction without a permit, the illegal action is the commencement of construction; (3) thus the statute of limitations begins to accrue at the time of construction; and (4) any claims brought more than five years after the commencement of construction at PGE Boardman are time-barred.  Essentially, PGE argues that it may be illegal to *commence construction* without a preconstruction permit, but it is not illegal to *operate* without one.  In support of its argument, PGE relies not on the plain language of the CAA or the Oregon SIP, but instead on cases which have either applied a fundamentally flawed analysis of the CAA, or attempted to fit the analysis into the confines of the "continuing violation" doctrine.  Because neither approach is correct, this Court should reject PGE's arguments and instead follow the Sixth Circuit's reasoning in *Nat'l Parks*.  Like the claims at issue in *Nat'l Parks*, Sierra Club's claims here are based on a series of discrete violations occurring within the statute of limitations, and are thus timely.

### A.    Under the CAA PGE Has an Ongoing Duty to Comply with PSD Requirements and Operate in Compliance with BACT Emission Limits.

The PSD program addresses the impact on ambient air quality resulting from newly constructed or modified pollutant-emitting facilities.  The PSD program requires certain pollution sources to obtain PSD permits prior to construction or modification.  Though referred to as "preconstruction requirements," it is clear that Congress intended PSD permits to restrict

---

[12] Thus, the statute of limitations, if applicable, would only affect Sierra Club's claims for penalties.  *See* Section IV, below.

ongoing operations at a source post-construction.[13]

42 U.S.C. § 7475 (a)(1)-(2) provide, in part, that "[n]o major emitting facility . . . may be constructed[14] . . . unless . . . a permit has been issued" and the facility meets several other requirements.  Importantly, the facility must obtain a permit "setting forth emission limitations . . . which conform to [the CAA]," and the facility must be *subject to the best available control technology [BACT]* for each pollutant subject to regulation." 42 U.S.C. § 7475(a)(1) and (4) (emphasis added).  BACT is "an emission limitation based on the maximum degree of reduction of each pollutant" emitted from the facility.  42 U.S.C. § 7479(3).  An emission limitation is defined as "a requirement . . . which limits the quantity, rate, or concentration of emissions of air pollutants *on a continuous basis*, including any requirement relating to the operation or maintenance of a source to assure *continuous emission reduction*. . ."  42 U.S.C. § 7602(k) (emphasis added).  Thus BACT is an ongoing requirement that applies beyond the time of construction or modification.  Though Congress clearly intended the BACT determination to be made through the permitting process, prior to construction, nothing in 42 U.S.C. § 7475 supports the conclusion that a facility's duty to comply with a BACT emission limitation ceases upon construction or modification.

Other provisions of 42 U.S.C. § 7475 demonstrate that PSD requirements apply not just at the time of construction, but also during operation.  For example, no major emitting facility may be constructed unless "the owner or operator . . . demonstrates . . . that emissions from

---

[13] "The CAA statutory scheme contemplates at least two different types of air permits unhappily named 'preconstruction permits' and 'operating permits,' with confusion easily resulting from the fact that preconstruction permits often include limits upon a source's operations." *U.S. v. Marine Shale Processors*, 81 F.3d 1329, 1355-56 (5th Cir. 1996).

[14] 42 U.S.C. § 7479 provides that the term construction includes "modification" as defined in 42 U.S.C. § 7411(a).  Section 7411(a) defines modification as "any physical change in, or change in the method of operation of, any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."

construction or *operation* of such facility will not cause, or contribute to air pollution in excess

of" specified requirements.  42 U.S.C. § 7475(a)(3) (emphasis added).  Subsection 7475(a)(7)

also creates ongoing monitoring obligations:

> the person who owns or operates, or proposes to own or operate, a major emitting facility for which a permit is required under this part *agrees to conduct* such monitoring as *may be necessary* to determine the effect which emission from any such facility *may have*, or is having, on air quality in any area which *may be affected* by emissions from such source.

(emphasis added).  Section 7475(d) provides that PSD permits must contain specific limitations

on emissions from operating facilities, and Section 7475(e) further specifies provisions that PSD

permits must contain related to monitoring the emissions from operating facilities.  42 U.S.C. §

7475(d) and (e) .  These requirements clearly apply to the ongoing operation of a source.

These statutory provisions demonstrate that PSD permits govern source operation, not

just construction or modification.  They also demonstrate that operating without a PSD permit

and BACT emission limit is an ongoing violation, not a singular violation that ceases after the

first day of construction.  As one court explained, it is "illogical to conclude that a defendant

may only be held liable for constructing a facility, rather than operating such facility, without

complying with the [PSD] requirements."  *U.S. v. Am. Elec. Power*, 137 F. Supp.2d 1060, 1066

(S.D. Ohio 2001).  As demonstrated by these CAA provisions, Congress did not intend such an

illogical result.

    **B.**    **Oregon's SIP Creates an Ongoing Duty to Meet PSD Requirements and Operate in Compliance with BACT Emission Limits.**

As explained above, since 1981 Oregon has had authority from EPA to implement the

PSD program through its SIP.  Remarkably, absent from this section of PGE's brief are any

citations to applicable Oregon SIP provisions.  However, the Oregon SIP creates an ongoing

obligation to meet PSD requirements and operate in compliance with BACT emission limits.

First, the Oregon SIP requires that a facility making a major modification "*shall apply BACT* for each pollutant emitted at a significant emission rate." OAR 340-224-0070(1)[15] (emphasis added). BACT, in turn, is defined in pertinent part as:

> *an emission limitation*, including, but not limited to, a visible emission standard, based on the maximum degree of reduction of each air contaminant subject to regulation under the Act which would be emitted from any proposed major source or major modification which, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, is achievable for such source or modification[.]"

OAR 340-200-0020(15) (emphasis added). Oregon's SIP also expressly provides that a facility's duty to meet the SIP requirements does not cease upon approval to construct or modify the facility. Rather, the duty to comply with the SIP and other federal and state requirements is ongoing. Specifically, OAR 340-224-0030(2)(b) provides:

> Approval to construct does not relieve any owner or operator of the responsibility to comply fully with applicable provisions of the State Implementation Plan and any other requirements under local, state or federal law.

Consequently, the owner/operator duties for "proposed major modifications" are ongoing even if permits should be obtained prior to beginning the modification. Several courts have relied on nearly identical SIP provisions in rejecting defendants' statute of limitations arguments. *See U.S. v. Duke Energy,* 278 F.Supp. 2d 619, 652 (M.D.N.C. 2003) *vacated on other grounds in Envt'l Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) (North Carolina and South Carolina SIPs), *Nat'l Parks*, 480 F.3d at 418 (Tennessee SIP), and *U.S. v. E. Ky. Power Coop., Inc.*, 498 F .Supp. 2d 970, 974 (E.D. Ky.2007); (Kentucky SIP).[16]

The only reference to the Oregon SIP in this section of PGE's brief is its statement that

---

[15] All references to Oregon SIP provisions in this section of Sierra Club's brief are to the current EPA-approved SIP provisions contained in Exhibit A.

[16] For the Court's convenience, Sierra Club has compiled a table containing excerpts of the relevant provisions of the SIPs relied on by these courts, as well as the parallel Oregon SIP provisions. The table is attached to this memorandum as Exhibit B.

Oregon's program requires a permit in advance of making a modification but separately requires a Title V operating permit. PGE Memo at 16. Here PGE simply invites the Court to compare *generally* Oregon's *entire* PSD program[17] to the *entire* Title V program. The actual provisions of the Oregon PSD program, however, do not support PGE's argument, as illustrated above.

Moreover, the fact that Oregon has both a PSD program and a separate Title V program is irrelevant. "[T]he Title V operating permit program does not supplant the PSD program. Title V does not establish additional substantive requirements, but merely brings together applicable requirements, such as the PSD provisions, into one permitting scheme." *Duke Energy*, 278 F.Supp.2d at 651-52. The PSD program's ongoing operational requirements must be included in Title V permits, but those requirements exist independently, by virtue of the PSD provisions of the CAA and Oregon's SIP. Thus the fact that Oregon has a Title V operating permit program is irrelevant to the question of whether PSD requirements are ongoing.

Further, PGE should not be able to avoid claims for violations of the PSD provisions by relying on the existence of its Title V permit. Unfortunately, several courts have accepted the same red herring argument PGE advances. *See e.g.*, *New York v. Niagara Mohawk Power*, 263 F.Supp.2d 650, 662 (W.D.N.Y. 2003) ("Continuing violations are more appropriately enforced through the operating permit requirements."). But Sierra Club cannot bring these particular claims against PGE for violating its Title V operating permit *because its Title V permit does not contain PSD/BACT limits*. The permitting authority, Oregon DEQ, has never determined what BACT is for PGE Boardman precisely because PGE violated the requirement to go through the PSD process prior to construction or modification of the plant.

Finally, with respect to Oregon's PSD program, PGE attempts to distinguish cases that

---

[17] The program cited by PGE, OAR 340, Division 224, is referred to as "Major New Source Review," and includes Oregon's PSD program.

have rejected the statute of limitations defense by noting that the state programs at issue in those cases had combined preconstruction and operating permits. *See* PGE Memo at 16 and n.16. However, the proper analysis does not turn on whether a state has a one-step or two-step permitting process. One of the cases PGE attempts to distinguish on this basis even acknowledges that the combined nature of the permitting program is of questionable relevance to the analysis. *See Duke Energy*, 278 F.Supp.2d at 652. Under either type of state program, a plant making a modification must obtain a PSD permit, and this permit must contain operational limits. Although some states require separate construction and operation permits, the SIP's PSD requirements themselves impose conditions on the facility's operation. This Court should thus reject PGE's argument because it is premised on a false distinction between operating and construction permits, and it is completely untethered from the actual Oregon PSD program.

### C. Sierra Club's Suit is Timely Because PGE Violates the Law Each Day it Operates Without Complying with PSD Requirements.

Each day PGE operates the Boardman plant constitutes a discrete violation of CAA and the Oregon PSD program. Sierra Club's claims are not barred because they are based on discrete violations within the statute of limitations.

PGE mischaracterizes the basis for Sierra Club's claims. PGE argues that Sierra Club is improperly trying to avoid the statute of limitations by alleging continuing harms based on past wrongdoing. *See* PGE Memo at 15. As demonstrated above, both the CAA and Oregon's PSD program establish requirements that continue to apply to the operation of an unlawfully constructed or modified plant. While it is certainly true that PGE's past illegal actions have continuing "ill effects" on the environment and public health, Sierra Club's claims are based on discrete PSD violations occurring within the statute of limitations.

Some courts have been led astray by attempting to fit the PSD analysis into the

"continuing violations doctrine" based on the notion of continuing effects of claims that accrued

outside of the statute of limitations.  *See* PGE Memo at 14-15, and n. 15 (citing district court

cases applying "continuing violations doctrine").  But, as the Sixth Circuit concluded in *Nat'l*

*Parks*, "[w]e need not decide whether the continuing-violation doctrine applies in environmental

suits, as we conclude this case presents a series of discrete violations rather than a single

violation that may or may not be 'continuing' in nature."  480 F.3d at 417. The Sixth Circuit held

that "failing to apply BACT is actionable, and this cause of action *manifests itself anew each day*

*a plant operates without BACT limits* on emissions."  *Id*. at 419 (emphasis added). Likewise, the

court concluded that the failure to obtain a permit with the necessary requirements is a separate

violation which manifests itself each day the plant operates.  *Id*. The Sixth Circuit's logic applies

with equal force here; and, indeed, the Tennessee SIP provisions upon which the court based its

analysis are nearly identical to Oregon's SIP requirements.  *See* Exhibit A.  Each day PGE

operates the Boardman plant without a PSD permit and BACT emission limitations thus

constitutes a new claim for CAA and PSD program violations.[18]

PGE fails to discuss the Sixth Circuit's well-reasoned analysis and instead relies heavily

on the Eleventh Circuit's analysis in the parallel case, *Nat'l Parks Conservation Ass'n v. TVA*,

502 F.3d 1316 (11th Cir. 2007).   The Eleventh Circuit's analysis was significantly flawed,

however, because it was based on a sharp distinction between construction and operating permits

which is unsupported by the CAA, because it ignored several important statutory provisions of

the PSD program, and because it misapplied the Alabama SIP provisions at issue in the case.

Indeed, even though TVA had *prevailed* below, the U.S. Solicitor General's brief (on behalf of

---

[18] *See also Duke Energy*, 278 F.Supp.2d. at 651 ("[E]ach day that Duke operates an allegedly
modified plant and emits pollutants into the atmosphere, it may be in violation of the requirement
to comply with the operation conditions, i.e., the emission limitations, that would have been
contained in a PSD permit had Duke Energy submitted to the permitting process.")

TVA and the federal government as a whole) before the Supreme Court on the plaintiffs' petition for writ of certiorari *entirely repudiated* the Eleventh Circuit's analysis. *See Nat'l Parks, Cert Pet.* No. 07-867, Resp. Br. in Opp. at 9-22 (May 23, 2008) (attached as Exhibit D). Thus PGE's reliance on the Eleventh Circuit's decision is significantly misplaced.

Moreover, the flaws in PGE's reasoning are quite apparent if the Court compares Sierra Club's NSPS claim to its PSD claims. PGE did not seek to dismiss the NSPS $SO_2$ emissions violations claim on statute of limitations grounds because it knows that once a source becomes subject to an NSPS subpart, that source must comply with the emission limitations imposed by that subpart every day. In other words, a modified power plant becomes a "Subpart Da source." Similarly, a modified power plant may become a "PSD source." Once that status is attained, the source becomes subject to PSD emission limitations.

The structural difference between the PSD program and the NSPS program is that the PSD program imposes emission limits first through a permit, whereas the NSPS program does not. Thus, in the NSPS context, if a source has been violating its emission limits continually for more than five years, the statute of limitations is no bar to bringing claims for those violations occurring today. Similarly, in the PSD context, a source operating without a PSD permit is emitting pollution in excess of the emission limits it would have obtained had it gone through the permitting process. And the statute of limitations is no bar to claims for those current violations.

Finally, contrary to PGE's assertions, Sierra Club is not calling for a "de facto elimination of any statute of limitations." *See* PGE Memo at 15. Sierra Club recognizes it is limited to seeking penalties for violations occurring during the preceding five years. Sierra Club is also not attempting to trick the Court by pleading its claims as "continuing violations." *See* PGE Memo at 11, 13. To be sure, Sierra Club's fifth claim is closely related to its sixth claim;

and Sierra Club's seventh claim is closely related to its eighth claim. Sierra Club pleaded the claims as it did because, as the Sixth Circuit's analysis makes clear, PGE is presently in violation of the law both by operating without a PSD permit and by operating without complying with BACT emission limitations. Sierra Club pleaded these as separate claims out of an abundance of caution precisely because Sierra Club was aware of the confusion that has ensued in the case law, and because Sierra Club expected PGE to do exactly what it did – attempt to characterize all PSD requirements as one-time obligations that terminate at the time of construction.

### D.    Adoption of PGE's Arguments Would Create a Perverse Incentive for Facilities to Begin and Continue Construction in Violation of the CAA.

PGE's position taken to its logical ends would mean that only the first day of construction in violation of PSD requirements is actionable for penalty purposes. Under PGE's reasoning, those PSD claims which are not barred by the statute of limitations could be considered only one-time violations for purposes of calculating penalties if Sierra Club prevails. If this position were adopted, facilities would have tremendous incentives to begin and continue construction in violation of the PSD program, because a single penalty of $32,500 is woefully inadequate to outweigh the financial benefit of avoiding PSD. As the court explained in *Duke Energy*, "it could be in certain circumstances more cost-effective to avoid permit obligations altogether and, if challenged, litigate the claim endlessly with little incentive to settle and no downside risk of an increasing fine." 278 F.Supp.2d at 652. This cannot be the result Congress intended.

EPA has consistently interpreted Section 7413(a)(5) of the CAA as authority to impose civil penalties when it finds a facility has been constructed or modified out of compliance with the PSD program. *See* Eric Schaeffer, Reduced Penalties for Disclosures of Certain Clean Air

Act Violations (Sept. 30, 1999).[19]  In a memorandum explaining certain EPA penalty policies, EPA clearly stated that "companies always remain subject to enforcement action for violations uncovered later," and "sources are never relieved of the obligation to comply with PSD/NSR requirements." *Id.* at 3.

Moreover, the obligation to comply with PSD requirements is far from a ministerial obligation to obtain a permit prior to construction or modification.  PSD avoidance results in the illegal emission of thousands of tons of air pollution per year.  U.S. EPA, Compliance and Enforcement National Priority: Clean Air Act, New Source Review/ Prevention of Significant Deterioration (November 2004).[20]  EPA explains:

> Noncompliance with NSR/PSD provisions of CAA results in inadequate control of emissions and the release of thousands of tons of illegal pollution into the atmosphere each year. These illegal emissions aggravate already poor air quality in places that are designated non-attainment areas because they do not meet air quality standards, threaten to drive areas with good air quality into non-attainment status, and have a significantly negative impact on public health and the environment.

*Id.*[21]  These policy statements evince EPA's strong and consistent position that construction without adherence to the requirements of the PSD program is an ongoing violation subject to civil penalties for each day of violation within the applicable statute of limitations period.[22]  For

---

[19]Available at: <<http://www.epa.gov/region7/programs/artd/air/title5/t5memos/redpen.pdf>>

[20] Available at: <<http://www.epa.gov/compliance/resources/publications/data/planning/priorities/fy2005priority caansrpsd.pdf>>

[21] Illegal pollution from PGE Boardman is no exception. Assuming a modest 80% reduction would have been imposed as a BACT emission limitation when the 1997 boiler modification occurred, PGE has emitted approximately 134,760 tons of sulfur dioxide and 102,297 tons of nitrogen oxides illegally over the years.  These amounts were calculated using the 2007 reporting year actual emissions x an 80% reduction over the past 12 years.

[22] When Congress expressly delegates authority, the courts have "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer."  *United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2000) (quoting *Chevron*, 467 U.S. at 844).

all of these reasons, the Court should reject PGE's arguments and conclude that Sierra Club's claims are timely.

**IV.    The Concurrent Remedy Doctrine Does Not Bar Sierra Club's Claims for Injunctive Relief.**

The concurrent remedy doctrine does not apply to Sierra Club's claims for injunctive relief because the legal and equitable relief Sierra Club seeks have different goals and effects. PGE argues that because Sierra Club's claims for civil penalties are barred under the statute of limitations, Sierra Club's equitable claims for injunctive relief are also barred.  As explained above, Sierra Club's claims for civil penalties are not barred.  Even if the statute of limitations did bar Sierra Club's penalty claims, however, the concurrent remedy doctrine would not bar its claims for injunctive relief.

On its face, the statute of limitations only applies to claims seeking a "civil fine, penalty, or forfeiture."  28 U.S.C. § 2462.  Courts have therefore held that 28 U.S.C. § 2462 does not bar injunctive relief as a matter of law.  *See U.S. v. Telluride Co*., 146 F.3d 1241, 1245 (10th Cir. 1998) (CWA); *U.S. v. Cinergy Corp*., 397 F.Supp.2d 1025, 1031 (S.D. Ind. 2005) (CAA).  The Supreme Court has held that "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."  *Porter v. Warner Holding Co*., 328 U.S. 395, 398 (1946).  The concurrent remedy doctrine, a narrow exception to this rule, states that "equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy."  *Cope v. Anderson*, 331 U.S. 461, 464 (1947).  Here, the concurrent remedy doctrine could only bring Sierra Club's injunctive claims under 28 U.S.C. § 2462's scope if they were concurrent with the legal remedy Sierra Club seeks.  As explained below, because the legal and equitable remedies have different goals and effects, they are not concurrent.

The Supreme Court applied the concurrent remedy doctrine in *Cope*, an action in equity to enforce the legal right to collect assessments on shares from insolvent national banks, because "it [was] only the scope of relief sought and the multitude of parties sued which [gave] equity concurrent jurisdiction to enforce the legal obligations [there] asserted." *Cope*, 331 U.S. at 463-64. In other words, "[t]he concurrent jurisdiction stemmed from the scope of that relief (i.e., bringing the class of stockholders in one suit), and it was invoked to enforce that legal obligation—not to provide a remedy that was within its exclusive jurisdiction (i.e., an injunction)." *Fed. Election Comm'n v. Christian Coal.*, 965 F. Supp. 66, 72 (D.D.C. 1997) (discussing the nature of the relief sought in *Cope*). Thus, in *Cope*, the concurrent remedy doctrine barred equitable claims substituted for legal claims.

Unlike in *Cope*, Sierra Club's claims for injunctive relief are not identical to its claims for civil penalties. Rather, the CAA explicitly provides for equitable relief as a remedy distinct from civil penalties. The CAA provides that district courts have jurisdiction to (1) enforce an emission standard or limitation and (2) to apply appropriate civil penalties. 42 U.S.C. § 7604(a). Equitable and legal remedies under the CAA have distinct goals and effects: the purpose of equitable remedies is to halt pollution that threatens the environment, while the purpose of civil penalties is deterrence. *See Cinergy Corp.*, 397 F.Supp.2d at 1032 (S.D. Ind. 2005); *see also Commonwealth of Pennsylvania v. Allegheny Energy, Inc*., No. Civ. A. 05-885, 2006 WL 1509061 at *5 (W.D. Pa. April 19, 2006) (refusing to bar plaintiffs' injunctive claims even though civil penalties were time-barred); *N.Y. v. Am. Elec. Power Serv. Corp*., Nos. 2:04 CV 1098, 2:05 CV 360, 2006 WL 1331543 at *9 (S.D. Ohio March 21, 2006) (same). Because the CAA establishes separate goals and effects for legal and equitable relief, Sierra Club's claims for injunctive relief are not concurrent with its claims for civil penalties.

PGE urges an overbroad application of the concurrent remedy doctrine. Under PGE's interpretation of the doctrine, whenever "'both legal and equitable relief [are] sought . . . the statute of limitations bars both.'" PGE Memo at 17 (quoting *United Transp. Union v. Fla. E. Coast Ry. Co.*, 586 F.2d 520, 524 (5th Cir. 1978)). In *United Transportation*, the Fifth Circuit does not even discuss the concurrent remedy doctrine. The question presented was whether a state's statute of limitations should apply to the plaintiffs' claim for back pay under the Railway Labor Act. *United Transportation*, 586 F.2d at 525. The court determined that the remedy sought was more analogous to damages, a legal remedy, and was thus barred by the statute of limitations. The court noted that its holding was limited to the plaintiffs' legal claims. *Id.*

PGE once again relies on the Eleventh Circuit's decision in *Nat'l Parks*, which applied the concurrent remedy doctrine to equitable claims under the CAA. In that case, the court stated that "civil penalties and equitable relief . . . are concurrent because 'an action at law or equity could be brought on the same facts.'" *Nat'l Parks*, 502 F.3d at 1327 (citations omitted). The Eleventh Circuit was incorrect. A close reading of the case shows that the Eleventh Circuit drew its definition of "concurrent" from a district court case that found the concurrent remedy doctrine applicable "when legal and equitable relief are available concurrently (*i.e.*, when an action at law or equity could be brought on the same facts)." *U.S. v. Windward Props.*, 821 F.Supp. 690, 693 (N.D. Ga. 1993), *abrogated by U.S. v. Banks*, 115 F.3d 916 (11th Cir. 1997). However, the *Windward* court cited no authority for its "*i.e.*" addition to the *Cope* rule, and PGE supplies no additional support for this expansive application of the concurrent remedy doctrine. The nature of the relief provided, rather than the underlying basis of the right, determines whether equitable jurisdiction is exclusive or concurrent. This court should decline to adopt PGE's expansive definition of "concurrent," and should allow Sierra Club's claims for injunctive relief to go

forward regardless of its ruling on Sierra Club's legal claims.

**V.      Sierra Club's PSD Claims are Proper as PGE Has Not Demonstrated that It Commenced Construction by the Regulatory Deadline as a Matter of Law.**

Claims 5 and 6 allege violations of the PSD program for construction and operation of Boardman without the proper permits and not in compliance with BACT emission limits.  With respect to the initial construction of PGE Boardman, both the CAA and EPA's regulations govern the analysis.  EPA promulgated the regulatory PSD program in 1974 pursuant to its obligation under the 1970 CAA to require states to implement plans to prevent significant deterioration of air quality in areas where minimum standards had already been attained.  39 Fed. Reg. 42,510, 42,514 (Dec. 5, 1974); *See Alabama Power,* 636 F.2d at 347.  In 1977, Congress amended the CAA to include a statutory PSD program.  42 U.S.C. §§ 7470 – 7492.

Sierra Club alleges that PSD is applicable to Boardman because PGE had not "commenced" construction within the meaning of either the 1974 PSD Regulations or the 1977 PSD Amendments by the deadlines, and Boardman was therefore improperly "grandfathered." Compl. ¶¶ 204-06; 217-22.  As the Second Circuit explained when reversing a district court's decision to dismiss a CAA citizen suit under 42 U.S.C. § 7604(a)(3) for failure to state a claim:

> The plaintiffs have alleged that the proposed factory will be a major emitting facility within the meaning of the Act and that [defendant] has not obtained the permits required by Part D for major emitting facilities . . . .  At this stage of the litigation, the district court was required to accept these allegations as true.  It is therefore difficult to see in what respect the plaintiffs have failed to state a cause of action.

*Weiler v. Chatham Forest Prods.*, 392 F.3d 532, 538 (2nd Cir. 2004) (internal citations omitted). Just like the plaintiffs in *Weiler*, Sierra Club has alleged that PGE constructed and continues to operate a major emitting facility without satisfying the requirements of the PSD program.  Sierra Club has thus adequately stated a claim for relief.

PGE argues that it "commenced" construction before the regulatory deadlines.  PGE

claims that a 1975 EPA determination that PGE was not subject to the 1974 PSD regulations

proves as a matter of law that it had "commenced construction."  PGE Memo at 20-2; Exhibit 1

to PGE's Memo.  PGE further claims that a 1975 Site Certification Agreement ("Site

Certification"), attached as Exhibit 2 to PGE's Memo, constitutes "all necessary preconstruction

approvals and permits" under the 1977 PSD Amendments.[23]  PGE Memo at 22-24.  PGE's

arguments must fail, however, because whether PGE "commenced" construction involves factual

findings and the attached documents do not conclusively establish that PGE "commenced"

construction by the regulatory date as matter of law.

> **A.    EPA's 1975 Determination Fails to Prove PGE had "Commenced"**
> **Construction by June 1, 1975 as a Matter of Law.**

The 1974 regulations "grandfathered" sources that had commenced construction by June

1, 1975.  Under the 1974 PSD regulations, "commenced" was defined as "undertaken a

continuous program of construction or . . . entered into a binding agreement or contractual

obligation to undertake and complete, within a reasonable time, a continuous program of

construction . . . ."  40 C.F.R. § 52.21(b)(7) (1975).  Because PGE had not commenced actual

on-site construction, it must rely on a contractual obligation to meet this test.  EPA interprets

"contractual obligation" as requiring a contract for continuous on-site construction work which

will subject the owner/operator to "substantial loss" if it abandons the project.  Memorandum

from Roger Strelow, Assistant Administrator for Air and Waste Management, U.S. EPA, to

Regional Administrators (April 1976).[24]  Only in the rare case where a non-site-work contract

"irrevocably commits" the source to full construction does a non-site-work contract suffice.  *Id.*

---

[23] Courts may consider documents when dealing with a 12(b)(6) motion in limited
circumstances.  *Fecht v. The Price Co.*, 70 F.3d 1078 , 1080 n.1 (9th Cir. 1995).  Attaching
documents to a motion to dismiss does not automatically convert it into a motion for summary
judgment.  *Id.*

[24] Available at:
<<http://http://www.epa.gov/region07/programs/artd/air/nsr/nsrmemos/comconst.pdf>>

The Westinghouse turbine letter of intent that EPA notes in PGE Exhibit 1 is not before this Court. Determining whether that agreement would have caused PGE to suffer a "substantial loss" and whether PGE was "irrevocably committed" to the project requires review of the agreement and other facts surrounding the initial construction of Boardman, making this an issue this Court cannot resolve as a matter of law. Sierra Club's claim should thus not be dismissed based on PGE Exhibit 1.

PGE also argues that Exhibit 1 settles, as a matter of law, that PGE had "commenced" construction because EPA so determined. PGE's argument must fail, however, because PGE is not protected from citizen suit liability by EPA's determination. A court may effectively overturn an agency determination that a permit is not required. That is, a citizen suit for failure to satisfy obligations under the CAA will not be barred by an agency determination that the obligations are inapplicable. *Ass'n to Protect Hammersly, Eld, and Totten Inlets v. Taylor Res.*, 299 F.3d 1007, 1011-12 (9th Cir. 2002). In *Hammersley*, plaintiff alleged unpermitted discharges even though the agency refused to accept or process the defendant's Clean Water Act permit application. *Id.* at 1011. After holding that agencies do not have exclusive authority to determine if a permit is required, the Ninth Circuit ultimately determined that a permit was not required. *Id.* at 1012; *See also Ass'n of Irritated Residents v. C&R Vanderham Dairy*, 2006 WL 2644896 at *13 (E.D. Cal., Sept. 14, 2006) (agency determination that a CAA permit was not required did not bar citizen suit). Thus, EPA's determination does not irrevocably answer the question of whether PSD applied to Boardman from the beginning.[25]

---

[25] Moreover, though this question is not properly before the Court on a motion to dismiss, Sierra Club's position is that EPA's determination was simply incorrect. EPA has even subsequently admitted as much. *See Montana Power v. EPA*, 608 F.2d 334, 347 (9th Cir. 1979) (stating "[t]he EPA has since admitted it mistakenly exempted [PGE Boardman] from PSD review and permitting on the basis of a turbine generator contract").

**B.      The 1975 NTEC Site Certification Agreement Did Not Constitute "All Necessary Preconstruction Approvals and Permits."**

When it codified the 1974 EPA PSD regulatory program, Congress changed the definition of "commenced." Thus, if PGE cannot show that it had commenced construction before June 1, 1975, to avoid PSD review, PGE must have satisfied the 1977 CAA definition of "commenced." The 1977 CAA definition of "commence" requires that an owner or operator must have "obtained all necessary preconstruction approvals and permits required by Federal, State, or local air pollution agencies and air quality laws or regulations *and* either [actual physical construction or contractual obligation to undertake a continuous program of construction]" before August 7, 1977 to be exempt from PSD. Pub. L. No. 95-95 § 127(a), 91 Stat. 685 (1977) (emphasis added). Sierra Club alleges that PGE had not obtained "all necessary preconstruction approvals and permits" by August 7, 1977, and thus had not "commenced" construction by that date. Compl. ¶¶ 204-206; 217.

PGE argues that the Site Certification bound all state agencies to issue all other permits required by the Site Certification. Obtaining the Site Certification did not constitute "all necessary preconstruction approvals and permits" by the applicable date, however, because PGE had not yet applied for and received the permits upon which the Site Certification was explicitly conditioned. The Site Certification lists 13 categories of "approvals, permits, licenses or certificates . . . considered necessary to construction or operation" which "shall be applied for and obtained by PGE including payment of any associated fees." Compl. ¶ 123; PGE Ex. 2, § IV(K). Thus, the Site Certification became effective when PGE met those conditions, one of which was application for, and receipt of, an air contaminant discharge permit ("ACDP"). PGE Ex. 2, § IV(K)(8)(e). PGE did not obtain an ACDP until December 6, 1979. Compl. ¶ 128. Thus, according to Sierra Club's allegations, PGE had not commenced construction by August 7,

1977.  Therefore, the Court must deny PGE's Motion to Dismiss Claims 5 and 6.

**VI.    Changes that Significantly Increase Pollution from Existing Sources in Oregon are Subject to PSD, and PGE's Interpretation of the Oregon PSD Program's Definition of "Modification" is Antithetical to the Effective Operation of the Program.**

PGE claims that modifications at Boardman are not subject to PSD review because PGE has not requested an increase to the Boardman Plant Site Emission Limit ("PSEL") since the plant began commercial operation.  PGE Memo at 6, 25-26.  PGE argues, essentially, that the Oregon PSD program only regulates increases in permit limits, ignoring *actual* pollution or *potential* pollution and instead focusing on *allowable* pollution.  PGE Memo at 6, 25-26.  PGE's interpretation of the law should be rejected by this Court because it is inconsistent with the plain language of the 1982 and 2003 PSD programs, at odds with a prior interpretation of this Court, thwarts the intent of the CAA PSD program, and leads to absurd results.

Contrary to PGE's argument, the Oregon PSD program has at all times required PSD review and compliance with a BACT emission limitation when a major source makes a change that significantly increases pollution.  When the PSD program was established, existing facilities were grandfathered, but Congress intended that modification of those facilities would trigger the requirement to continuously comply with BACT emission limitations.  *Alabama Power*, 636 F.2d at 400; *WEPCO*, 893 F.2d at 909; *Cinergy*, 458 F.3d at 709.  Consistent with this intent, changes at PGE Boardman that increase *actual* pollution trigger PSD review under Oregon's PSD program.

**A.    The Language of the Oregon PSD Program Has Changed Significantly Since 1982, but has Always Regulated Increases in Pollution over Baseline.**

Sierra Club alleges modifications to PGE Boardman during the mid-nineties through

2004.  Therefore both the 1982 PSD program and the changes approved in 2003 are relevant.[26] The 1982 PSD program defined "major modification" as a physical or operational change resulting in a "net significant emission rate increase." OAR 340-020-225(14)(1982) (renumbered OAR 340-028-0110(57) (1997)) (superceded).[27]  Calculation of the increase must take into account all increases and decreases in "actual emissions" since the "baseline period."  *Id.*  Under the 1982 PSD program, applicability was determined by comparing actual emissions at the source during the baseline period with actual emissions after the change.  *See Oregon Environmental Council v. Oregon Dept. of Environmental Quality*, 1992 WL 252123 at *19 (D. Or. Sept. 24, 1992) (interpreting OAR 340-020-225(15), renumbered OAR 340-028-0110).

In *OEC v. DEQ*, this Court interpreted the definition of "major modification" under the nonattainment new source review program, which is the same definition as in the 1982 PSD program, to mean "any physical or operational alteration of a source of pollutants which results in a net increase in emission of [a specified amount] over its actual emissions since the baseline year."  *Id.*  When discussing a facility that received a permit to construct and operate from DEQ in 1979, as PGE Boardman did, this Court explained that

---

[26] "[T]he legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." *Landgraf v USI Film Prods.*, 511 U.S. 244, 265 (1994) (citations omitted); *see also Hernandez de Anderson v. Gonzalez*, 497 F.3d 927, 935-36 (9th Cir. 2007). Thus, whether PSD became applicable to PGE Boardman must be assessed based upon the Oregon PSD program in place at the time of the modification.  The standards with which PGE must comply if PSD is applicable, however, are found in the current Oregon PSD program. Thus, PGE is currently violating the Oregon PSD program, including the duty to apply BACT, complete an air quality analysis, and monitor ambient air quality.  OAR 340-224-0010; 340-224-0070 (2003)..

[27] The Oregon PSD program has been recodified and renumbered multiple times since 1982, though changes before 2003 were not substantive.  *See* 40 C.F.R. § 52.1970.  For the Court's convenience, in this section Sierra Club will cite to the 1997 provisions, which are the relevant provisions for Sierra Club's pre-2003 modification claims.  All 1997 provisions cited in this section have been superceded by the current Oregon SIP provisions in Exhibit A.  The 1997 provisions are contained in Exhibit C.

> This permit [to construct] was issued before the final approval by the EPA of the new source review regulations of the State of Oregon on November 5, 1981. 46 Fed.Reg. 54950 (1981). Thus, the approval of the DEQ for the construction of the facility [] was not issued pursuant to new source review regulations. Accordingly, the baseline year [] is 1978, and the actual emissions [] in the year prior to the construction of the facility were zero.

*Id.*  This Court further concluded that to define the language of the Oregon PSD program to require an increase in potential emissions rather than actual emissions was in error.  The court noted that, "[a] source's potential to emit [pollution] may not be used to excuse a source from new source review rules if its actual emissions so require..."  *Id.* at *20 (citing *United States v. Louisiana-Pacific Corp.*, 682 F.Supp. 1122, 1133 (D.Colo.1987)).[28]

On January 22, 2003, EPA approved changes to the PSD program.  68 Fed. Reg. 2891 (Jan. 22, 2003).  The definition of "major modification" was changed.  OAR 340-200-0020(66)(a)-(d) (2003).  When approving the change, EPA understood that "[a]ccumulated emission increases from physical or operational changes that exceed the SER would be subject to [PSD]." 68 Fed. Reg. at 2896-97.   The revised "major modification" definition separates sources into two categories: those covered by OAR 340-200-0020(66)(a) and (b), and those covered by OAR 340-200-0020(66)(c).

---

[28] PGE takes the position in its Memo that it is not liable for modification that did not require an increase in PSELs.  PGE Memo at 25-26. PGE does not address the 1982 PSD program, but EPA also approved a separate Plant Site Emission Limits ("PSEL") program in 1982.  The PSEL program did not supplant the PSD program.  The stated goals of the PSEL program were to allow DEQ to assure progress toward attaining the NAAQS, ensure compliance with the NAAQS and maintenance of PSD increments, set the baseline for tracking consumption of PSD increments, and administer trading and netting programs.  OAR 340-028-1010 (1997).  The 1982 PSEL program was not related to the determination of whether a "modification" occurred at a source.  Rather, the PSEL program was a tool to keep track of accumulated changes in actual emissions and applicable regulations at a source that would impact compliance with ambient air quality standards and consumption of increment.  PSD review involves more than these two elements. *See* OAR 340-028-1940 (1997).  Thus, the plain language of the PSEL program indicates that compliance with PSELs does not satisfy PSD.

Under OAR 340-200-0020(66)(a) and (b), a source with an "accumulation of physical changes and changes since baseline [that] would result in a significant emission rate increase" is subject to PSD.  OAR 340-200-0020(66)(b).   In addition to this increase, subpart (a) requires "[a]n increase in the PSEL by an amount equal to or more than the significant emission rate over the netting basis."  OAR 340-200-0020(66)(a).   PSEL is now defined as "the total mass emissions per unit time of an individual air pollutant specified in a permit for a source. . ."  OAR 340-200-0020(88).  "Netting basis" defines "both the baseline emissions from which increases are measured to determine if changes are subject to review, as well as the process for re-establishing the baseline after changes have been through the major source permitting process." 68 Fed. Reg. at 2891.  According to OAR 340-200-0020(71), emission increases that were not approved, or subject to PSD, would not be part of this calculation.

The second category of sources under the definition for "major modification" includes "new or modified major sources that were permitted to construct and operate after the baseline period [1977 or 1978] and were not subject to [PSD]."  OAR 340-200-0200(66)(c).  For these sources, a "major modification" includes "[t]he addition or modification of any stationary source or sources after the initial construction that have cumulative potential emissions greater than or equal to the significant emission rate, excluding any emission decreases."  OAR 340-200-0200(66)(c)(B).  This provision is written in the disjunctive and bears no connection to any requirements for increases in PSEL.  The plain language indicates that *modifications* that have cumulative potential emissions equal to or greater than the significant emission rate will be subject to PSD.  The inquiry is focused on the potential emissions associated with the modification, without regard to the potential emissions of the unmodified source.  Thus, the Oregon PSD program has undergone significant changes since 1982.  The program now more

fully integrates the PSEL program, but the language does not support PGE's position that it should forever escape PSD review because DEQ imposed a PSEL on PGE Boardman. The Oregon PSD program always has, and always must, regulate actual increases in pollution over baseline to preserve air quality and air quality related values.

> **B.**     **Interpreting Oregon's PSD Program to Ensure Regulation of Increases in Pollution Rather than Increases in Permit Limits Avoids Absurd Results and Uncontrolled Increases in Actual Pollution.**

PGE contends that, because Boardman was not "permitted to construct and operate after the baseline period," the facility is of the category subject to subparts (a) and (b) of OAR 340-200-0020(66). PGE Memo at 26. Sierra Club, however, has alleged that PGE Boardman did not operate during the baseline period, and was not permitted to construct and operate until after the baseline period. Compl. ¶ 128, 133. Sierra Club has also alleged that PGE Boardman has never satisfied PSD requirements for any emissions from the plant. Compl. ¶ 136. Taking these allegations as true, PGE Boardman fits squarely within the category of sources regulated by OAR 340-200-0020(66)(c).

Subsection (c) requires plaintiffs to demonstrate that modifications occurred that "have cumulative potential emissions greater than or equal to the significant emission rate." OAR 340-200-0020(66)(c)(B). Sierra Club alleged that PGE made physical changes at the plant that resulted in net significant emission rate increases of regulated pollutants and cumulative potential emissions greater than or equal to the significant emission rate. Compl. ¶ 232-236. Sierra Club has thus adequately stated a claim for relief, and Claims 7 and 8 should not be dismissed.

PGE fails to address how the pre-2003 PSD program should be applied to PGE Boardman. The plain language of the 1982 definition of "major modification" clearly includes the physical changes to the plant alleged in Sierra Club's complaint. The 1982 PSD program defined "major modification" as a physical or operational change resulting in a net significant

emission rate increase considering all accumulated increases and decreases in actual emission at the source since the baseline period or the latest PSD review.  OAR 340-028-0110(57) (1997).  The "baseline period" was defined as either calendar year 1977 or 1978.  OAR 340-028-0110(13) (1997).   "Actual emissions" were defined as mass emissions of a pollutant from a source during a specified time period.  OAR  340-028-0110(3) (1997).  Under the 1982 PSD program, if cumulative increases in actual emissions after a physical change exceeded baseline period actual emissions by more than the significant emission rate, the source is subject to PSD.

Sierra Club alleges that PGE made physical changes at the plant that resulted in net significant emission rate increases of regulated pollutants and cumulative potential emissions greater than or equal to the significant emission rate.  Compl. ¶ 232-236.  Sierra Club has thus adequately stated a claim for relief, and Claims 7 and 8 should not be dismissed.

Adoption of PGE's interpretation of the 2003 PSD program would fail to prevent significant increases of actual emissions due to physical changes at facilities as required by the CAA, and, in the case of PGE Boardman, would allow the plant to double sulfur dioxide emissions without further analysis.  According to PGE, Oregon's program requires that PGE request an increase in Boardman's PSEL before a PSD review is required.  This interpretation is absurd and must be rejected.

The purpose of the CAA's PSD program is "to prevent significant deterioration of air quality in the nation's 'clean air areas[.]'" *Alabama Power*, 636 F.2d at 362.  Moreover, the PSD program is designed to protect air quality in national parks and other special places, and in areas where pollution attains the NAAQS, while allowing economic growth consistent with air quality protection.  *Environmental Defense Fund v. E.P.A.*, 489 F.3d 1320, 1323 (D.C. Cir. 1979).  The PSD program protects the ambient air, thus any regulation to achieve these purposes must be

concerned with the concentration of pollutants in the air. Any interpretation of the Oregon PSD provisions must be consistent with this approach, which measures success based on the quality of the ambient air, not on emissions from individual sources or source categories.[29]

The CAA requires that a new or modified source demonstrate that it will not cause or contribute to a violation of ambient air quality standards, PSD increment, or interfere with air quality related values in federally protected parks and wilderness areas. 42 U.S.C. § 7475(a). These analyses are intended, among other things, to protect visibility and other air quality related values at federally protected parks and wilderness areas. *Id.* If Oregon's PSD program only requires these analyses when a source requests an increase in its PSEL, as PGE claims, Oregon's program would never achieve its purpose because a source with a PSEL higher than its historical maximum emissions could increase actual emissions far above current actual emissions without the analyses required by the CAA. Because compliance with the NAAQS is based on monitoring results of the actual airshed, the PSD program, which is designed to prevent degradation in actual air quality, must be interpreted to regulate actual pollution rather than permit limits.

Applying PGE's argument to Boardman demonstrates the absurdity of PGE's position. Under PGE's interpretation, PGE will never have to comply with PSD for any equipment that it installs and operates at Boardman unless the potential emissions of the new equipment, along

---

[29] A state PSD program, incorporated as part of the SIP, should be interpreted with the underlying statutory requirements in mind because a state PSD program must meet minimum standards set forth in the CAA and federal implementing regulations, is subject to EPA review and approval, and is federally enforceable once approved. 42 U.S.C. §§ 7410(a)(2)(A) and (k), 7413, 7471; 40 C.F.R. § 51.166(a)(6); *Navistar Int'l Transp. Corp. v. EPA*, 858 F.2d 282, 288 (6th Cir. 1988), cert. denied, 490 U.S. 1039 (1989); *Sierra Club v. Administrator*, U.S. EPA, 496 F.3d 1182, 1186 (11th Cir. 2007) (deferring to EPA's reading of a SIP); *American Cyanamid Co. v. United States EPA*, 810 F.2d 493, 498 (5th Cir. 1987) (same).

with existing equipment that continues to operate, exceed the current PGE Boardman PSELs, which dramatically exceed current actual emissions. For demonstrative purposes, the chart below compares PGE Boardman's actual emissions in 2007 with its PSELs.

**Table 1: PGE Boardman PSELs versus actual emissions.**

| Current PSEL | 12,687 tons per year of Nitrogen Oxides (NOx) | 30,450 tons per year of Sulfur Dioxide (SO2) | 1056 tons per year of particulate matter of any size. |
|---|---|---|---|
| Actual Emissions (2007 reporting year) | 10656 tons per year of Nitrogen Oxides (NOx) | 14037 tons per year of Sulfur Dioxide (SO2) | 853 tons per year of particulate matter of any size |

Under PGE's interpretation of the current Oregon PSD program, PGE Boardman could more than double its emissions of sulfur dioxide without completing PSD review or any analyses of the increased emissions on ambient air quality or air quality related values. Again, because compliance with the NAAQS is based on actual air quality monitoring, a result allowing a source that has never undergone PSD review to double actual emissions without PSD review would eviscerate Congress's intent that increases in actual pollution in clean air areas be evaluated and subjected to a BACT emissions limit. Even if OAR 340-200-0020(66) demanded that result by its plain meaning, which as explained above it does not, the Court should not interpret the regulation to lead to absurd results. *Safe Air for Everyone v. U.S. E.P.A.,* 488 F.3d 1088, 1098 (9th Cir. 2007) (citing *Dyer v. United States*, 832 F.2d 1062, 1066 (9th Cir. 1987) (plain language of a State Implementation Plan controls unless it would lead to absurd results)).

In addition, the PSEL program, upon which PGE relies for its interpretation of the PSD program, did not supplant the PSD program. Rather, PSELs are a regulatory tool to keep track of increases and decreases in emissions and measure compliance with NAAQS and PSD increment, not a replacement for PSD review. The PSEL policy contemplates that the baseline emission

rate, equal to the actual emissions in 1977 or 1978, would be the starting point for upward or downward adjustments. For facilities built after 1978, the source would be subject to new source review with appropriate emission limitations to protect the NAAQS, PSD increment and visibility in federally protected parks and wilderness areas. The PSEL for sources built after 1978 would reflect these limitations because, under the 1975 EPA regulations and the 1977 CAA, such sources would have gone through the PSD review.

To now interpret the PSD program to mean that a facility that has never gone through PSD review, and did not operate during the baseline year, can benefit from very high PSELs set based on potential emissions without the burden of PSD review and associated emission limitations completely defeats the intent of the PSD program to control actual emissions. The approach advocated by PGE has no rational basis in either the law or the facts of this case.

In short, under both the 2003 and the 1982 PSD programs, the focus must be on actual pollution or the individual potential emissions of modifications, not on allowable pollution. For a source like Boardman, that has escaped PSD review for nearly 30 years, utilization of the entire PSEL renders the PSD program a nullity by interfering with the goal of ensuring that clean air areas are not degraded by additions of actual emissions.

## CONCLUSION

Therefore, for the reasons explained above, PGE's Motion to Dismiss should be denied.

Dated this 25th day of February, 2009.

Respectfully submitted,

/s/ Aubrey Baldwin
AUBREY BALDWIN, OSB No. 060641
Pacific Environmental Advocacy Center
(503) 768-6929

Attorney for Plaintiffs