**William M. Bumpers**, District of Columbia No. 385282
william.bumpers@bakerbotts.com
Baker Botts L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
202.639.7718 (direct) 202.585.1008 (fax)

**Martin Dolan**, OSB No. 87205
martindolan@dolangriggs.com
**David Griggs,** OSB No. 98243
dgriggs@dolangriggs.com
Dolan Griggs LLP
1130 S.W. Morrison Street, Suite 630
Portland, Oregon 97205
503.228.7500 (direct) 503.243.1188 (fax)

**David Aamodt**, OSB No. 754016
david.aamodt@pgn.com
Portland General Electric Company
121 Southwest Salmon Street
Portland, Oregon 97204
503.464.8861 (direct) 503.464.2200 (fax)

Attorneys for Defendant Portland General Electric Company

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **SIERRA CLUB**, a non-profit corporation, **NORTHWEST ENVIRONMENTAL DEFENSE CENTER**, a non-profit corporation, **FRIENDS OF THE COLUMBIA GORGE,** a non-profit corporation, **COLUMBIA RIVERKEEPER,** a non-profit corporation, and **HELLS CANYON PRESERVATION COUNCIL**, a non-profit corporation,<br><br>                 **Plaintiffs,**<br>    **v.**<br><br>**PORTLAND GENERAL ELECTRIC COMPANY**,<br>                 **Defendant.** | Civil No.: CV-08-1136-HA<br><br><br><br>**DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**<br><br>**ORAL ARGUMENT REQUESTED** |

## INTRODUCTION

Plaintiffs' opposition brief fails to refute most of Portland General Electric's ("PGE's") bases for dismissing multiple claims from Plaintiffs' complaint. Plaintiffs' principal argument is that PGE has fundamentally misinterpreted applicable law or that the law must be wrong. To the contrary, PGE's arguments are supported by the relevant statutory and regulatory language, the majority of courts, and the Oregon Department of Environmental Quality's ("ODEQ's") interpretation of its own Prevention of Significant Deterioration ("PSD") program.

## ARGUMENT

### I.    Plaintiffs' PSD Construction Claims (Claims 5-6) and Pre-January 2003 PSD Modification Claims (Claims 7-8) are Time-Barred

A number of Plaintiffs' claims are barred by the statute of limitations. Plaintiffs' PSD Construction Claims are 30 years old and the PSD Modification Claims, regarding Changes 1 and 2, also pre-date the five-year statute of limitations. Plaintiffs' attempt to avoid the statute of limitation via their "continuing violation" or "ongoing duty" theory also fails. The Clean Air Act ("CAA") and the Oregon PSD program, as well as holdings by a large majority of courts, undermine Plaintiffs' theory. In addition, because the statute of limitations bars Plaintiffs' claims as to any civil penalties, the concurrent remedy doctrine as interpreted by the U.S. Supreme Court and the Ninth Circuit also bars Plaintiffs' associated equitable claims.

### A.    The CAA and Oregon SIP do not support Plaintiffs' theory that the failure to obtain a PSD permit prior to construction is an ongoing violation

The CAA and Oregon State Implementation Plan ("SIP") impose a one-time obligation to obtain a PSD permit prior to construction or modification. They do not impose ongoing or discrete, daily duties. Plaintiffs acknowledge that the PSD requirements are named *preconstruction* requirements and are imposed in advance of construction. Plaintiffs'

Defendant Portland General Electric Company
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
REQUEST FOR ORAL ARGUMENT

1

Opposition to Defendant's Motion to Dismiss ("Pls.' Opp'n"), p. 25. They also acknowledge that the CAA and ODEQ regulations have *separate* permit programs for the *construction* of sources (including PSD) and the *operation* of sources (Title V). Pls.' Opp'n, p. 18. Plaintiffs nonetheless ask the Court to ignore these plain facts and treat the PSD program as if it were part of the operating permit program to circumvent the statute of limitations.

The PSD preconstruction program imposes specific requirements *as conditions of starting construction or modification*, including those related to Best Available Control Technology ("BACT"). 42 U.S.C. § 7475. These requirements must be undertaken *prior* to the construction or modification of a facility. "Therefore, a violation of 42 U.S.C. § 7475 occurs when construction is commenced, but does not continue on past the date when construction is completed." *United States v. S. Ind. Gas & Elec. Co.*, 2002 WL 1760752, *5 (S.D. Ind. 2002).[1] Plaintiffs admit that "Congress clearly intended the BACT determination to be made through the permitting process, prior to construction." Pls.' Opp'n, p. 19. Plaintiffs' theory would eviscerate the statute of limitations and allow them to bring claims against PGE in 2008 for having failed to obtain a *preconstruction* permit in 1975: thirty-three years earlier.

## B.    The majority of courts have held that the five-year statute of limitations applies to PSD claims

The vast majority of courts that have addressed the statute of limitations for PSD claims would bar Plaintiffs' claims. *See* Defendant's Motion to Dismiss ("Def.'s Mot."), pp. 14-15.

---

[1] That PGE did not assert the statute of limitations against Plaintiffs' New Source Performance Standard ("NSPS") claims has no bearing on this subject. *See* Pls.' Opp'n, p. 25. The PSD and NSPS programs are distinct requirements with completely different obligations. The NSPS program imposes continuous emission requirements on specified sources. For instance, NSPS Da provides that "no owner or operator subject to the provisions of this subpart shall cause to be discharged into the atmosphere from any affected facility . . . any gases that contain" particulate matter, sulfur dioxide, or nitrogen oxides in excess of specific amounts. 40 C.F.R. §§ 60.42Da-60.45Da. The PSD program has no similar requirement.

Defendant Portland General Electric Company
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
REQUEST FOR ORAL ARGUMENT

2

PGE provided multiple citations directly on point,[2] which Plaintiffs merely argue were wrongly decided.  Pls.' Opp'n, pp. 18, 23-24.[3]  In fact, except for cases decided by a single judge in Ohio, the few cases that have found PSD violations to be continuing violations involved states in which the preconstruction permit program and the operating permit program were "merged."  *See, e.g.*, *United States v. Duke Energy*, 278 F. Supp. 2d 619 (M.D.N.C. 2000).  That is, in those states, the preconstruction and operating permits were the same permits, issued in accordance with a single permitting program.  This is not the case in Oregon or in the numerous states in which courts have concluded that PSD violations are not continuing violations.

Even since Plaintiffs filed their Opposition in this case, yet another district court has rejected arguments nearly identical to those of Plaintiffs.  In *Sierra Club v. Otter Tail Corporation*, CIV 08-1012 (D.S.D. March 31, 2009) (copy attached as Exhibit A), Plaintiff

---

[2] *See, e.g.*, *Nat'l Parks & Conservation Ass'n v. Tenn. Valley Auth.*, 502 F.3d 1316, 1324 (11th Cir. 2007) ("[T]he obligation to apply Best Available Control Technology - like all the violations alleged in the New Source Review counts of the complaint in this suit - was solely a prerequisite for approval of the modification, not a condition of [the facility's] lawful operation."); *United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025, 1030 (S.D. Ind. 2005) ("[A] violation of the Act's preconstruction permit regulations is complete at the time the construction project is completed."); *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 661 (W.D.N.Y. 2003) ("Violations of the preconstruction permitting requirements occur at the time of construction, not on a continuing basis."); *United States v. Westvaco Corp.*, 114 F. Supp. 2d 439, 444 (D. Md. 2001) ("[A] violation for failure to obtain a construction permit does not continue once the unpermitted construction is completed."); *S. Ind. Gas & Elec. Co.*, 2002 WL 1760752 at *6; *United States Dist. Court v. Campbell Soup Co.*, 1997 WL 258894 (E.D. Cal. 1997); *United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1083-84 (W.D. Wisc. 2001) ("[T]he statute of limitations for a violation of the preconstruction permit requirements under 42 U.S.C. § 7475 begins to run at time of construction and does not continue through the operational life of the modified source.").

[3] According to Plaintiffs, the numerous courts in the majority have applied "a fundamentally flawed analysis of the CAA."  Pls.' Opp'n, p. 18.  Plaintiffs found it "unfortunate" that the majority of courts agree with PGE's "red herring argument" and have been "led astray."  Pls.' Opp'n, pp. 22, 23.  Therefore, Plaintiffs felt the need to use "an abundance of caution" to ensure that the Court would not fall victim to this "confusion."  Pls.' Opp'n, p. 26.  PGE submits that the federal courts are more than capable of properly applying the statute of limitations to the CAA.

Defendant Portland General Electric Company
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
REQUEST FOR ORAL ARGUMENT

3

Sierra Club alleged that the defendant's failure to obtain a PSD permit or utilize BACT for its power plant resulted in ongoing violations of the CAA.[4]  The court thoroughly examined Sierra Club's theory and the breadth of cases, and followed the Eleventh Circuit in *National Parks* and the clear majority of other courts.  *Id.* at 9.[5]

Plaintiffs' statute of limitation argument, "taken to its logical end, suggests a *de facto* elimination of any statute of limitation, for the limitation period would never begin to accrue as long as the facility remained in operation."  *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 661 (W.D.N.Y. 2003).  "[T]hese [PSD] provisions cannot reasonably be construed to mean that building or altering a machine without a permit is a violation that continues as long as the machine exists or is operated."  *United States v. Ill. Power Co.*, 245 F. Supp. 2d 951, 957 (S.D. Ill. 2003); *accord United States Dist. Court v. Campbell Soup Co.*, 1997 WL 258894, *2 (E.D. Cal. 1997).  Plaintiffs' time-barred claims should be dismissed.

### C.    Plaintiffs misconstrue the concurrent remedy doctrine and cannot claim exceptions applicable only to the government

This case is a perfect example to which the concurrent remedy doctrine applies.  *See Nat'l Parks*, 502 F.3d at 1326 ("[W]here a party's legal remedies are time-barred, that party's concurrent equitable claims generally are barred under the concurrent remedy doctrine."); *Otter Tail* at 11-13.  Plaintiffs ask the Court to reject the Eleventh Circuit's decision in *National Parks*

---

[4] The Court rejected Sierra Club's purported distinction between "ongoing violations" and "a series of discrete violations on a daily basis" as "semantics."  *Otter Tail* at 6.

[5] Plaintiffs are wrong that the Court should ignore *National Parks* because the U.S. Solicitor General's position before the Supreme Court changed from TVA's position in lower courts.  *See* Pls.' Opp'n, pp. 24-25.  A party's change of position has no bearing on the precedential value of an opinion of a U.S. Court of Appeals.  In addition, the Solicitor General's position is plainly self-serving because, despite being a rare defendant in PSD cases (such as TVA in this case), the U.S. government (as EPA) usually brings enforcement actions for alleged PSD violations under the CAA.

Defendant Portland General Electric Company
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
REQUEST FOR ORAL ARGUMENT

4

because it was "incorrect" when it drew its definition of "concurrent" from a case that found the concurrent remedy doctrine applicable "when legal and equitable relief are available concurrently." Pls.' Opp'n, p. 30. Plaintiffs erroneously argue that the doctrine does not apply to their claims for injunctive relief because "the legal and equitable remedies have different goals and effects." Pls.' Opp'n, p. 28.

Plaintiffs' reading of "concurrent" is inconsistent with *Cope v. Anderson*, 331 U.S. 461, 463-64 (1947), and with the Ninth Circuit's interpretation of the concurrent remedy doctrine. In *Federal Election Commission v. Williams*, 104 F.3d 237, 240 (9th Cir. 1996), the Ninth Circuit addressed whether section 2462, the federal five-year statute of limitations, applies to claims for injunctive relief. Rejecting the plaintiff's argument that the statute of limitations does not apply, the Ninth Circuit stated:

> This assertion [that section 2462 does not apply to claims for injunctive relief] runs directly contrary to the Supreme Court's holding in *Cope v. Anderson*. *Cope* holds that "equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy." In other words, *because the claim for injunctive relief is connected to the claim for legal relief, the statute of limitations applies to both.*

*Id.* at 240 (emphasis added) (internal citations omitted). In determining whether the concurrent remedy doctrine applied, the Ninth Circuit based its decision on whether the claims for injunctive and legal relief were connected, not whether they had the same "goals and effects." Plaintiffs' claims for legal and equitable relief are unquestionably connected and the statute of limitations applies to both. *See id*; *see also Russell v. Todd*, 309 U.S. 280, 289 (1940) ("[W]hen the jurisdiction of the federal court is concurrent with that of law, or the suit is brought in aid of a legal right, equity will withhold its remedy if the legal right is barred by the local statute of limitations."). The precedent set by the Supreme Court, the Eleventh Circuit and the Ninth

Defendant Portland General Electric Company
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
REQUEST FOR ORAL ARGUMENT

5

Circuit should be followed here and Plaintiffs' claims should be dismissed. *See Cope*, 331 U.S. at 463-64; *Russell*, 309 U.S. at 289.

Plaintiffs also cannot avail themselves of the limited exception to the concurrent remedy doctrine for "claims brought by the federal government in its sovereign capacity." *See, e.g.*, *United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997); *United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025, 1032 (S.D. Ind. 2005) (holding that "the concurrent remedy doctrine is inapplicable to the USA and to the States"). Here, "[t]here is no authority . . . for expanding the governmental exception to preclude application of the concurrent remedy doctrine in the instant suit, which was filed by private parties where the government has declined to act." *Nat'l Parks*, 502 F.3d at 1327; *see also Otter Tail* at 11-13. Therefore, the concurrent remedy doctrine applies to bar Plaintiffs' claims for injunctive relief.

**II.    Plaintiffs' PSD Construction Claims (Claims 5-6) Must be Dismissed Because Plaintiffs Cannot Challenge EPA's Determination that Boardman was Not Subject to the PSD Program**

Plaintiffs acknowledge in their complaint that "EPA concluded that PGE Boardman was not subject to the 1974 PSD regulations" and "stated that PGE had 'commenced' construction within the meaning" of those regulations. Compl. ¶ 124. Plaintiffs argue only that EPA's determination is irrelevant and incorrect. Pls.' Opp'n, pp. 31-35. There is no basis for this argument. This Court may "not allow Plaintiffs to circumvent the limited review process established by Congress, by entertaining Plaintiffs' claim that [PGE] should have obtained PSD permits despite EPA's decision to the contrary." *Grand Canyon Trust v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1253 (D.N.M. 2003).[6]

---

[6] The court in *Grand Canyon* addressed claims strikingly similar to Plaintiffs' PSD claims. In that case, the plaintiffs alleged that the defendant failed to obtain a PSD permit prior to undertaking construction of a power plant in 1975. *Grand Canyon*, 283 F. Supp. 2d at 1251.

Defendant Portland General Electric Company
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
REQUEST FOR ORAL ARGUMENT

6

Plaintiffs simply cannot challenge EPA's thirty-year-old determination – a final agency action – in this forum. "EPA had certainly completed its decisionmaking process here; by deciding that no PSD permit was necessary, EPA issued its final word on the subject and no further administrative proceedings were available." *Id.* at 1252. As a final agency action, Plaintiffs may challenge this determination only in the appropriate U.S. Court of Appeals. 42 U.S.C. § 7607(b)(1). Therefore, "the proper avenue by which to challenge the EPA decision that no PSD permits were necessary [for Boardman] is not through Plaintiffs' citizens' suit against [PGE], but through the judicial-review provisions of the CAA." *Grand Canyon*, 283 F. Supp. 2d at 1254; *accord Otter Tail* at 15.[7] Plaintiffs' PSD claims constitute an impermissible collateral attack on EPA's decision thirty-three years after the fact and should be dismissed. *See Grand Canyon*, 283 F. Supp. at 1251-54.

## III. Plaintiffs' PSD Modification Claims (Claims 7-8) Fail Because None of the Changes Resulted in Any of Boardman's PSELs Exceeding the Plant's Netting Basis by a Significant Emission Rate

### A. Oregon's PSD program is the only PSD program applicable to sources in the State

Plaintiffs contend that complying with the Oregon PSD program somehow contradicts the CAA and produces absurd results. Pls.' Opp'n, p. 39. These arguments completely ignore the federal structure of the CAA and the plain language of the Oregon PSD program. Oregon's

---

However, EPA had determined that the power plant was not subject to the 1974 Regulations. *Id.* The court held that the plaintiffs could not bring their PSD claims, which essentially challenged EPA's permitting decision, in federal district court. *Id.* at 1253-54.

[7] Plaintiffs cited *Ass'n to Protect Hammersley v. Taylor Res.*, 299 F.3d 1007 (9th Cir. 2002), to support their claim that this Court may overturn EPA's determination. *Hammersley* is inapposite, however, because it was brought under the Clean Water Act, which does not specifically provide for judicial review of these final agency actions. *See Grand Canyon*, 283 F. Supp. 2d at 1254 n.5.

Defendant Portland General Electric Company
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
REQUEST FOR ORAL ARGUMENT

7

PSD program has been explicitly approved by EPA as *different from*, but at least *equal to*, the

federal program.[8]

EPA fully approved Oregon's PSD/PSEL rules in 1982.  Approval and Promulgation of

State Implementation Plans: Oregon, 47 Fed. Reg. 35,191 (Aug. 13, 1982).  In 2003 EPA

described ODEQ's PSD and PSEL programs *as they have existed since their approval in 1982*,

as follows:

> Revisions to this Division [Division 224 - Major New Source Review] must be evaluated in the context of the currently-approved ODEQ NSR rules.  *ODEQ's NSR rule differs from EPA's regulations in a number of fundamental ways*.  EPA evaluated and initially approved the ODEQ NSR program on August 13, 1982 (47 FR 35191), as being *equivalent or more stringent than EPA's regulations* on a program basis.  The ODEQ NSR program, which is closely linked to the ODEQ PSEL program, does not subject the same sources and modifications to major NSR as would EPA's rules. . . . [T]he ODEQ program utilizes a plant-wide cap approach to defining major modification rather than a contemporaneous net emissions increase approach as does EPA's rules.  *The effect of this plant-wide cap approach is that some changes which would be subject to review under EPA's rules are not subject under ODEQ's rules*. . . . Overall, EPA when it initially approved Oregon's program in 1982 determined that the Oregon program would review and control emissions from new and modified sources equal to or better than EPA's program regardless of the fact that some specific changes might not be subject to NSR in Oregon that would be under EPA's program.

Approval and Promulgation of Implementation Plans; Oregon, 68 Fed. Reg. 2891, 2897-98 (Jan.

22, 2003) (emphasis added).  EPA also noted that one of the key goals of the PSEL rules, the

plant-wide caps to which EPA refers, is to "*prevent significant deterioration* of air quality," *i.e.*,

---

[8] By setting PSELs for Boardman from the beginning and fully considering them in assessing Oregon's initial air quality under the PSD program, ODEQ has ensured that any changes to Boardman accounted for in the initial or subsequent permitting actions will not adversely affect air quality.  Thus, Boardman's emissions of sulfur dioxide could increase without triggering PSD requirements because its PSEL for that pollutant was fully accounted for in assessing Oregon's air quality in the beginning.

the PSD program.  *Id.* at 2896 (emphasis added).  As a result, Oregon's PSD program contains

the exclusive PSD requirements applicable to Boardman.[9]

> **B.     None of the alleged changes resulted in any of Boardman's PSELs exceeding its netting basis (or baseline emission rate) by a significant emission rate, as required to trigger PSD for Boardman since the inception of the Oregon PSD program**

Plaintiffs' allegations that PGE made "major modifications" triggering PSD requirements

are legally deficient.   Section 340-200-0020(66) of ODEQ's PSD rules define a "major

modification" to require a change that "results in . . . [a]n increase in the PSEL by an amount

equal to or more than the significant emission rate over the netting basis."  OR. ADMIN. R. 340-

200-0020(66)(a).   Boardman's netting basis is the same as its PSELs.[10]   Plaintiffs have not

alleged that a change at Boardman resulted in any PSEL exceeding the netting basis for that

pollutant, much less exceeding the netting basis by that pollutant's "significant emission rate."

Plaintiffs' assertions that subsections (a)-(b) of section 340-200-0020(66) do not apply to

Boardman are incorrect.   Subsections (a)-(b) define what constitutes a "major modification,"

except in the case of "new or modified major sources that were permitted to construct and

operate after the baseline period and were not subject to New Source Review."  OR. ADMIN. R.

---

[9] Plaintiffs' lengthy protests about the true nature and purpose of the PSD program simply ignore this reality.  Pls.' Opp'n, pp. 35-43.  EPA approved the Oregon PSD program pursuant to the very CAA provisions that Plaintiffs claim require a different approach.  Plaintiffs do not deny that EPA's PSD program was merely the basis for evaluating and approving the Oregon PSD program and, with one exception that PGE addresses, cite no cases even mentioning the *Oregon PSD program*.

[10] *See* Def.'s Mot., p. 25 n.25.  As PGE explained, a source's "netting basis" is its "baseline emission rate" with certain possible adjustments for emission reductions, emission increases, and transfer of emission reduction credits.  OR. ADMIN. R. 340-200-0020(13)&(71).  Plaintiffs fail to allege that there have been any of these adjustments with respect to Boardman, and there have been none.  Thus, the plant's netting basis equals its baseline emission rate.  Because Boardman had not begun normal operations during the baseline period (1977-78), its baseline emission rate was its potential to emit ("PTE"), which is represented by its PSELs.  Thus, Boardman's baseline emission rate, netting basis, PTE, and PSELs are all the same, and are represented by the PSELs.

340-200-0020(66)(c).  Plaintiffs argue that subsection (c) applies, as opposed to subsections (a)-(b), because Boardman (1) did not operate during the baseline period; (2) was not permitted to construct and operate until after the baseline period; and (3) never satisfied PSD requirements for any emissions from the plant.  Pls.' Opp'n, p. 39.

These arguments cannot save Plaintiffs' claims.  First, whether Boardman operated during the baseline period (it did not) is irrelevant to whether it was *permitted* to construct and operate before or during the baseline period.  Second, Boardman was fully permitted to construct and operate before the baseline period by the March 24, 1975 Site Certificate Agreement.  Site Certificate Agreement, Section I; OR. REV. STAT. § 453.305(10) (1974).[11]  Third, that Boardman was not required to meet PSD permitting requirements is irrelevant because subsection (c) applies only to sources permitted to construct and operate after the baseline period, which Boardman was not.

Contrary to Plaintiffs' assertion, the pre-2003 version of the Oregon PSD program was functionally equivalent to the current PSD program with respect to Boardman.[12]  Under the earlier rules, a change triggered PSD for Boardman only where the change resulted in a PSEL exceeding the plant's "baseline emission rate" by a significant amount.  "Major modification" was then defined as a change that resulted in a "net significant emission rate increase," and calculations of net emission increases had to "take into account all accumulated increases and decreases in *actual emissions* occurring at the source since the baseline period."  OR. ADMIN. R.

---

[11] Even if the applicability of subsections (a)-(b) to Boardman was conditioned on the issuance of an Air Containment Discharge Permit ("ACDP") prior to the baseline period – which it is not – that condition would have been met.  Plaintiffs ignore that a temporary ACDP was issued as a matter of law prior to the baseline period.  *See* Def.'s Mot., p. 27.

[12] The 2003 version of the Oregon PSD program was approved by EPA on January 22, 2003, and Changes 3-7 are dated July 2003 through 2006.  Plaintiffs erroneously referred to the range of dates for the Seven Changes as "the mid-nineties through 2004."  Pls.' Opp'n, pp. 35-36.

Defendant Portland General Electric Company
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
REQUEST FOR ORAL ARGUMENT

10

340-028-0110(57) (1997) (emphasis added).  The definition of "actual emissions" was the "mass emissions of a pollutant from a source during a specified time period," Pls.' Opp'n, p. 40, but Plaintiffs neglected to mention that the regulations went on to state that "[f]or any *source which has not yet begun normal operation* in the specified time period, *actual emissions shall equal the potential to emit* of the source."  OR. ADMIN. R. 340-028-0110(3)(b) (1997) (emphasis added).

Thus, as a matter of law Boardman could not have triggered PSD under the pre-2003 rules.  Boardman's "actual emissions" during the baseline period equaled its PTE because Boardman was a newly permitted source that had not yet begun normal operation in 1977-78.  Boardman's PSELs were established equal to the plant's PTE, and the PSELs legally capped the plant's emissions at that level.[13]  PGE never sought an increase in Boardman's PSELs above the baseline emission rate, and Plaintiffs have not alleged that it did.  Absent an increase in the PSEL above the baseline emission rate, Boardman never experienced any net emission rate increase and thus never undertook a "major modification" triggering PSD.

PGE is in full agreement with the State of Oregon's description of the Oregon PSD program in its Amicus Reply.  Amicus State of Oregon's Reply to Def.'s Mot. to Dismiss and Pls.' Resp. to Mot. to Dismiss.  As PGE has noted, Boardman's baseline emission rate and PSELs were initially set equal to the plant's PTE for each pollutant.  There have been no developments with respect to Boardman that would make its netting basis different from its baseline emission rate, and Plaintiffs have alleged none.  As a result, the PSELs and the netting basis for Boardman have been identical for each pollutant since the day the program was implemented in 1982.  PGE noted that PSD can only be triggered *for Boardman* by a change that

---

[13] Under the pre-2003 Oregon program, PTE included any enforceable "operational limitation on the capacity of a source to emit an air pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed. . . ."  OR. ADMIN. R.  340-028-0110(78) (1997).

Defendant Portland General Electric Company
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
REQUEST FOR ORAL ARGUMENT

11

increases a PSEL by at least a significant emission rate.  PGE acknowledges, as the State asserted, that this is not necessarily true for all sources in Oregon, as not all sources have PSELs equal to the netting basis.  Rather, a change triggers PSD applicability for any federal major source in Oregon, including Boardman, only when the change results in a PSEL that exceeds the netting basis by at least a significant emission rate.

Thus, the State's Amicus Brief fully supports PGE's position.  PGE described in its initial brief how the Oregon PSD permitting program applies to Boardman.  The State's Amicus Brief points out, and PGE concurs, that the netting basis and PSEL for many sources need not be the same, and that for such sources an increase in emissions below the PSEL could trigger PSD requirements.  For Boardman, however, the netting basis (and baseline emission rate under the pre-2003 rules) and PSEL are identical.  Thus, for purposes of resolving the PSD claims in this case, PGE focused on the effect of ODEQ's PSD program on Boardman only, and PGE's description of ODEQ's program as it applies to Boardman is entirely consistent with ODEQ's position.

Plaintiffs argue that *Oregon Environmental Council v. ODEQ*, 1992 WL 252123 (D. Or. Sept. 24, 1992), stands for the proposition that pre-2003 emission increases at Boardman, *even if below its PSELs*, could have triggered PSD.  This argument fails.  As the State confirms in its Amicus Brief, *Oregon Environmental Counsel* is not relevant to this case.  In that case, the defendant had failed to obtain applicable emission limits in its permit, and the court's decision turned on whether the company's actual past emissions made it a major source under the Nonattainment New Source Review rules.[14]  The State clearly explains in its Amicus Brief that

---

[14] While PSD requirements apply in areas that "attain" the National Ambient Air Quality Standard for a particular pollutant, the Non-attainment New Source Review requirements are the "major" new source review requirements applicable in areas that do not meet the standard.

Defendant Portland General Electric Company
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
REQUEST FOR ORAL ARGUMENT

12

this issue is not presented here. The determination of the "netting basis" for evaluating PSD is

entirely different with respect to Boardman.

      The core of Plaintiffs' PSD claims is that Plaintiffs disagree with EPA's 1982 and 2003

decisions to approve the Oregon PSD program. These objections were not timely raised with

EPA, and they cannot be raised here. PGE at all times complied with Oregon's PSD program

and, therefore, Plaintiffs' PSD modification claims must be dismissed.

**IV.**    **Plaintiffs' SIP Notice Claim (Claim 9) and Title V Notice Claim (Claim 10) Must Be Dismissed as Derivative of Other Failed Claims**

      Plaintiffs' SIP Notice Claim (Claim 9) is merely an argument that PGE was required to

notify ODEQ of changes that resulted in increases in Boardman's PTE or PSELs. *See* Def.'s

Mot., pp. 27-28. Because Plaintiffs' substantive PSD modification claims must be dismissed, the

SIP Notice Claim also should be dismissed. In addition, Plaintiffs do not deny that their Title V

Notice Claim (Claim 10) is wholly dependent on Claim 7 and Claim 9. *See* Def.'s Mot., pp. 28-

29. Because Claim 7 and Claim 9 fail, so does Claim 10.

**V.**    **The Court Has Jurisdiction Over Only the Specific Reports Identified in Plaintiffs' Clean Air Act Notice for their SIP Reporting Claim (Claim 11) and Title V Reporting Claim (Claim 12)**

      Plaintiffs argue that their CAA notice was adequate as to Claims 11 and 12 because their

notice "simply listed the specific provisions applicable to PGE that Sierra Club alleges [PGE]

had violated" and "stated that between 2003 and 2008 PGE failed to submit all required reports

and those it did submit were incomplete because they did not contain the information required by

OAR 340-028-1440 and Title V Permit Conditions 54-62." Pls.' Opp'n, p. 13. However, the

notice did not specify which reports PGE "failed to submit" or which specific permit conditions

were not met in the reports that PGE did submit. "[T]hat level of generality [] is not really

compatible with the purposes of the notice requirements." *Ctr. for Biological Diversity v.*

Defendant Portland General Electric Company
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
REQUEST FOR ORAL ARGUMENT

13

*Marina Point Dev. Co.*, 535 F.3d 1026, 1034 (9th Cir. 2008). That Plaintiffs provided discrete examples of violations demonstrates they could have provided additional information about the other alleged violations. "The insufficiency of [Plaintiffs'] notice is underscored by the fact that [Plaintiffs] had more specific information than [they] provided." *Atwell v. KW Plastics Recycling Div.*, 173 F. Supp. 2d 1213, 1225 (M.D. Ala. 2001).[15]

A similar notice was deemed inadequate in *California Sportfishing Protection Alliance v. City of West Sacramento*, 905 F. Supp. 792 (E.D. Cal. 1995). There, the notice provided in part, "For the previous five years on hundreds of occasions you have violated your NPDES permit," and gave three specific examples. *Id.* at 796. The court determined that "the previous five years on hundreds of occasions" did not provide adequate notice and held that the plaintiff's claim "only may go forward as to the three dates specified in the notice letter." *Id.* at 800. The same result should follow here: Plaintiffs may proceed with the specific violations enumerated in their CAA notice, but not with other allegations they may later identify.

## VI.    Almost All Plaintiffs' NSPS Claims (Claim 1) Have Been Dropped

Plaintiffs acknowledge that most of their identified NSPS claims should be dismissed. They concede that their claims regarding Changes 2-7 should be dismissed because they do not allege changes to Boardman's boiler. Pls.' Opp'n, p. 9 n.4. Plaintiffs even concede that only a portion of their remaining NSPS claim regarding Change 1 is not time-barred. Pls.' Opp'n, p. 17 n.11.[16]

---

[15] Plaintiffs relied on several Ninth Circuit cases, *see* Pls.' Opp'n, pp. 12-17, which were subsequently clarified by the court in *Marina Point*. The court explained that "even at our most lenient we have never abandoned the requirement that there be a true notice that tells a target precisely what it allegedly did wrong, and when." *Marina Point*, 535 F.3d at 1032.

[16] As with Plaintiffs' PSD modification claims, this Court has no jurisdiction to entertain NSPS claims for "modifications" not identified in Plaintiffs' CAA notice. *Marina Point*, 535 F.3d at 1032; Def.'s Mot., pp. 31-32.

Defendant Portland General Electric Company
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
REQUEST FOR ORAL ARGUMENT

14

## <u>CONCLUSION</u>

For the above reasons, the Court should dismiss from the Complaint most of Claims 1, 11 and 12 and all of Claims 5-10.  For the Court's convenience, attached as Exhibit B is a table summarizing each of these claims and the applicable grounds for dismissal.

Defendant Portland General Electric Company
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
REQUEST FOR ORAL ARGUMENT

15

Respectfully submitted,

/s/ William M. Bumpers
William M. Bumpers
District of Columbia No. 385282
Kent Mayo
District of Columbia No. 452842
Lauren Edwardson
District of Columbia No. 986124
Baker Botts L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Email:  william.bumpers@bakerbotts.com
Email:  kent.mayo@bakerbotts.com
Email: lauren.edwardson@bakerbotts.com
202.639.7718 (voice) 202.585.1008 (fax)

David A. Aamodt, OSB No. 754016
Associate General Counsel
Portland General Electric Company
121 Southwest Salmon Street
Portland, OR 97204
Email:  david.aamodt@pgn.com
503.464.8861 (voice) 503.464.2200 (fax)

David A. Savage
Texas State Bar No. 24004461
Baker Botts L.L.P.
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4078
Email:  david.savage@bakerbotts.com
512.322.2654 (voice) 512.322.8333 (fax)

Martin Dolan, OSB No. 87205
David Griggs, OSB No. 98243
Dolan Griggs LLP
1130 S.W. Morrison Street, Suite 630
Portland, Oregon 97205
Email:  martindolan@dolangriggs.com
Email:  dgriggs@dolangriggs.com
503.228.7500  (voice) 503.243.1188 (fax)

**ATTORNEYS FOR DEFENDANT
PORTLAND GENERAL ELECTRIC COMPANY**

## CERTIFICATE OF SERVICE

I certify that this Reply to Opposition to Motion to Dismiss by Defendant Portland General Electric Company has been electronically filed and is available to be viewed and downloaded from the Court's Electronic Case Filing System.

Dated:  April 8, 2009

*/s/ William M. Bumpers*_____
William M. Bumpers
District of Columbia No. 385282
Baker Botts L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Email:  william.bumpers@bakerbotts.com
202.639.7718 (voice) 202.585.1008 (fax)

**ATTORNEY FOR DEFENDANT
PORTLAND GENERAL ELECTRIC COMPANY**

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|--|--|--|
| SIERRA CLUB, | \* | CIV 08-1012 |
| | \* | |
| Plaintiff, | \* | |
| | \* | |
| -vs.- | \* | MEMORANDUM OPINION |
| | \* | AND ORDER |
| OTTER TAIL CORPORATION, d.b.a. | \* | |
| Otter Tail Power Company, MDU | \* | |
| RESOURCES GROUP, INC., and | \* | |
| NORTHWESTERN CORPORATION, | \* | |
| d.b.a. NorthWestern Energy, | \* | |
| | \* | |
| Defendants. | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff filed a complaint for declaratory and injunctive relief, civil penalties, and costs and fees for alleged violations of the Prevention of Significant Deterioration ("PSD") provisions of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7470-7492, the South Dakota State Implementation Plan (the "South Dakota SIP"), and the New Source Performance Standards ("NSPS") of the CAA, 42 U.S.C. § 7411, all such violations allegedly occurring at the Big Stone Generating Station near Big Stone, Grant County, South Dakota ("Big Stone"). Defendants filed a motion to dismiss on the basis that some claims were not asserted within the statute of limitations, are barred by the concurrent remedy doctrine, or are an impermissible collateral attack on a valid Clean Air Act permit issued by the State of South Dakota.

## CLEAN AIR ACT BACKGROUND

The United State Court of Appeals for the Eighth Circuit has set forth the background of the Clean Air Act:

> The Clean Air Act "establishes a partnership between EPA and the states for the attainment and maintenance of national air quality goals." Title I of the CAA allocates regulatory responsibilities between EPA and the respective states. For pollutants meeting certain criteria, EPA is responsible for promulgating national ambient air quality standards (NAAQS), pursuant to Section 109 of the Act . . . Under the CAA, states

**EXHIBIT A**

> must then adopt and develop state plans to ensure that state air quality
> meets the NAAQS.  Thus, each state must submit a state implementation
> plan (SIP)[1] for each NAAQS promulgated by EPA.

Sierra Club v. E.P.A., 252 F.3d 943, 944-45 (8th Cir. 2001) (internal citations omitted).

In addition to promulgating NAAQS and requiring states to develop SIP's, the CAA directed the EPA to establish new source performance standards ("NSPS") for each source of pollution.  42 U.S.C. § 7411(b).  New sources of pollution, including existing sources that undergo modifications resulting in a new source or increase in pollution, are prohibited from operating in violation of the performance standards.  42 U.S.C. § 7411(e).  New (or modified) sources are required to undergo a new source review permitting process and to conform to technology-based performance standards.

The pollutants regulated and at issue here include sulfur oxides ("SO$_2$"), carbon monoxide ("CO"), particulate matter ("PM"), and nitrogen oxides ("NO$_x$")[2].  40 C.F.R. §§ 50.1 et seq.  South Dakota's SIP is administered by the Department of Environment and Natural Resources ("DENR")[3].  SDCL 34A-1-5, SDCL 1-40-22, 59 Fed. Reg. 47,260 (September 16, 1994).

The CAA regulates both new and significant modifications to existing major stationary sources of air pollution.  As applicable in this case, the CAA requires that when a new source of pollution is built or an existing source undergoes a "major modification," the source (in this case, Big Stone) must obtain a PSD permit.  42 U.S.C. § 7475(a), 40 C.F.R. §§ 52.21(a)(2)(iii) 52.21.2178, ARSD § 74:36:09:01.01.  As part of the permitting process, the facility must demonstrate that the proposed modification is subject to the best available control technology ("BACT") for each regulated pollutant emitted from the facility.  42 U.S.C. § 7475(a)(4), 40

---

[1]See 40 C.F.R. § 52.2186 for a history of South Dakota's SIP.  See also 63 FR 55804-01

[2]The EPA established rules for only one nitrogen oxide ("NO$_x$") compound, i.e. nitrogen dioxide ("NO$_2$").  Environmental Defense v. E.P.A., 489 F.3d 1320, 1324 (D.C. Cir. 2007).

[3]The Department of Natural Resource Development, formerly known as the Department of Water and Natural Resources, was renamed the Department of Environment and Natural Resources in 1991.  SDCL 1-40-01.

C.F.R. § 52.21(j)(3), ARSD § 74:36:09:02 (incorporating by reference the provisions of 40 C.F.R. § 52.21).

The CAA provides separate permitting programs for pre-construction permits (42 U.S.C. § 7475) and operating permits (42 U.S.C. § 7661a). Section 7475 provides, in part, that:

> No major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless--
>
> (1) **a permit has been issued** for such proposed facility . . . setting forth emission limitations for such facility . . .
>
> (2) the proposed permit has been subject to a review . . . the required analysis has been conducted . . . and a public hearing has been held with opportunity for interested persons . . . to appear and submit written or oral presentations on the air quality impact of such source, alternatives thereto, control technology requirements, and other appropriate considerations;
>
> (3) the owner or operator of such facility demonstrates . . . that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any (A) maximum allowable increase . . . (B) national ambient air quality standard in any air quality control region, or (C) any other applicable emission standard . . .
>
> (4) **the proposed facility is subject to the best available control technology** for each pollutant . . . emitted from, or which results from, such facility . . .
>
> (6) there has been an analysis of any air quality impacts projected for the area as a result of growth associated with such facility;
>
> (7) the person who owns or operates . . . a major emitting facility for which a permit is required . . . agrees to conduct such monitoring as may be necessary . . . (emphasis supplied)

Title V of the CAA, 42 U.S.C. § 7661a, provides, in part,

> it shall be unlawful for any person to violate any . . . permit issued under this subchapter, or to operate [a source of pollution] . . . except in compliance with a permit issued by a permitting authority under this subchapter. (Nothing in this subsection shall be construed to alter the applicable requirements of this chapter that a permit be obtained before construction or modification.)

3

Plaintiff did not contend in its complaint that defendants had not obtained a Title V operating permit or that it was not in compliance with a Title V operating permit.

At all times relevant here, South Dakota either did not have an approved SIP or the approved SIP merely incorporated the federal regulations by reference. Thus, in South Dakota, there are separate construction and operating permit programs. In some states, the SIP integrates the construction and operating permit programs.

The citizen suit provision of the CAA provides, in part, that:

> [Unless a person fails to give notice as required by § 7604(b)] any person may commence a civil action on his own behalf--
>
> (1) **against any person . . . who is alleged to have violated** (if there is evidence that the alleged violation has been repeated) **or to be in violation of** (A) **an emission standard or limitation** under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,
>
> (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator, or
>
> (3) **against any person who proposes to construct or constructs any new or modified major emitting facility without a permit** required under part C of subchapter 1 of this chapter (relating to significant deterioration of air quality) or part D of subchapter 1 of this chapter (relating to nonattainment) **or who is alleged to have violated** (if there is evidence that the alleged violation has been repeated) **or to be in violation of any condition of such permit**.

42 U.S.C. § 7604(a) (emphasis supplied). Section 7604(a)(1) of the citizen suit provision authorizes suit to enforce compliance with Title V permits issued under §§ 7661 - 7661f (operation permits). *See* 42 U.S.C. § 7604(f) ("the term 'emission standard or limitation under the chapter' means . . . any requirement to obtain a permit as a condition of operations.") Section 7604(a)(3) authorizes, *inter alia*, a suit to enforce Title C permitting requirements under § 7475 (preconstruction permits).

## FACTUAL BACKGROUND

Otter Tail Corporation ("Otter Tail"), MDU Resources Group, Inc. ("MDU"), and NorthWestern Corporation (NorthWestern") are the owners of Big Stone, an electric generating facility operated by Otter Tail. Big Stone's first operating permit was issued on January 14, 1975, and it began commercial operation on May 1, 1975, burning lignite coal as its primary fuel. In August 1995, Big Stone began burning subbituminous coal as its primary fuel. Plaintiff contends that this conversion resulted in a significant net emissions increase in $NO_x$ and PM emissions. Plaintiff alleges that defendants did not obtain a PSD permit before initiating the burning of subbituminous coal, did not install BACT, and did not comply with BACT-based emission limitations.

Plaintiff contends that, in 1998, changes were made to the boiler at Big Stone that added surface area to the primary superheater. Plaintiff contends that such changes resulted in a significant net emissions increase in $SO_2$ and $NO_x$ emissions. Plaintiff alleges that defendants did not obtain a PSD permit before making such changes, did not install BACT, and did not comply with BACT-based emission limitations.

In 2001, Big Stone again made changes to its boiler, this time to allow the plant to supply steam to a co-located ethanol plant, rather than only supplying steam to produce electricity for sale. Plaintiff contends that such changes resulted in a significant net emissions increase in $SO_2$ and PM emissions. On August 8, 2001, DENR issued a minor permit amendment to the Big Stone Title V permit to allow the provision of steam to the ethanol plant by increasing the permitted heat input capacity of the boiler. Plaintiff contends that the defendants did not obtain a PSD permit *prior* to making the changes to the Big Stone boiler and defendants did not install and comply with BACT-based emissions requirements.

## DECISION

### I. Limitations

Defendants contend that plaintiff's claims as to the 1995 conversion from burning lignite coal to burning subbituminous coal, the 1998 changes to the Big Stone boiler, and the 2001 changes to supply steam to the ethanol plant are barred because they were not timely asserted. A limitations defense may be asserted through a motion to dismiss pursuant to Fed. R. Civ. P.

12(b)(6) when it appears from the face of the complaint that the limitation period has run. Varner v. Peterson Farms, 371 F.3d 1011, 1016 (8th Cir. 2004).

The parties agree that the Clean Air Act does not specify a limitations period for a citizens suit and, therefore, the applicable limitations provisions set forth in 28 U.S.C. § 2642 apply. That provision provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462. This action was not commenced within five years of the alleged failure to obtain permits prior to changes made to the Big Stone plant in 1995, 1998, and 2001.

Plaintiff claims that defendants' failure to obtain a PSD permit or to utilize the BACT results in Big Stone's ongoing violations of the CAA. To put it otherwise, plaintiff claims that there have been a series of discrete violations on a daily basis. Putting semantics aside, I believe this still comes within a claim of continuing violations, thus escaping the statute of limitations. Defendants contend that any alleged failure to obtain a PSD permit or use BACT is a violation of the CAA that accrues only once - on the day construction commences without the required permit or technology.

The issue is certainly not one of first impression, although it has not been specifically decided in the Eighth Circuit. The United States Court of Appeals for the Eleventh Circuit has held that "a violation of the Clean Air Act's preconstruction permit requirements . . . occurs at the time of the construction or modification and is not continuing in nature." National Parks and Conservation Ass'n, Inc. v. Tennessee Valley Authority, 502 F.2d 1316, 1324 (11th Cir. 2007) (*quoting* United States v. Ill. Power Co., 245 F.Supp.2d 951, 957 (S.D. Ill. 2003)). The Eleventh Circuit followed a line of district court cases holding that violations of the preconstruction permitting process do not constitute continuing violations of the CAA: New York v. Niagara Mohawk Power Corp., 263 F.Supp.2d 650, 661 (W.D.N.Y.2003) ("A given construction or modification project occurs only once."); United States v. Ill. Power Co., 245 F.Supp.2d 951, 957-58 (S.D.Ill.2003); United States v. Murphy Oil USA, Inc., 143 F.Supp.2d 1054, 1083-84

(W.D.Wis.2001); and <u>United States v. Westvaco Corp.</u>, 144 F.Supp.2d 439, 443-44 (D.Md.2001) (collecting additional cases).

    <u>Westvaco</u> explained that

> 42 U.S.C. § 7475(a), the Act's PSD Program, specifically indicates that violations of that provision occur at the time construction is commenced, and not at some later point in time.
>
> Section 7475(a), entitled "Preconstruction requirements," states that "[n]o major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless [a permit meeting certain criteria has been issued]." 42 U.S.C. § 7475(a) (emphasis added). Section 7475(a), therefore, clearly and unambiguously applies to the construction-not the operation-of major stationary sources. This interpretation is further supported by 42 U.S.C. § 7477, the PSD Program's enforcement provision, which mandates the EPA to "take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent construction or modification of a major emitting facility which does not conform to the requirements of [the PSD Program]." Id. § 7477 (emphasis added).

<u>United States v. Westvaco</u>, 144 F.Supp.2d at 444-45.

    The United States Court of Appeals for the Sixth Circuit held in <u>National Parks Conservation Ass'n, Inc. v. Tennessee Valley Authority</u>, 480 F.3d 410, 419 (6th Cir. 2007), that failure to apply BACT is a cause of action that "manifests itself anew each day a plant operates without BACT limits on emission." The Sixth Circuit relied upon language in one of the PSD regulations that states:

> "A major modification *shall apply* best available control technology for any pollutant for which it would result in a significant net emissions increase at the source." Tenn. Comp. R. & Regs. § 1200-3-0-.01(4)(j)(3) (emphasis added). This provision, by its own terms creates an ongoing obligation to apply BACT, regardless of what terms a preconstruction permit may or may not contain.

<u>National Parks v. TVA</u>, 498 F.Supp.2d at 418-19.

    In a case decided prior to the Sixth Circuit's <u>National Parks</u> case, the district court in <u>United States v. Duke Energy Corporation</u>, 278 F.Supp.2d 619, 650 (M.D.N.C. 2003), rejected <u>Westvaco</u>, <u>Murphy Oil</u>, and similar cases based upon the language in the PSD statutes that

"facilities contemplating undergoing a modification must obtain a PSD permit prior to construction and, following construction, operate in accordance with the terms of that permit."

> The permitting process involves not only preconstruction review but also the determination of BACT, i.e., the setting of emission limitations, and absent the proper implementation of BACT a source operator may be enjoined from operating.
>
> * * *
>
> [B]ecause the PSD permitting provisions provide both preconstruction obligations and subsequent obligations on operations, Duke Energy's alleged violation of failing to undergo the PSD permitting process does not terminate upon the completion of construction activity. The violation continues because each day that Duke Energy operates an allegedly modified plant and emits pollutants into the atmosphere, it may be in violation of the requirement to comply with the operation conditions, i.e., the emission limitations, that would have been contained within a PSD permit had Duke Energy submitted to the permitting process.

United States v. Duke Energy, 278 F.Supp.2d at 651. Duke Energy relied upon the conclusion that "Title V does not establish additional substantive requirements, but merely brings together applicable requirements, such as the PSD provisions, into one permitting scheme." Id. at 651-52. It should be noted, however, that the court in Duke Energy specifically acknowledged that the contrary majority view (described above) has no application in a case such as Duke Energy where the SIP contains an integrated construction and operation permit. Id. at 652.

The Eastern District of Kentucky relied upon similar statutory language in determining that "each day [the defendant] does not obtain a construction permit is arguably a violation of the regulation that an owner cannot operate a modification that is not in accordance with a submitted application for or approved construction permit." United States v. East Kentucky Power Co-op., Inc., 498 F.Supp.2d 970, 975 (E.D. KY 2007) (emphasis in original). The Eastern District of Kentucky noted that, like Duke Energy, Kentucky's SIP has nearly identical integrated scheme language. Id. at n.7.

The Eleventh Circuit rejected the Sixth Circuit rationale and the line of district court cases set forth above because, in the Eleventh Circuit's case, the obligation to apply BACT "was solely a prerequisite for the approval of the modification, not a condition of . . . lawful operation under [the relevant SIP]." 502 F.3d at 1324.

8

we conclude that an important difference in the states' plans ultimately precludes us from reaching the same result as our sister circuit. Tennessee's State Implementation Plan provided that, if a party failed to obtain a construction permit specifying emission limitations at the time of construction or modification, a construction permit could be issued at a later date "to assure that these regulatory requirements are met." Tenn. Comp. R. & Regs. § 1200-3-9-.01(1)(e). The Sixth Circuit construed this provision as creating an ongoing obligation to comply with requirements of the preconstruction permitting process. *National Parks*, 480 F.3d at 413. National Parks and the Sierra Club have not pointed out any analogous provision in the Alabama Plan in effect in 1982, and we are not aware of one.

National Parks Conservation Ass'n, Inc. v. Tennessee Valley Authority, 480 F.3d at 419.

Defendants here rely upon the fact that the obligation to employ BACT is in conjunction with obtaining a PSD permit. Defendants contend that there is not a separate obligation under the CAA to continue to upgrade and employ technological advances as a prerequisite to continued operation.

This case is more analogous to the Eleventh Circuit's decision. South Dakota does not have an integrated permitting system - it incorporates by reference the federal statutory scheme under which Title V operating permits did not even exist until 1990, nearly 20 years after the CAA's PSD permit rules were enacted.

I adopt the reasoning of the Eleventh Circuit primarily based upon the United States Court of Appeals for the Eighth Circuit's recent decision in Izaak Walton League of America, Inc. v. Kimbell, ___ F.3d ___, 2009 WL 564976 (8th Cir. March 6, 2009). That case concerned alleged violations of the Boundary Waters Canoe Area Wilderness Act. The Eighth Circuit rejected a continuing violation theory to extend the federal statute of limitations found at 28 U.S.C. § 2401(a). The language of that statute is similar to the language in § 2462 - the action must be commenced within the applicable period of "when the claim first accrued."

The plaintiff's enforcement claims here first accrued in 1995, 1998, and 2001, over five years prior to instituting this action.

Of course, the purpose of the CAA is to reduce pollution. Would it be contrary to the purposes of the CAA to allow Big Stone to escape from a PSD enforcement action because it allegedly managed to make a major modification which did not come to the attention of the

9

government or the public prior to the running of the statute of limitations?  Concerns that Big
Stone is "operating a facility after it was modified without first obtaining the necessary
construction permit may constitute a continuing violation of the relevant operating permit, but it
does not constitute a continuing violation of the relevant construction permit.  Continuing
violations are more appropriately enforced through the operating permit requirements.  <u>New
York v. Niagara Mohawk</u>, 263 F.Supp.2d at 662 (internal citation to unpublished case omitted).

Language from <u>Westvaco</u> is instructive:

> But even if the underlying intent behind the [CAA PSD] regulation is to
> assure continuing air quality, the regulation cannot reasonably be
> construed to mean that building or altering a machine without a permit is a
> violation that continues as long as the machine still exists or is operated
> . . . [There is] a significant distinction between a failure to obtain
> preconstruction permits and plan approvals and failure to obtain *operating*
> permits.  The latter violation would be continuing since every day of
> operation without an operating permit is another violation.  In contract, a
> violation for failure to obtain a construction permit does not continue once
> the unpermitted construction is completed.

<u>United States v. Westvaco</u>, 144 F.Supp.2d at 443-44 (*citing* unpublished district court cases).

The D.C. Circuit addressed similar enforcement concerns in a case under the Toxic
Substances Act:

> We are interpreting a statute, not creating some federal common law.  The
> provision before us, § 2462, is a general statute of limitations, applicable
> not just to EPA in TSCA cases, but to the entire federal government in all
> civil penalty cases, unless Congress specifically provides otherwise.  We
> therefore cannot agree with EPA that our interpretation of § 2462 ought to
> be influenced by EPA's particular difficulties in enforcing TSCA.  And we
> cannot understand why Congress would have wanted the running of
> § 2462's limitations period to depend on such considerations.  An agency
> may experience problems in detecting statutory violations because its
> enforcement effort is not sufficiently funded; or because the agency has
> not devoted an adequate number of trained personnel to the task; or
> because the agency's enforcement program is ill-designed or inefficient; or
> because the nature of the statute makes it difficult to uncover violations; or
> because of some combination of these factors and others . . . An agency's
> failure to detect violations, for whatever reasons, does not avoid the
> problems of faded memories, lost witnesses and discarded documents in
> penalty actions brought decades after alleged violations are finally
> discovered.  Most important, nothing in the language of § 2462 even

10

> arguably makes the running of the limitations period turn on the degree of difficulty an agency experiences in detecting violations.

3M Co. v. Browner, 17 F.3d 1453, 1461 (D.C. Cir. 1994).

It is not the province of the district court to concern itself with any arguable unfairness in the application of a statute of limitations under certain circumstances. A statute of limitations defense is not a "disfavored" defense. Further, the strict application of the five year limitations period is not unjust here because defendants' alleged CAA violations could at least arguably be addressed in a citizen suit Title V claim or in an equitable enforcement claim by the EPA.

## II. Concurrent Remedy Doctrine.

Defendants also contend that plaintiff's claims for injunctive and declaratory relief should be dismissed under the concurrent remedy doctrine. The United States Supreme Court held in Cope v. Anderson, 331 U.S. 461, 464, 67 S.Ct. 1340, 1341, 91 L.Ed. 1602 (1947), that equitable relief is not available "where the applicable statute of limitations would bar the concurrent legal remedy." The Eleventh Circuit explained this doctrine in National Parks and Conservation Ass'n, Inc. v. Tennessee Valley Authority:

> By its plain language, the statute of limitations set forth in 28 U.S.C. § 2462 applies only to claims for legal relief; it does not apply to equitable remedies. Nonetheless, where a party's legal remedies are time-barred, that party's concurrent equitable claims generally are barred under the concurrent remedy doctrine.
>
> National Parks and the Sierra Club rely on *Banks* and *United States v. Cinergy Corp.*, 397 F.Supp.2d 1025, 1032 (S.D.Ind.2005), in arguing that the concurrent remedy doctrine does not bar their claims. *Banks* carved out an exception to the concurrent remedy doctrine so that statutes of limitations cannot operate to bar "claims brought by the federal government in its sovereign capacity" as enforcer of environmental regulations. National Parks and the Sierra Club argue that this exception should be extended to them because they are acting as "private attorneys general" to enforce environmental regulations for the public benefit. There is no authority, however, for expanding the governmental exception to preclude application of the concurrent remedy doctrine in the instant suit, which was filed by private parties where the government has declined to act. The statute provides that plaintiffs in a citizen suit are acting "on [their] own behalf," 42 U.S.C. § 7604(a); though they may be acting as

11

> private attorneys general, they do not represent the public at large in the same way the government does when it brings suit to enforce the statute.

National Parks and Conservation Ass'n, Inc. v. Tennessee Valley Authority, 502 F.3d at 1326-27 (internal citations omitted).

Plaintiff contends that the Eleventh Circuit "invented" a limit on CAA citizen suit remedies. It is true that the federal statute of limitations set forth in 28 U.S.C. § 2462, by its own terms, bars only an "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture," all legal remedies. Federal Election Commission v. The Christian Coalition, 965 F.Supp. 66, 71 (D.C. 1991). "The Supreme Court also instructs us that 'statutes of limitation are not controlling measures of equitable relief.'" Id. (quoting Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1943) (interpreting the availability of a remedy under the Federal Farm Loan Act and whether to adopt a state law statute of limitations in the absence of an applicable federal limitation). The Supreme Court's decision in Holmberg did not address the concurrent remedy rule because that case concerned "a federal right for which the sole remedy is in equity." Holmberg v. Armbrecht, 327 U.S. at 395, 66 S.Ct. at 584.

Plaintiff relies upon the rule that enforcement actions seeking injunctive relief brought by the government are not barred by the concurrent remedy rule. See United States v. Banks, 115 F.3d 916, 919 (11th Cir. 1997). The Tenth Circuit held, in a Clean Water Act case, that "[we interpret § 2462 narrowly because 'an action on behalf of the United States in its governmental capacity . . . is subject to no time limitation, in the absence of congressional enactment clearly imposing it.'" United States v. Telluride Co., 146 F.3d 1241, 1243 (10th Cir. 1998) (quoting E.I. Dupont De Nemours & Co. v. Davis, 264 U.S. 456, 462, 44 S.Ct. 364, 68 L.Ed. 788 (1924)).

DuPont, Telluride, and Christian Coalitions, supra, all concerned enforcement actions brought by a federal agency. This case was initiated under the citizen suit provision of the CAA. Plaintiff contends that citizens who file citizen enforcement actions act as a "private attorney general" and stand in the shoes of the government which is not subject to a statute of limitations as to equitable remedies.

> Citizen enforcement actions greatly resemble government enforcement and qui tam actions. A citizen plaintiff, when bringing an enforcement action, supplements the enforcement power of the EPA . . . Although citizen

> plaintiffs may seek civil penalties only in the context of suits brought to enjoin or otherwise abate ongoing violations, in those suits citizen plaintiffs effectively stand in the shoes of the EPA. The citizen plaintiff's role is to assert permit violations and to request that a fine be imposed; the citizen plaintiff does not personally benefit from bringing the action.

Sierra Club v. Chevron U.S.A., Inc., 834 F.2d 1517, 1522 (9th Cir. 1987).

I reject the contention that the federal government's special exemption from statutes of limitation for equitable actions inures to the benefit of private parties. Citizens bringing suits under the CAA do not represent the public at large in the same way that the government does when it brings suit. National Parks and Conservation Ass'n, Inc. v. Tennessee Valley Authority, 502 F.3d at 1327; 42 U.S.C. § 7604(a) ("any person may commence a civil action *on his own behalf*"). Despite the fact that any monetary penalty recovered in a citizen suit is paid to the United States Treasury, 42 U.S.C. § 7604(g), plaintiff cites no compelling authority that citizens may stand in the shoes of the EPA and be insulated from limitations periods in the same manner.

**III. Collateral Attack**.

Defendants contend that the PSD and NSPS claims involving the 2001 changes (to enable Big Stone to supply steam to the ethanol plant) must also be dismissed because they constitute a collateral attack on the permit issued by DENR in 2001 for that project. (The PSD claims are untimely). Defendants did obtain an amendment to their Title V permit for that project. During the permitting process, DENR made a determination that the changes would not trigger the NSPS provisions of the CAA because the changes were not a "modification."

Pursuant to 42 U.S.C. § 7661a(a), it is unlawful to either violate a permit or to operate without a valid permit. Plaintiff contends that defendants cannot rely upon the 2001 permit as a defense to plaintiff's allegations that defendants failed to comply with NSPS standards because Congress specifically limited the so-called "permit shield" defense in 42 U.S.C. 7661c(f) (as to Title V permits):

> Permit shield.
>
> Compliance with a permit issued in accordance with this subchapter shall be deemed compliance with section 7661a of this title. Except as otherwise provided by the Administrator by rule, the permit may also provide that compliance with the permit shall be deemed compliance with other applicable provisions of this chapter that relate to the permittee if–

13

> (1) the permit includes the applicable requirements of such provisions, or
> (2) the permitting authority in acting on the permit application makes a determination relating to the permittee that such other provisions (which shall be referred to in such determination) are not applicable and the permit includes the determination or a concise summary thereof.

> Nothing in the preceding sentence shall alter or affect the provisions of section 7603 of this title, including the authority of the Administrator under that section.

"A part 70 permit that does not expressly state that a permit shield exists shall be presumed not to provide such a shield." 40 C.F.R. § 70.6(f)(2). The permit shield results in a conclusion that, as a matter of law, "compliance with the permit is 'deemed compliance with other applicable provisions' of the CAA." Sierra Club v. E.P.A., 551 F.3d 1019, 1022 (D.C. Cir. 2008).

Plaintiff contends, and defendants agree, that the Title V permit at issue here contains no permit shield. Absent such language, compliance with the Title V permit issued to Big Stone in 2001 does not, as a matter of law, compel a conclusion that DENR determined that Big Stone was in compliance with the NSPS requirements (or was not required to comply). Defendants cannot, due to the absence of a permit shield, rely upon the permit as an affirmative defense.

The absence of a permit shield does give plaintiff a free pass to challenge the permit in a § 7604 citizen enforcement action. The absence of a permit shield provision in the 2001 permit merely prohibits the automatic permit shield defense. Defendants assert a collateral challenge defense separate from the statutory permit shield defense.

Defendants applied for and received an amended Title V operating permit in 2001. That permit did not require defendants to comply with the NSPS provisions of the CAA. A Title V permit is a compilation in a single document of existing applicable emission limits. 42 U.S.C. § 7661c(a). Plaintiff does not contend that defendants are not in compliance with the terms of that operating permit. Instead, plaintiff contends that defendants are not in compliance with NSPS emissions provisions (which provisions DENR did not include in the permit). The citizen suit provisions of the CAA do not authorize such a claim. Citizen suits are limited to claims that sources of pollution either failed to obtain a permit or are violating a permit. 42 U.S.C. § 7604(a).

14

Title V sets forth its own provisions to challenge the provisions of a Title V permit. Plaintiff complains that defendants were not required to comply and did not comply with NSPS emissions limitations. If defendants' Title V permit application did not comply with a requirement of the CAA, the EPA was required to object to the issuance of the permit. 42 U.S.C. § 7661d(b)(1). If the EPA does not object, and it did not do so in this case, any person may petition the EPA to object to the permit application. 42 U.S.C. § 7661d(b)(2). If the EPA denies the petition asking the EPA to object, such denial is subject to the judicial review provisions of 42 U.S.C. § 7607. *Id.* Pursuant to § 7607(b)(1), a petition for review of the EPA's denial of a petition to object must be filed in the United States Court of Appeals for the circuit in which the action arose. The CAA specifically provides that private parties may not seek judicial review in a civil enforcement proceeding of an action of the EPA if such action could have been reviewed pursuant to § 7607(b)(1):

> Action of the Administrator [EPA] with respect to which review should have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement.

42 U.S.C. § 7607(b)(2).

Plaintiff's challenge to defendants' failure to comply with NSPS emissions limitations should have been made pursuant to § 7661d Title V permit provisions and the § 7607 judicial review provisions of the CAA. This Court does not have jurisdiction over that claim under the citizen suit provisions of the CAA.

## ORDER

Based upon the foregoing

IT IS ORDERED:

1. The motion, Doc. 22, to dismiss should be and is granted.

Dated this 31st day of March, 2009.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY:_____
                    DEPUTY
        (SEAL)

15

**Plaintiffs' Claims and Grounds for Dismissal**

| Claim | Description | Alleged Basis | Grounds for Dismissal |
|-------|-------------|---------------|-----------------------|
| 1 | NSPS | Change 1 1997-98/boiler | Statute of limitations and concurrent remedy doctrine/Not being pursued (partial) |
| | | Change 2 2000/turbine | Failure to allege change to boiler/Not being pursued |
| | | Change 3 2003/turbine | Failure to allege change to boiler/Not being pursued |
| | | Change 4 2004/turbine | Failure to allege change to boiler/Not being pursued |
| | | Change 5 2004-5/generator | Failure to allege change to boiler/Not being pursued |
| | | Change 6 2005-6/turbine-generator | Failed to allege change to boiler/Not being pursued |
| | | Change 7 2006/ turbine | Failure to allege change to boiler/Not being pursued |
| 5 | PSD Construction | 1974 Regulations | Barred by statute of limitations and concurrent remedy doctrine<br><br>Court lacks jurisdiction to hear collateral attack on 1975 EPA Determination |
| | | 1977 Amendments | 1975 Site Certificate Agreement was only preconstruction approval required as matter of Oregon law |

**EXHIBIT B**

| Claim | Description | Alleged Basis | Grounds for Dismissal |
|-------|-------------|---------------|-----------------------|
| 6 | PSD Construction – BACT | 1974 Regulations | Barred by statute of limitations and concurrent remedy doctrine <br><br> Court lacks jurisdiction to hear collateral attack on 1975 EPA Determination |
| | | 1977 Amendments | 1975 Site Certificate Agreement was only preconstruction approval required as matter of Oregon law |
| 7 | PSD Modification | Change 1 1997-98/boiler | Barred by statute of limitations and concurrent remedy doctrine <br><br> Failure to allege change resulted in PSEL increase over netting basis by significant emission rate |
| | | Change 2 2000/turbine | Barred by statute of limitations and concurrent remedy doctrine <br><br> Failure to allege change resulted in PSEL increase over netting basis by significant emission rate |
| | | Change 3 2003/turbine | Failure to allege change resulted in PSEL increase over netting basis by significant emission rate |
| | | Change 4 2004/turbine | Failure to allege change resulted in PSEL increase over netting basis by significant emission rate |
| | | Change 5 2004-5/generator | Failure to allege change resulted in PSEL increase over netting basis by significant emission rate |
| | | Change 6 2005-6/turbine-generator | Failure to allege change resulted in PSEL increase over netting basis by significant emission rate |
| | | Change 7 2006/turbine | Failure to allege change resulted in PSEL increase over netting basis by significant emission rate |

| Claim | Description | Alleged Basis | Grounds for Dismissal |
|-------|-------------|---------------|------------------------|
| 8 | PSD Modification – BACT | Change 1 1997-98/boiler | Barred by statute of limitations and concurrent remedy doctrine<br><br>Failure to allege change resulted in PSEL increase over netting basis by significant emission rate<br><br>Duplicative of Claim 7 |
| | | Change 2 2000/turbine | Barred by statute of limitations and concurrent remedy doctrine<br><br>Failure to allege change resulted in PSEL increase over netting basis by significant emission rate<br><br>Duplicative of Claim 7 |
| | | Change 3 2003/turbine | Failure to allege change resulted in PSEL increase over netting basis by significant emission rate<br><br>Duplicative of Claim 7 |
| | | Change 4 2004/turbine | Failure to allege change resulted in PSEL increase over netting basis by significant emission rate<br><br>Duplicative of Claim 7 |
| | | Change 5 2004-5/generator | Failure to allege change resulted in PSEL increase over netting basis by significant emission rate<br><br>Duplicative of Claim 7 |
| | | Change 6 2005-6/turbine-generator | Failure to allege change resulted in PSEL increase over netting basis by significant emission rate<br><br>Duplicative of Claim 7 |
| | | Change 7 2006/turbine | Failure to allege change resulted in PSEL increase over netting basis by significant emission rate<br><br>Duplicative of Claim 7 |

| Claim | Description | Alleged Basis | Grounds for Dismissal |
|-------|-------------|---------------|-----------------------|
| 9 | SIP Notice | | Duplicative of Claim 7 |
| 10 | Title V Notice | | Duplicative of Claims 7 and 9 |
| 11 | SIP Reporting | | Limited to specific reports identified in CAA 304 Notice |
| 12 | Title V Reporting | | Limited to specific reports identified in CAA 304 Notice |