**AUBREY BALDWIN, OSB No. 060414**
abaldwin@lclark.edu
**ALLISON LAPLANTE, OSB No. 02361**
laplante@lclark.edu
**TOM BUCHELE, OSB No. 081560**
tbuchele@lclark.edu
Pacific Environmental Advocacy Center
10015 SW Terwilliger Blvd.
Portland, OR 97219
(503) 768-6929, (503) 768-6894, (503) 768-6736
(503) 768-6642 (fax)

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **SIERRA CLUB**, a non-profit corporation, **NORTHWEST ENVIRONMENTAL DEFENSE CENTER**, a non-profit corporation, **FRIENDS OF THE COLUMBIA GORGE**, a non-profit corporation, **COLUMBIA RIVERKEEPER**, a non-profit corporation, and **HELLS CANYON PRESERVATION COUNCIL**, a non-profit corporation, | Civil No.: 08-1136-HA |
| Plaintiffs, | **PLAINTIFFS' SURRESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| **PORTLAND GENERAL ELECTRIC COMPANY**, an Oregon Corporation, | |
| Defendant. | |

## INTRODUCTION

Sierra Club submits the following surresponse to address three new matters raised in

PGE's reply brief.  First, the State of Oregon filed an amicus brief upon which PGE heavily

relied.  Second, PGE relied on a judicial opinion issued after Sierra Club submitted its Response.

Third, for the first time in its Reply, PGE argued that this Court lacks jurisdiction to hear Sierra

Club's claim based on the initial construction of PGE Boardman.  For the reasons below, PGE's

reliance on these additional arguments and authorities is misplaced.

## ARGUMENT

I.    **The Court Should Not Dismiss Sierra Club's PSD Modification Claims Because an
      Increase in PSEL is Not Required to Demonstrate a Violation of Oregon's SIP.**

The State of Oregon's amicus brief presents the Oregon Department of Environmental

Quality's ("DEQ's") latest interpretation of the Prevention of Significant Deterioration ("PSD")

Program contained in its state implementation plan ("SIP").  This Court should not defer to

DEQ's interpretation of the SIP because it is flatly inconsistent with the plain meaning of the SIP

as well as the federal Clean Air Act ("CAA").  Moreover, DEQ's position is a sharp departure

from its prior interpretations.  Contrary to the position advanced by DEQ in this case, a

violation of Oregon's SIP must be determined with a focus on the actual pollution increases or

the individual potential emissions of modifications, not on *allowable* pollution.

### A.    This Court Should Not Defer to DEQ's Interpretation of the SIP.

A SIP becomes federal law once approved by the Environmental Protection Agency

("EPA") and cannot be changed unless and until EPA approves the changes.  *Safe Air For*

*Everyone v. U.S. E.P.A.,* 488 F.3d 1088, 1097 (9th Cir. 2007).  Accordingly, courts interpret SIPs

as they would interpret federal regulations, and do not consider state interpretations of their SIPs

to be "directly dispositive of the meaning of the SIP." *Id.*  Thus, a court first looks at the plain

language of the SIP.  *Id.; Wards Cove Packing Corp. v. Nat'l Marine Fisheries Service*, 307 F.3d

1214, 1219 (9th Cir. 2002).  If the language of the SIP is clear, the court need look no further.

*SAFE*, 488 F.3d at 1097; *Wards Cove*, 307 F.3d at 1219.

The plain language can be overridden in only two circumstances: if employing the plain

meaning would lead to absurd results; or if administrative intent to the contrary was clearly

expressed at the time the SIP was approved. *Id.* Deference is not appropriate when the state's

interpretation conflicts with the plain meaning or is otherwise unreasonable. *Idaho Conservation*

*League v. Boer*, 362 F.Supp.2d 1211 (D. Idaho 2004) (declining to defer to state's interpretation

of SIP because the interpretation had "no basis in the plain language of the regulations"); s*ee*

*also U.S. v. General Dynamics Corp,* 755 F.Supp. 720, 722 (N.D. Tex. 1991) (refusing to defer

to state when interpretation of SIP was contrary to the CAA and SIP's plain meaning). Further,

where an agency has taken conflicting positions on a provision, the agency's new interpretation

is entitled to considerably less deference than a consistently held agency view." *INS v. Cardoza-*

*Fonseca*, 480 U.S. 421, 446 n. 30 (1987).

     As explained below, DEQ's interpretation contradicts the plain meaning of the SIP, and

would lead to absurd results. Neither DEQ nor EPA expressed DEQ's interpretation in formal

rulemaking documents. In fact, DEQ's interpretation contradicts the agency's prior public

interpretations of the SIP.

> **B.     The Interpretation Announced in DEQ's Amicus Brief is Flatly Inconsistent
> with the Plain Meaning of the SIP, and the Plain Meaning Should Control.**

     DEQ's amicus brief suffers from a number of flaws with respect to its interpretation of

both the former (pre-March 2003) and the current (post-March 2003) versions of the SIP.[1] First,

DEQ largely ignores the former SIP. To the extent that DEQ addresses the former SIP, it ignores

the plain meaning of the definition of "major modification," and its proffered interpretation leads

to absurd results. DEQ's position on how the SIP applies to PGE is also inconsistent with prior

public positions. Second, with respect to the current SIP, DEQ ignores an entire subsection of

---

[1] EPA approved the PSD provisions of Oregon's SIP in 1982. Oregon made few changes to
those provisions until 2003, when Oregon revised and EPA approved changes, including
revisions to the SIP's definition of "major modification." Both SIPs are relevant to Sierra Club's
claims.

the definition of "major modification," which DEQ previously stated applies to PGE Boardman. This Court should reject DEQ's interpretation, which appears designed only to bolster PGE's defenses despite the plain language of the SIP.

### 1.    DEQ Either Ignores or Misinterprets the Former Oregon SIP.

Contrary to the position advanced by DEQ in its amicus brief, nothing in the former SIP required an increase in a facility's Plant Site Emissions Limits ("PSEL") in order for the plant to trigger PSD requirements.  Rather, the SIP required an increase in actual emissions since the "baseline."  Sierra Club's Complaint sufficiently alleges such an increase, and thus Sierra Club's claims alleging modifications between 1995 and 2003 should not be dismissed.

#### a.    The plain language of the former SIP covers increases in actual emissions since the baseline period.

Under Oregon's former SIP, a modification was defined as a physical or operational change that results in "a net significant emission rate increase" for any regulated air pollutant. OAR 340-028-0110(57) (1997) (superceded).  In calculating this increase, "all accumulated increases and decreases in actual emissions occurring at the source since the baseline period," must be taken into account.  *Id.*  Thus, after a change at a source, the actual emission rate must be greater by the significant emission rate than the actual emissions occurring at the source since the baseline period.  "Actual emissions as of the baseline period" meant "the average rate at which the source actually emitted the pollutant during a baseline period and which is representative of normal source operation."  OAR 340-028-0110(3)(a).  DEQ's interpretation, however, focuses on a different section of the definition of "actual emissions."  According to DEQ, "for any source that had not begun normal operations as of the baseline period, actual emissions equal the potential to emit of the source, provided there was a permit allowing the construction and operation of the source in the baseline period."  DEQ Amicus at 8.  This position, however, is contrary to the plain meaning of the former definition of "actual emissions."

"Actual emissions" was defined as "mass emissions of a pollutant from an emissions source during a specified time period. . ." OAR 340-028-0110(3). The definition then included a specific provision for "determining actual emissions as of the baseline period," discussed above. OAR 340-028-0110(3)(a). That specific provision, in turn, contains one exception allowing DEQ to substitute a "source-specific mass emission limit included in the permit for a source that was effective on September 8, 1981" if it is within 10% of the average rate at which the source actually emitted the pollutant during the baseline period. *Id.* The "baseline period" was defined as either 1977 or 1978, or a prior time period more representative of normal source operations. OAR 340-028-0110(13). Under this definition, actual emissions during the baseline period were zero for a source that had an average rate of actually emitting pollution of zero. The definition did not distinguish between sources permitted to construct and operate during the baseline period and those that were not.[2] Moreover, Sierra Club has alleged that PGE was *not* permitted to construct and operate during the 1977-1978 baseline period. Complaint ¶ 128.

The definition of "actual emissions" also contained a separate subpart "[f]or any source which had not yet begun normal operation in the specified time period," providing that actual emissions equal the "potential to emit" of the source. OAR 340-028-0110(13)(b). This appears to be the subsection that DEQ relies on in asserting that "actual emissions during the baseline period" for PGE Boardman equaled its potential to emit. The (a) definition discussed above

---

[2] DEQ's focus on whether sources were permitted or unpermitted during the baseline period also leads to its mischaracterization of *Oregon Environmental Council v. Oregon Dept. of Environmental Quality*, 1992 WL 252123 (D. Or. Sept. 24, 1992) (*OEC v. ODEQ*). DEQ attempts to distinguish this case by saying that Precision Castparts did not have a permit during the baseline period, but apparently was operating during 1977-1978. DEQ Amicus at 8. Nothing in *OEC v. ODEQ* indicates that Precision Castparts was operating until after it received its permit to construct and operate on October 31, 1979, two months before PGE received its air permit for Boardman. *OEC v. ODEQ*, p. 19. Regardless, the applicable SIP provision makes no distinctions between permitted and unpermitted sources. Even if it did, Sierra Club has alleged that Boardman received the necessary permit to construct and operate in 1979, two months after Precision Castparts.

controls, however, under the plain meaning rule.

Subpart (a) provides specifically for the calculation of emissions during the baseline period, and includes only one exception to the "actual emissions" rule. Under the canon of construction *expressio unius est exclusio alterius* (the express mention of one thing excludes all others), because (a) expressly includes one exception to the "actual emissions" calculation for the baseline period, other exceptions should not be assumed. Moreover, the definition in subsection (b) is silent regarding sources that had been permitted during the applicable period, but had not begun actual operation. Subpart (b) only states that "for *any* source which had not yet begun normal operation in the specified time period, actual emissions shall equal the potential to emit of the source." OAR 340-028-0110(3)(b). DEQ alters the plain meaning of (b)'s "*any* source" to say "sources permitted during the baseline period." This addition contradicts the plain language of the definition.

> **b.      DEQ's Interpretation Leads to Absurd Results and Flatly Contradicts Prior Agency Interpretations.**

Applying the plain meaning of (b) leads to absurd results, while applying the plain meaning of (a) does not. In fact, Oregon's PSD program would have been eviscerated by interpreting "actual emissions" during the "baseline period" to mean "potential to emit" for any source that did not operate during the baseline period. Again, the definition of actual emissions made no distinctions between sources permitted in 1977-1978, and those permitted later. Thus, the "actual emissions" calculation was the same for permitted and unpermitted sources.

If "actual emissions during baseline" means "potential to emit" for sources that had not begun normal operation in 1977 or 1978, no new sources would have been required to undergo PSD review under the former SIP. For instance, a new manufacturing facility that "had not begun normal operation" in 1977-1978, but was permitted in 1990 with the potential to emit more than the significant emission rate of a regulated pollutant, would not have been subject to

PSD, even though its actual emissions exceeded the significant emissions rate. "Actual emissions" would never exceed "potential to emit" because those terms were equivalent, according to DEQ.

DEQ fails to provide any regulatory language, administrative history or logic for its interpretation that (b) applies to sources that were permitted to construct and operate during the baseline period, but which had not begun operation. DEQ's lack of explanation is troubling given DEQ's conflicting statements about how the PSD program applies to PGE Boardman. On several occasions, DEQ has explicitly stated that PGE Boardman's "baseline emissions" equal zero. *See* 1996 Title V Review Report at 11 ("[PGE Boardman] did not operate nor was it permitted to operate during the baseline period of 1977 or 1978. Therefore the baseline emissions rate is zero for all pollutants"), relevant portions attached as Ex. E[3]; June 19, 2000 letter from Mark Fisher, DEQ to Tom Kingston, PGE ("[s]ince PGE's coal-fired power plant did not operate during the baseline period, the baseline emission rate is zero."), attached as Ex. F. Thus, in 1996 and again in 2000, DEQ correctly determined that for purposes of PSD review, the baseline emissions rate for PGE Boardman was zero.

Interestingly, however, DEQ did not take that conclusion to its logical, legal, end. The interpretation of "actual emissions during the baseline period" advanced by DEQ in these documents should have required PGE Boardman to undergo PSD review, something that PGE and DEQ apparently sought to avoid. Thus, in its 2000 letter, DEQ claimed that the PSEL program exempted PGE from PSD review. DEQ stated that PSELs are intended to regulate increases and decreases in air emissions and thus the increase in emissions over the baseline emissions rate referred to in the definition of "major modification" must be an increase in the PSEL (i.e. allowable emissions). This is a significant leap in logic. DEQ fails to explain the

---

[3] Exs. A-D are attached to Sierra Club's Opposition.

leap, and it appears that DEQ was simply attempting to alter the plain meaning of the SIP to avoid requiring PSD review at PGE Boardman.  Recognizing that this approach would allow PGE to add entirely new units to the facility and double emissions of $SO_2$ without going through PSD, DEQ tried to re-write the SIP provisions in the letter to address PGE's situation.  DEQ's new "SIP-amendment-by-letter" provided that PSEL increases of more than 1 ton per year trigger PSD at Boardman (though at all other facilities the increase must be more than the significant emissions rate), and that the PSEL assigned to the original emissions units cannot be used for new or replacement emissions units (though the SIP did not contain such a restriction.) This interpretation differs significantly from the plain meaning of the SIP, as DEQ itself recognized in the 2000 letter.  The 2000 interpretation also differs significantly from the new position in DEQ's amicus brief.  Thus, it appears that DEQ's interpretation shifts in whatever direction benefits PGE, resulting in conflicting interpretations of its SIP that simply do not hold water.

        2.       **DEQ's interpretation regarding the current SIP is in error.**

DEQ also takes an erroneous position on the current SIP definition of "major modification," which has been in place since 2003.  DEQ claims that PSD applies when a physical or operational change at a facility results in an increase in emissions that necessitates a PSEL exceeding the facility's "netting basis."  In explaining why its position is credible, DEQ cites to OAR 340-200-0020(66)(a) & (b).  Remarkably and inexplicably, DEQ ignores the existence of subsection (c), which directly follows the provisions cited by DEQ and which clearly applies to PGE Boardman.  As Sierra Club explained in its Opposition, subsection (c) applies to "new or modified major sources that were permitted to construct and operate after the

baseline period [1977 or 1978] and were not subject to [PSD]." OAR 340-200-0200(66)(c).[4]

For these sources, a "major modification" includes "[t]he addition or modification of any stationary source or sources after the initial construction that have cumulative potential emissions greater than or equal to the significant emission rate, excluding any emission decreases." OAR 340-200-0200(66)(c)(B). This provision is written in the disjunctive and bears no connection to the requirements for increases in PSEL contained in subsections (a) and (b).

DEQ has previously stated that OAR 340-200-0020(66)(c) applies to PGE Boardman. *See* 2007 Title V Permit Review Report ("[t]he portion of the definition that applies to PGE Boardman is as follows," citing *only* (c)), relevant portions attached as Ex. G. DEQ fails to explain why DEQ's new interpretation is appropriate in light of the agency's prior proclamations. Moreover, DEQ's new interpretation of the current SIP fails to prevent significant increases of actual emissions due to physical changes at facilities, as required by the CAA, and, in the case of PGE Boardman, would allow the plant to double its $SO_2$ emissions without further analysis. *See* Opposition 40-43. DEQ's new interpretation is an *ad hoc* amendment to the approved SIP to accommodate one regulated entity.

## II.    The Statute of Limitations Does Not Bar Sierra Club's Claims.

PGEs reliance on a recent district court decision does nothing to strengthen its position that Sierra Club's claims are time-barred. In its Reply brief, PGE relies on *Sierra Club v. Otter Tail Corp.*, CIV 08-1012, 2009 WL 891868 (D.S.D. March 31, 2009), an opinion issued after

---

[4] While Sierra Club is not challenging the legality of (c) in this litigation, one explanation for why DEQ has sharply changed its mind about which provision applies to PGE is that the very existence of (c) is problematic. Any facility that had not "commenced" construction, which includes the procurement of all necessary construction and operation permits before August 7, 1977, should have been subject to PSD. Thus, a "source that [was] permitted to construct and operate after the baseline period [1977 or 1978]" could not *legally* have been "*not* subject to PSD." DEQ may be changing its interpretation now to avoid admitting that PGE Boardman was illegally grandfathered to begin with.

Sierra Club submitted its Opposition in this case.[5]  In *Otter Tail*, the district court held that the plaintiff's PSD claims against a power plant were barred by the statute of limitations.  However, a close look at *Otter Tail* shows that the court did little more than rely on the Eleventh Circuit's erroneous decision in *Nat'l Parks Conservation Ass'n v. TVA*, 502 F.3d 1316 (11th Cir. 2007), and the Eighth Circuit's decision in *Izaak Walton League of America, Inc. v. Kimbell*, --- F.3d ---, 2009 WL 564976 (8th Cir. March 6, 2009), which, as explained below, is distinguishable.

As Sierra Club explained in its Opposition, there is a clear conflict between the two appellate level courts that have addressed whether PSD claims such as Sierra Club's are barred by the statute of limitations.  *Cf. Nat'l Parks Conservation Ass'n v. TVA*, 480 F.3d 410 (6th Cir. 2007) to *Nat'l Parks Conservation Ass'n v. TVA*, 502 F.3d 1316 (11th Cir. 2007).  The court in *Otter Tail* chose to follow the Eleventh Circuit and not the Sixth Circuit because the court believed that a recent non-Clean Air Act decision by the Eighth Circuit directed this result: "I adopt the reasoning of the Eleventh Circuit [in *Nat'l Parks*] primarily based upon the Eighth Circuit's reasoning in *Izaak Walton League* [.]" *Otter Tail*, 2009 WL 939575 at *7.  The district court's reliance on *Izaak Walton League* was misplaced, however.

In *Izaak Walton League*, plaintiffs sued the Forest Service over construction of a snow mobile trail between two lakes and failure to establish motor boat quotas in those lakes -- conduct which plaintiffs alleged constituted violations of the Boundary Waters Canoe Area Act.  The Forest Service contended that it determined in 1980 that the lakes were not part of the designated wilderness area, and the statute of limitations barred plaintiffs from challenging that

---

[5] The opinion was subsequently amended.  *See Sierra Club v. Otter Tail Corp.*, -- F.Supp.2d --, 2009 WL  939575 (D.S.D. April 6, 2009).

determination.  The court agreed.

In applying the "continuing violation" doctrine,[6] the court determined that, to avoid the statute of limitations, "new overt acts must be more than the unabated inertial consequences of the initial violation."  *Izaak Walton League*, 558 F.3d at 759 (internal quotations ommitted).  In that case, the "initial violation" was the Forest Service's alleged failure to designate the lakes in the wilderness area.  The rest of the Forest Service's alleged failures, such as the failure to establish boat quotas, were *legally dependent* upon this one, non-repeating act.  Thus, the "new overt acts" were merely "consequences of the initial violation" because they could not be established unless the Forest Service's wilderness designation was reversed.

Similarly, in each of the cases relied upon by the Eighth Circuit in *Izaak Walton League*, none of the "new overt acts" constituted independent violations of law.  *See, e.g.*, *Stupak-Thrall v. Glickman*, 346 F.3d 579 (6th Cir. 2003) (affirming dismissal based on statute of limitations; noting that plaintiffs' new claim pertaining to failure to complete a map of a wilderness area really stemmed from plaintiffs' time-barred claim on the original designation of the area).  Contrast this decision with the Sixth Circuit's decision in *Nat'l Parks*.  The author of the *Nat'l Parks* decision, Judge Karen Nelson Moore, was also on the unanimous *Stupak-Thrall* panel.  But in *Nat'l Parks*, the Sixth Circuit recognized that the CAA makes operation in violation of an emission limit independently actionable.  480 F.3d at 418 (citing 42 U.S.C. § 7604(a) and (f)).

---

[6] Confusingly, it would appear that what the Eighth Circuit referred to as "continuing violations" are what the Sixth Circuit (and Sierra Club) refer to as "a series of discrete violations."  *See Nat'l Parks*, 480 F.3d at 417.  Thus when the Eighth Circuit referred to "new overt acts" it was inquiring into whether there was "a series of discrete violations," which were within the statute of limitations.  The Eighth Circuit's decision has arguably furthered the confusion over what the expression "continuing violation" means.  *See also* Opposition at 23-26.

The Sixth Circuit went on to find that "failing to apply BACT is actionable, and this cause of action manifests itself anew each day a plant operates without BACT limits on emissions." *Id.* Under the Eighth Circuit's formulation in *Izaak Walton League*, the "new overt acts" at issue here are more than the "unabated inertial consequences of the initial violation." 558 F.3d at 759. That is because, as the Sixth Circuit recognized in *Nat'l Parks*, the CAA makes construction without a PSD permit and operation without a PSD permit separately actionable. That was not true of the "new overt acts" in *Izaak Walton League* or in *Stupak-Thrall*; and that is also why *Stupak-Thrall* and *Nat'l Parks*, both decided by the Sixth Circuit, are consistent decisions.

In sum, the recent decision in *Otter Tail* fails because of its reliance on *Izaak Walton League*, and in turn, on the Eleventh Circuit's decision in *Nat'l Parks*. PGE's submission of *Otter Tail* as "yet another district court [that] has rejected arguments nearly identical to those of Plaintiffs," rings hollow, as it unaccompanied by any actual analysis of why PGE believes the *Otter Tail* court was correct. Reply at 3. Rather, PGE simply continues to assert that Sierra Club lacks authority for its position, save the opinions of a "single judge in Ohio,"[7] and that the Court need look no further than the mere existence of separate PSD and Title V permitting programs in Oregon.[8] In presenting these oversimplified arguments, PGE fails to address the numerous statutory and regulatory arguments and cases that Sierra Club raises. Unlike PGE, Sierra Club has explained *why* this Court should follow the Sixth Circuit, and not the Eleventh

---

[7] Sierra Club, in fact, relies on numerous cases in addition to the Ohio cases to which PGE refers. *See* Opposition at 17-25.

[8] As explained in Sierra Club's Opposition, a proper analysis of the statute of limitations question does not depend on whether a state has a combined or separate permitting program. Indeed, in the very case PGE relies on for this assertion, *United States v. Duke Energy*, 278 F.Supp.2d 619, 652 (M.D.N.C. 2000), the court noted that the combined nature of the state permitting program was of questionable relevance to its analysis.

Circuit or its recent progeny.  Because Sierra Club's claims are based on a series of discrete

violations occurring within the statute of limitations, they are timely.

## III.   This Court has Jurisdiction to Hear Sierra Club's Claims Based on the Initial Grandfathering of PGE Boardman.

For the first time in its Reply, PGE argues that this Court lacks jurisdiction to hear Sierra

Club's claims stemming from the initial construction of the plant because those claims are a

collateral attack on EPA's 1975 determination that PGE was not subject to PSD.  For Sierra

Club's claims to constitute an impermissible collateral attack on an agency determination,

however, judicial review of that decision must have been available through some other means.

EPA's letter has never been directly reviewable, either under the CAA or the APA, thus this

Court has jurisdiction to rule on whether a PSD permit was required for the initial construction

and operation of PGE Boardman.  Moreover, the CAA confers jurisdiction in the district courts

for this citizen suit.  Therefore, Sierra Club's claims are properly before the court.

### A.    The CAA did not provide a cause of action for judicial review of EPA's 1975 determination.

The judicial review section of the CAA in force in 1975 provided judicial review in the

Courts of Appeals for a limited range of EPA actions, which did not include PSD applicability

determinations.  In 1977, Congress amended section 7607 ("1977 version").  Pub. L. 95-95, 91

Stat. 776; § 14 of Pub. L. 95-190, 91 Stat. 1404, 42 U.S.C. § 7607(b)(1) (1976 ed., Supp. II).  As

amended, section 7607(b)(1) provides for appellate judicial review of specific EPA actions and

"any other final action."  This amendment significantly increased the range of reviewable EPA

actions under the CAA.  The amendment, however, was not retroactive.

If Congress' intent for retroactive effect is clear, courts should not apply the judicial

presumption against retroactivity. *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994).  If

Congress' intent is not clear, on the other hand, the court moves to step two of the *Landgraf*

analysis to ask whether the new statute has retroactive effect.  Under *Landgraf* step two, if the statute operates retroactively, a presumption against retroactivity attaches, and the court will not apply the statute to an action that occurred prior to enactment.  *Id.  See also Hughes Aircraft Co. v. United States ex re. Schumer*, 520 U.S. 939 (1997).  PGE does not specifically address retroactive application, but rather wholly relies on *Grand Canyon Trust v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1253 (D.N.M. 2003), to aruge that Sierra Club's claims are collateral attacks.  While the court in *Grand Canyon* touched on related issues, the court made no holding on the retroactivity of section 7607(b)(1).[9]  *Id.* at 1254.  The *Grand Canyon* court did not decide whether the 1977 version of 7607(b)(1) applied retroactively.  *Id.*[10]  Rather, the court implied that plaintiff's claim that a PSD permit was required belonged in the district court against EPA.  *Id.*  Because the CAA only provides district court jurisdiction for claims that EPA failed to perform mandatory duties, the suit referred to by the *Grand Canyon* court must lie in the APA, if anywhere.  42 U.S.C. 7604(a)(2).  As explained below, however, the APA does not grant jurisdiction for such a claim.

**B.    The Administrative Procedure Act did not provide a cause of action for judicial review of EPA's 1975 determination.**

The APA provides for judicial review of "final agency action."  5 U.S.C. § 704.  Under *Bennett v. Spear*, 520 U.S. 154 (1997), a "final" action marks the "consummation" of the agency's decision-making process, and must be one from which "rights or obligations have been determined," or from which "legal consequences will flow."  *Id.* at 177-78.  Courts have held

---

[9] While PGE and the *Grand Canyon* court fail to provide a *Landgraf* analysis, if this Court engages in the analysis, the 1977 version of 7607(b)(1) does not apply to pre-1977 conduct.
[10] PGE also cites to *Grand Canyon* to support its contention that *Ass'n to Protect Hammersly v. Taylor Res.* is inapposite because of the judicial review section of the CWA differs from that of the CAA, but the judicial review section of the CAA in effect in 1975, however, was more similar to that of the CWA than the current section. Compare 33 U.S.C. § 1369 with Pub. L. 91-604, 84 Stat. 1708 (1970).  *Hammersley* is thus the applicable precedent, *in para materia*.

that, to be considered final, an agency action must impose direct and immediate consequences. *See Sierra Club v. Yeutter*, 911 F.2d 1405, 1416 (10th Cir.1990).

EPA's 1975 determination did not have immediate consequences or require immediate compliance.  EPA was free at any time to exercise its enforcement authority to issue an administrative compliance order or institute an enforcement action against PGE for violations of PSD.  42 U.S.C. § 7413.  Citizens were similarly not barred from bringing a citizen suit for violations of SIP permit requirements.  *See* Opposition at 33.  As explained by the Ninth Circuit in *Grand Canyon Trust v. Tucson Electric Power Co.*, section 7604 vests the district courts with jurisdiction over citizens' claims against third parties for violations of permit requirements.  382 F.3d 1016, 1021 (9th Cir. Sept. 2, 2004); *see also Grand Canyon Trust v. Tucscon Electric Power Company*, Civ. No. 01-2189-PCT-EHC, slip op. at 3 (D. Ariz. Sept. 12, 2002) *rev'd on other grounds by* 382 F.3d 1016 (attached as Ex. H) (the only jurisdictional prerequisite to citizen suit is a 60-day notice of violations).  The CAA is a strict liability statute that does not contain an exception to enforcement under sections 7413 or 7604 based on agency determinations of non-applicability.  Thus, EPA's 1975 determination was not a final agency action under the APA.  Sierra Club's claim that PGE has been illegally operating the plant since its initial construction is therefore not barred as a collateral attack on that determination.

## CONCLUSION

For the reasons explained in Plaintiffs' Opposition to Defendant's Motion to Dismiss, and the reasons explained above, PGE's Motion to Dismiss should be denied.

Dated this 18th day of May 2009.        Respectfully submitted,

/s/ Aubrey Baldwin
AUBREY BALDWIN, OSB 060414
Pacific Environmental Advocacy Center
(503) 768-6929
Attorney for Plaintiffs