UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SIERRA CLUB, a non-profit corporation;
NORTHWEST ENVIRONMENTAL
DEFENSE CENTER, a non-profit
corporation; COLUMBIA GORGE, a
non-profit corporation; COLUMBIA
RIVERKEEPER, a non-profit corporation;
and HELLSCANYON PRESERVATION
COUNCIL,a non-profit corporation,

        Plaintiffs,

      v.                            Civil No. 08-1136-HA

                                     OPINION AND ORDER

PORTLAND GENERAL ELECTRIC
COMPANY, an Oregon corporation,

        Defendant.

_____

HAGGERTY, District Judge:

      Plaintiffs Sierra Club, Northwest Environmental Defense Center, Friends of the

Columbia Gorge, Columbia Riverkeeper, and Hells Canyon Preservation Council (hereinafter

plaintiffs or Sierra Club) filed suit against defendant Portland General Electric Company

(defendant or PGE) seeking civil penalties and injunctive relief for alleged violations of the

Clean Air Act (CAA or Act), 42 U.S.C. §§ 7401-7671q, and certain Oregon Department of

1- OPINION AND ORDER

Environmental Quality (ODEQ) regulations.  Defendant moves to dismiss plaintiffs' first, fifth,

sixth, seventh, eighth, ninth, tenth, eleventh, and twelfth claims for relief pursuant to Federal

Rule of Civil Procedure 12(b)(6).  The State of Oregon, acting as *amicus curiae*, has also filed a

brief with the court.  Oral argument was held on September 10, 2009.  For the following reasons,

defendant's Motion to Dismiss [21] is GRANTED IN PART and DENIED IN PART.

## STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6),

the court must determine whether the plaintiff has made factual allegations that are "enough to

raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

545 (2007); Fed. R. Civ. P. 12(b)(6).  Dismissal under Rule 12(b)(6) "can be based on the lack of

a cognizable legal theory or absence of sufficient facts alleged under a cognizable legal theory."

*Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).  The reviewing court must

treat all facts alleged in the complaint as true, and resolve all doubts in favor of the nonmoving

party.  *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986); *Experimental Eng'g, Inc. v.*

*United Tech. Corp.*, 614 F.2d 1244, 1245 (9th Cir. 1980).

## BACKGROUND

Plaintiffs are non-profit environmental organizations.  Plaintiffs allege that PGE

constructed, modified, and currently operates the coal-fired steam generating Boardman Electric

Generating Station (Boardman or the Plant) in Morrow County, Oregon, in violation of the CAA

and ODEQ regulations.[1]  Plaintiffs bring this action pursuant to the CAA's citizen suit provision.

---

[1] PGE is the operator and majority owner of Boardman.  The other owners are BA
Leasing BSC L.L.C., Idaho Power Company, and the Power Resources Cooperative.

42 U.S.C. § 7604.  Plaintiffs assert that Boardman is the single largest source of harmful air pollution in Oregon and that it lacks pollution control technologies that are required by law, and which, if implemented, would reduce Boardman's emissions levels drastically.

### A.    Overview of the Clean Air Act Regulatory Framework

####    1.    The Clean Air Act

The CAA of 1970 was enacted "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of the population."  42 U.S.C. § 7401(b)(1).  The Act requires the United States Environmental Protection Agency (EPA) to establish national ambient air quality standards (NAAQS) for six criteria pollutants that EPA has determined may cause or contribute to air pollution reasonably anticipated to endanger public health or welfare.  42 U.S.C. §§ 7408(a), 7409(a).  The Act requires the division of states into air quality planning areas, which are then designated as "in attainment," " nonattainment," or "unclassifiable" due to insufficient information with respect to each pollutant, depending on each area's air quality.  *Great Basin Mine Watch v. U.S. EPA*, 401 F.3d 1094, 1096 (9th Cir. 2005).  Under the CAA's scheme of "cooperative federalism," states may implement many of the Act's provisions, and each state is required to submit a state implementation plan (SIP) to EPA for approval.  A SIP must meet certain minimum standards set forth by the CAA and EPA regulations before being approved.  42 U.S.C. § 7410(a)(1), (a)(2)(A), (k)(1).

####    2.    New Source Performance Standards

The 1970 Act directed EPA to promulgate technology-based air emissions standards

3- OPINION AND ORDER

applicable to particular categories of facilities that are newly constructed, reconstructed, or have undergone modification which results in an increase in the amount of any air pollutant emitted by the facility.  42 U.S.C. § 7411; 40 C.F.R.§ 60.14.  The parties dispute which new source performance standards (NSPS) apply to the Plant.  PGE contends that Boardman is subject to, and in compliance with, 40 C.F.R. Part 60, Subpart D, which applies to fossil-fuel-fired steam generating units for which construction commenced after August 17, 1971.  Sierra Club contends that Boardman is additionally subject to 40 C.F.R. Part 60, Subpart Da, which applies to similar units for which construction, modification, or reconstruction is commenced after September 18, 1978.  40 C.F.R. § 60.40Da(a).

3.    Prevention of Significant Deterioration

The prevention of significant deterioration (PSD) program governs sources located in regions that are in attainment with NAAQS or where there is insufficient information to evaluate whether the standards have been met.  42 U.S.C. §§ 7470-92.[2]  The PSD program is designed to promote the protection of air quality in attainment areas, as well as economic growth that is consistent with the preservation of air quality.  42 U.S.C. § 7470.

A central feature of the PSD program is the requirement that proposed new major emitting facilities, or existing major emitting facilities for which modifications are proposed, obtain a permit and approval prior to construction.  42 U.S.C. § 7475.  The term "modification" is defined as: "any physical change in, or change in the method of operation of, a stationary

---

[2] The "Nonattainment New Source Review" program governs sources located in regions not in attainment with applicable NAAQS and requires more stringent pollution reduction measures than the PSD program.  *See New York v. U.S. EPA*, 413 F.3d 3, 12 (D.C.Cir. 2005); 42 U.S.C. §§ 7501-15.

source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. §§ 7479(2)(C), 7411(a)(4).

The PSD program includes requirements that the proposed facility demonstrate "that emissions from construction or operation of such facility will not cause, or contribute to" inordinate increases of any pollutant or an exceedance of NAAQS, and that the facility utilize best available control technology (BACT) for each regulated pollutant. 42 U.S.C. § 7475. A PSD permit sets forth emissions limitations for a facility and requires the operator to engage in ongoing monitoring "to determine the effect which emissions" have on air quality in affected areas. *Id*.

The PSD program currently utilizes both the 1974 PSD regulations promulgated by EPA and the superseding 1977 Amendments to the CAA.[3] Neither 1974 PSD regulations nor the 1977 PSD Amendments apply to plants that "commenced" construction prior to specified dates. Such plants are instead "grandfathered" past the PSD program unless and until the plant is modified within the meaning of the Act. Under EPA's 1974 PSD regulations, facilities that commenced construction before June 1, 1975, were not required to obtain a PSD permit. Under the 1977 PSD Amendments, facilities that commenced construction before August 17, 1977, were not required to obtain a PSD permit. 39 Fed. Reg. at 42,516; 42 U.S.C. § 7475(a).

The 1974 PSD regulations and 1977 PSD Amendments define "commence" similarly. A facility is determined to have commenced construction with either the initiation of actual

---

[3] The 1974 PSD regulations apply to fossil-fuel-fired plants with more than 1000 million British thermal units (BTU) per hour input. The 1977 Amendments apply to fossil-fuel-fired plants with more than 250 million BTU/hr heat input. 39 Fed. Reg. 42,510, 42,516 (Dec. 5, 1974); 42 U.S.C. § 7479(1).

construction, or upon entering into a contractual obligation for the construction of the facility.
39 Fed. Reg. at 42,516; 42 U.S.C. § 7479(2)(A).

        4.      Oregon's PSD Program

Each state's SIP must contain "emission limitations . . . to prevent significant
deterioration of air quality in each region" designated as "in attainment" or as "unclassifiable"
with applicable NAAQS. 42 U.S.C. § 7471. Oregon has primary responsibility for keeping its
air quality in compliance with federal standards pursuant to its SIP. Oregon's PSD program was
first approved by EPA on November 5, 1981. 46 Fed. Reg. 54939 (Nov. 5, 1981).[4] Before
Oregon's PSD program received approval, the federally administered program was administered
in Oregon.

Under Oregon's SIP, regulated sources are assigned a Plant Site Emission Limit (PSEL)
for each air pollutant emitted. Or. Admin. R. (OAR) 340-224-0020(89). Oregon's PSD program
applies to the construction of a "federal major source" and to "major modifications" of a federal
major source. OAR 340-224-0020(66). Before the owner or operator commences construction
of a major source or a major modification of such a source, the owner or operator must obtain a
Standard Air Contaminant Discharge Permit (ACDP). OAR 340-224-0010(2); OAR 340-216-
0025; OAR 340-028-1900(1) (1997). An ACDP is a PSD permit in Oregon.

Under Oregon's SIP, a modification is considered "major" if it is a "physical change or
change of operation of a source that results" in an "increase in the PSEL by an amount equal to
or more than the significant emission rate over the netting basis," and if the "accumulation of

_____

      [4] Oregon's original PSD program was replaced with a new version of the program that
was approved by EPA on August 13, 1982. 47 Fed. Reg. 35191 (Aug. 13, 1982).

physical changes and changes of operation since baseline would result in a significant emission

rate increase." OAR 340-224-0020(66)(a),(b). However, major modification is defined

differently for "new or modified major sources that were permitted to construct and operate after

the baseline period [1977-78] and were not subject to New Source Review." OAR 340-224-

0020(66)(c). For such plants, modifications are considered "major" if they "have cumulative

potential emissions greater than or equal to the significant emission rate, excluding any emission

decreases." OAR 340-224-0020(66)(c)(B).

The amount of a pollutant considered significant depends upon the pollutant in question

and the "significant emission rate" for each pollutant is set forth by rule. OAR 340-224-

0020(126). The "netting basis" is calculated by adding and subtracting from the "baseline

emission rate" based upon applicable rules and regulations. OAR 340-224-0020(71). The

baseline emission rate, in turn, is calculated as the "actual emission rate during" any consecutive

twelve-month period during calendar years 1977 or 1978. OAR 340-224-0020(13), (14). Some

modifications, such as "routine maintenance, repair, and replacement of components" are

expressly excluded from the definition of "major modification." OAR 340-200-0020(66)(d).

5.    Title V Permitting Program

Title V was enacted as part of the CAA's 1990 Amendments and requires "major

stationary sources of air pollution to obtain operating permits, and establishes a procedure for

federal authorization of state-run programs." *Ohio Pub. Interest Research Group, Inc. v.*

*Whitman*, 386 F.3d 792, 794 (6th Cir. 2004) (citing 42 U.S.C. §§ 7661a(a), 7661c(a); 40 C.F.R.

§§ 70.3, 70.6(a)(1)). "Title V does not impose new obligations; rather, it consolidates pre-

existing requirements into a single, comprehensive document for each source, which requires

7- OPINION AND ORDER

monitoring, record-keeping, and reporting of the source's compliance with the Act." *Id*. (citing 42 U.S.C. §§ 7661c(a), (a); 40 C.F.R. §§ 70.6(a)(3), (c)(1)); *see also* OAR 340-218-0010(3)(b)(A) ("Oregon Title V Operating Permits do not replace requirements in [ACDPs]"). Oregon's Title V program was approved by EPA in 1995. Boardman operates subject to a Title V permit issued by ODEQ in 1996 and renewed in 2001. OAR 340-218-0010; 60 Fed. Reg. 50,106 (Sept. 28, 1995).

### B.    Factual Background

Boardman combusts coal in a boiler to produce steam that drives turbines to generate electricity. On February 28, 1973, PGE filed a site certificate application to build Boardman with Oregon's Nuclear and Thermal Energy Council (NTEC), predecessor to the Energy Facility Siting Council (EFSC). Compl. ¶ 121. On July 31, 1974, ODEQ recommended that NTEC issue the site certificate with an understanding that the plant would be subject to EPA's then-pending 1974 PSD regulations. Compl. ¶ 122. On March 24, 1975, Oregon approved PGE's site certificate for Boardman, and on May 1, 1975, PGE requested that EPA make a determination as to whether the 1974 PSD regulations applied to the Plant. Compl. ¶¶ 123-24. On May 15, 1975, EPA determined that PGE had "commenced" construction within the meaning of applicable PSD regulations based on a March 15, 1974, "letter of intent" to purchase a turbine generator for the Plant. Accordingly, EPA concluded that Boardman was not subject to the 1974 PSD regulations. Compl. ¶¶ 124-25.

On November 12, 1975, EFSC authorized PGE to begin construction. It is unclear when construction actually began. Compl. ¶ 127. PGE applied for an ACDP on April 4, 1977, but was not formally issued the permit until December 6, 1979. Because the ACDP lacked necessary

emissions limitations, ODEQ reissued the ACDP on January 14, 1980. Compl. ¶ 127. Boardman began operations on August 3, 1980.

PGE has made several physical modifications to Boardman since operations began. Sierra Club alleges that seven of these modifications, taking place between 1997 and 2006, were major modifications. Boardman never applied for, or received, a PSD permit and has never utilized BACT. Compl. ¶ 136.

Boardman is the largest stationary source of sulfur dioxide, nitrogen oxides, and carbon dioxide in Oregon.[5] Compl. ¶¶ 17-20. Boardman is also a major source of particulate matter, or "soot," containing heavy metals. Compl. ¶ 21. These pollutants are alleged to have pernicious effects locally, regionally, and globally. Compl. ¶¶ 17-23.

Sierra Club served PGE with a pre-suit notice on January 15, 2008, and filed suit on September 30, 2008. Sierra Club asserts twelve claims for relief against PGE for the following alleged CAA violations at Boardman: (1) violations of NSPS Subpart Da, (2) NSPS opacity violations, (3) Oregon SIP opacity violations, (4) Title V opacity violations, (5) violations of PSD construction and operation permit requirements, (6) failure to utilize BACT following construction in violation of the PSD program, (7) illegal modifications in violation of Oregon's PSD program, (8) failure to utilize BACT following modifications of the Plant in violation of Oregon's PSD program, (9) violations of the Oregon SIP stationary source notification requirements, (10) violations of Title V notification requirements, (11) violations of Oregon SIP reporting requirements, and (12) violations of Boardman's Title V permit reporting requirements.

---

[5] Carbon dioxide is not a criteria pollutant under the CAA. However, the CAA gives EPA authority to regulate carbon dioxide. *See Massachusetts v. EPA*, 549 U.S. 497 (2007).

**DISCUSSION**

PGE seeks the dismissal of plaintiffs' first, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, and twelfth claims for relief pursuant to Federal Rule of Civil Procedure 12(b)(6). PGE argues that: (1) claims five and six, and parts of claims one, seven, and eight, are barred by the applicable statute of limitations and by the concurrent remedy doctrine; (2) claims one, five, six, seven, and nine fail to state claims upon which relief may be granted; (3) claim ten should be dismissed as duplicative of other claims subject to dismissal; (4) claims eleven and twelve fail to comply with pre-suit notice requirements of the CAA; (5) plaintiff's speculative allegations about unidentified projects fail to comply with pre-suit notice requirements; and (6) multiple claims should be dismissed for failure to plead a plausible set of facts under *Twombly*.

**A.      Statute of Limitations**

PGE argues that all or parts of five of plaintiffs' claims for relief are barred by the federal five-year statute of limitations and the concurrent remedy doctrine. PGE contends that plaintiffs' fifth claim (PSD construction) and sixth claim (BACT construction) are barred completely, and that plaintiffs' first claim (NSPS Subpart Da), seventh claim (PSD modification), and eighth claim (BACT modification) are barred with respect to the alleged modifications to the Plant occurring over five years ago.

Legal claims brought pursuant to the CAA are subject to the general federal five-year statute of limitations established by 28 U.S.C. § 2462. *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1322 (11th Cir. 2007) ("*Nat'l Parks-Alabama*"). Under 28 U.S.C. § 2462, a claim first accrues when the alleged violation occurs. *3M Co. v. Browner*, 17 F.3d 1453, 1461-62 (D.C. Cir. 1994); 28 U.S.C. § 2462.

1.      PSD and BACT Claims

PGE argues that Sierra Club's PSD and BACT construction claims accrued approximately thirty years ago when PGE began construction at Boardman without a PSD permit and without installing BACT, and that two of Sierra Club's PSD and BACT modification claims accrued at the time modification took place.  PGE asserts that all or parts of these claims are therefore time-barred by the five-year statute of limitations.

Sierra Club responds that PGE not only violated the PSD program when they constructed and modified Boardman without a permit, but that each day PGE operates Boardman absent a permit and without installing BACT is a new and separate violation.  The question presented is whether the PSD permit and BACT requirements apply to the construction and modification of the Plant only, or whether they impart ongoing operational requirements as well.

Most courts considering this issue have found that the statute of limitations tolls five years after the completion of construction for PSD claims.  *See Nat'l Parks-Alabama*, 502 F.3d at 1324 (holding that under the Alabama SIP, New Source Review requirements are solely prerequisites for the approval of a major modification and not a condition of a facility's lawful operation); *United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025, 1030 (S.D. Ind. 2005) ("a violation of the [CAA's] preconstruction permit regulations is complete at the time the construction project is completed"); *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 661 (W.D.N.Y. 2003) ("violations of the preconstruction permitting requirements occur at the time of construction, not on a continuing basis"); *United States v. Westvaco Corp.*, 144 F. Supp. 2d 439, 444 (D. Md. 2001) (under Pennsylvania's SIP, "a violation for failure to obtain a construction permit does not continue once the unpermitted construction is completed"); *United*

11- OPINION AND ORDER

*States v. S. Ind. Gas & Elec. Co.*, 2002 WL 1760752, *5 (S.D. Ind. 2002) ("a violation of 42 U.S.C. § 7475 occurs when construction is commenced, but does not continue on past the date when construction is completed"); *United States Dist. Court v. Campbell Soup Co.*, No. CIV-S-95-1854, 1997 WL 258894 (E.D. Cal. 1997) (Under California's SIP, a violation of the PSD construction permit accrues when the facility is modified); *United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1083-84 (W.D. Wisc. 2001) ("[T]he statute of limitations for a violation of the preconstruction permit requirements under 42 U.S.C. § 7475 begins to run at time of construction and does not continue through the operational life of the modified source"); *Sierra Club v. Otter Tail Corp.*, 608 F.Supp.2d 1120, 1127 (D.S.D. 2009) (adopting the Eleventh Circuit's reasoning); *but see Nat'l Parks Conservation Ass'n, Inc v. Tenn. Valley Auth.*, 480 F.3d 410, 417 (6th Cir. 2007) ("*Nat'l Parks-Tennessee*") (Under Tennessee's SIP, "the duty to obtain a construction permit containing proper emissions limits is ongoing, even *post*-construction"); *United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 652 (M.D. N.C. 2003) (holding that the failure to obtain a preconstruction permit constitutes an ongoing violation), *aff'd on other grounds*, 411 F.3d 539 (4th Cir. 2005), *vacated by Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007); *United States v. Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d 1060, 1066 (S.D. Ohio 2001) (finding that "it is illogical to conclude that a defendant may only be held liable for constructing a facility, rather than operating such facility, without complying with the permit requirements"); *United States v. Ohio Edison Co.*, No. 2:99-CV-1811, 2003 WL 23415140, *6 (S. D. Ohio Jan. 17, 2003); and *Sierra Club v. Dayton Power & Light, Inc.*, No. 2:04-CV-905, 2005 WL 1972549, *3 (S.D. Ohio Aug. 12, 2005) (all three Southern District of Ohio cases held that there is liability for operating a source without a PSD permit in addition to liability for

constructing a source without a PSD permit).

PGE urges this court to adopt the majority position, and asserts that the Oregon's PSD program requirements apply exclusively to construction and modification, not operation, and that only Oregon's Title V program applies to the operation of Boardman. PGE cites the reasoning set forth in *New York v. Niagara Mohawk*:

> A given construction or modification project occurs only once. If a permit is not obtained for that particular project, then the preconstruction permit requirement of the Clean Air Act has been violated. However, the requirement to secure a preconstruction permit applies *prior* to construction or modification. Once the construction or modification is complete, the window in which to apply for and obtain a preconstruction permit is gone. Thus, a violation of the Clean Air Act's preconstruction permit requirement is singular in nature, and does not constitute an ongoing violation.

263 F. Supp. 2d at 661.

PGE also argues that in two of the cases in which courts have concluded that the PSD program includes ongoing operational requirements, the relevant state's SIP utilized a "combined" pre-construction and operating permit. Here, the initial federal program addressed construction only, and Oregon's SIP has separate PSD and operating permit programs.

While the cases cited above are instructive, none of them provides dispositive authority in the Ninth Circuit. Moreover, none dealt with Oregon's regulatory scheme. As such, this court undertakes its own analysis of the CAA and Oregon's PSD regulations.

After reviewing Oregon's SIP, this court concludes that the PSD program applies to both the construction and the operation of a major source. Oregon's PSD program first provides that "no owner or operator may begin construction of a major source or a major modification" of such

13- OPINION AND ORDER

a source without having received an ACDP.  OAR 340-224-0010(2).  However, "[a]pproval to

construct does not relieve the owner or operator of the responsibility to comply fully with

applicable provisions of the [SIP] and other requirements under local, state or federal law;" and

"[a]pproval to construct a source under an ACDP . . . authorizes construction *and operation* of

the source."  OAR 340-224-0030(2)(b), (c) (emphasis added).  Moreover, "[t]he approval to

construct does not provide approval to *operate* the constructed or modified stationary source . . .

unless otherwise allowed by either the ACDP or Oregon Title V Operating Permit programs

(OAR 340 dvisions 216 and 218)."  OAR 340-210-0250(1) (emphasis added).  "No person may

construct, install, establish, develop, or *operate* any air contaminant source . . . without first

obtaining an ACDP." OAR 340-216-0020(1) (emphasis added).

   These provisions, by their own terms, establish that a PSD permit, or an ACDP, is

necessary for both the construction and operation of the source.  Additionally, OAR 340-224-

0070(1) establishes that the obligation to utilize BACT is ongoing, as the "owner or operator of

the proposed major source or major modification must apply BACT for each pollutant emitted."

The duty to utilize BACT goes beyond merely installing the technology, but also applies to the

operation of the facility.  Additionally, ongoing monitoring requirements indicate that a facility

is subject to the PSD program post-construction.  Oregon's PSD program requires the owner or

operator to "conduct ambient air quality monitoring."  OAR 340-224-0070(3).

   The language in the CAA also supports a conclusion that the PSD program includes

ongoing operational requirements.  The PSD program provides in relevant part:

> No major emitting facility on which construction is commenced ... may be
> constructed in any area to which this part applies unless –
> (1) a permit has been issued for such proposed facility in accordance with this

part *setting forth emission limitations* for such facility which conform to the requirements of this part;

(3) the owner or operator of such facility demonstrates . . . that emissions from construction or *operation* of such facility will not cause, or contribute to, air pollution in excess of any . . .

(4) the proposed facility is subject to [BACT] for each pollutant subject to regulation under this chapter *emitted from, or which results from, such facility*;

(7) the person who owns or operates, or proposes to own or operate, a major emitting facility for which a permit is required under this part *agrees to conduct* such monitoring as may be necessary to determine the effect which emissions from any such facility may have, *or is having*, on air quality.

42 U.S.C. § 74759(a) (emphasis added).

The PSD program contemplates not only preconstruction requirements, but also ongoing operational requirements. In addition to requiring a facility to obtain a permit prior to construction, the Act sets forth ongoing emissions limitations, requires that the operator ensure that emissions from the operation of the facility not cause excessive air pollution, requires the operator to utilize BACT for pollutants emitted from the facility, and requires the operator to conduct ongoing monitoring. *Id*. It is difficult to see how the program could effectively prevent significant deterioration of air quality if PSD requirements ceased upon the completion of construction. It makes little sense for a PSD permit to set emissions limitations and require pollution control technology, but not require a facility to operate pursuant to those restrictions. Courts focusing on language requiring a permit prior to construction do so "to the exclusion of language in the statute stating that the PSD permit shall set forth emission limitations for that source following the construction activity." *United States v. Duke Energy Corp.*, 278 F. Supp. 2d at 650. "[F]acilities contemplating undergoing a modification must obtain a PSD permit prior to construction and, following construction, operate in accordance with the terms of that permit."

15- OPINION AND ORDER

*Id*. Failure to obtain a permit in the first instance does not relieve an operator of the Act's ongoing operational requirements.

PGE argues that because Oregon has separate PSD construction and Title V operating permits, the PSD program does not contain operating requirements. However, that Oregon has separate PSD and Title V programs is irrelevant. The Title V operating program does not impose new obligations, but instead consolidates pre-existing requirements (such as those from the PSD program), into a single document. *Ohio Pub. Interest Research Group*, 386 F.3d at 794; (citing 42 U.S.C. §§ 7661c(a), (a); 40 C.F.R. §§ 70.6(a)(3), (c)(1)); *see also* OAR 340-218-0010(3)(b)(A), (B) ("Oregon Title V Operating Permits do not replace requirements in [ACDPs] and "[s]ource specific requirements, including . . . BACT . . . established in an ACDP must be incorporated into the" Title V program). The Title V and PSD programs are not mutually exclusive; rather they work in concert. Because one program contains operational requirements does not mean that the other program must lack similar requirements. As discussed above, the language of both the federal and Oregon PSD programs create ongoing operational requirements.

Defendant argues that this interpretation, "taken to its logical end, suggests a *de facto* elimination of any statute of limitation, for the limitation period would never begin to accrue so long as the facility remained in operation." *New York v. Niagara Mohawk*, 263 F. Supp. 2d at 661. This court disagrees. The statute of limitations is not eliminated. PGE may be held liable only for the five years of violations preceding suit.

This court does not find that the alleged violations are continuing violations within the meaning of the "continuing violations doctrine." Rather, this court is persuaded by the Sixth Circuit's reasoning that each day a facility operates absent a PSD permit and absent BACT

16- OPINION AND ORDER

constitutes a discrete violation of the CAA. *Nat'l Parks-Tennessee*, 480 F.3d at 416-17.

Because the statute of limitations does not bar plaintiff's claims, this court need not address the

concurrent-remedy rule. *Id*. at 420. Sierra Club may proceed with its fifth, sixth, seventh, and

eighth claims for alleged violations occurring since January 15, 2003.

> 2.    NSPS Subpart Da Claim

PGE moves to dismiss parts of Sierra Club's NSPS Subpart Da claim (claim one) for

modifications that occurred prior to January 15, 2003. Sierra club concedes that its NSPS claim

should be limited by the statute of limitations. Accordingly, Sierra Club's NSPS Da claim is

barred by the statute of limitations with respect to the alleged major modifications that took

place before January 15, 2003.

**B.    Sufficiency of the Pleadings**

PGE moves to dismiss claims one, five, six, seven, and nine for failure to state claims

upon which relief may be granted.

> 1.    NSPS Subpart Da Claim (1)

PGE asserts that most of the first claim should be dismissed because Sierra Club failed to

allege facts sufficient to establish that the modifications to Boardman render it subject to NSPS

Da.

NSPS Da applies to fossil-fuel-fired steam generating units for which modification

commenced after September 18, 1978. 40 C.F.R. § 60.40Da(a). Only modifications to the

"steam generating unit," which is defined to include the "fuel combustion system" and "steam-

generating system," but not the turbine and generator, trigger NSPS Da requirements. 43 Fed.

17- OPINION AND ORDER

Reg. 42,154 (Sept. 19, 1978).

Sierra Club concedes that it will not pursue any NSPS Da claims for any modifications to equipment other than the Boardman boiler, but argues that the first claim should not be dismissed because it has alleged at least one modification to the Boardman boiler. Accordingly, the alleged NSPS Da violations based on changes two through seven, described in paragraph 161 of the Complaint, are dismissed.

Because Sierra Club has alleged that PGE may have made other physical changes to Boardman that would trigger NSPS Da, Sierra Club is granted leave to replead this claim with additional allegations, should discovery reveal timely modifications to the steam generating unit. Compl.¶ 161. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 546; *see also Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 953 (9th Cir. 2002)(holding that a citizen plaintiff may include additional violations in a Clean Water Act suit once they are discovered).

### 2.     PSD Claim (5) and BACT Claim (6)

PGE asserts that plaintiffs' fifth and sixth claims should be dismissed because Boardman was "grandfathered" past PSD and BACT requirements and did not need a PSD permit. In support of this argument, PGE cites Exhibit 1 to its Motion to Dismiss, EPA's 1975 determination that Boardman was not subject to the 1974 PSD regulations because PGE "commenced" construction with the March 15, 1974, "letter of intent" to purchase a turbine generator for Boardman. PGE argues that construction commenced prior to June 1, 1975, as a matter of law and that Sierra Club's PSD and BACT claims must be dismissed because this court

18- OPINION AND ORDER

lacks jurisdiction to review EPA's determination.

Sierra Club argues that Exhibit 1 is not properly before the court on the Motion to Dismiss, and that a determination of whether PGE commenced construction at Boardman will require a determination of fact following discovery. This court agrees that it cannot, at this stage, determine when construction commenced within the meaning of the Act. However, this court can decide whether EPA's determination is dispositive on this issue as a matter of law, and whether this court has jurisdiction to hear plaintiffs' fifth and sixth claims. Sierra Club concedes that EPA made a determination that PGE was not required to obtain a PSD permit and Sierra Club stated as much in its Complaint. Compl.¶ 124. "Documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), overruled on other grounds by *Galbraith v. County of Santa Clara,* 307 F.3d 1119 (9th Cir. 2002). Considering such documents does not convert a motion to dismiss into a motion for summary judgment. *Id*. (citation and quotation omitted).

PGE cites *Grand Canyon Trust v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1251-54 (D.N.M. 2003) in arguing that EPA's 1975 determination was a final agency action that is not subject to collateral attack in district court. In *Grand Canyon*, the New Mexico district court held that EPA's determination that a source had commenced construction prior to June 1, 1975, was a final agency action and only subject to judicial review in circuit court pursuant to 42 U.S.C. § 7607(b)(1). *Id*. at 1253. Therefore, the court determined that the plaintiffs' citizen suit against the source was an inappropriate collateral attack of EPA's decision and that the court did not have jurisdiction to hear the claims. *Id.* at 1254.

19- OPINION AND ORDER

Sierra Club contends that the CAA's citizen suit provision grants this court jurisdiction over their fifth and sixth claims. Sierra Club also argues that § 7607(b)(1) should not be applied retrospectively and was not in effect at the time EPA determined PGE did not need a PSD permit.

Section 7607(b)(1), as modified in 1977, provides that a "petition for review [of any final action] under this subsection shall be filed [in circuit court] within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register." However, the judicial review provisions of the CAA in effect when the EPA issued its decision were narrower, and conferred jurisdiction in the circuit court only for a few particular actions not including PSD permit decisions. *See* Pub. L. 91-604, 84 Stat. 1708 (1970). This court must decide whether to apply § 7607(b)(1) as it is currently written, or as it was written at the time EPA made its decision. For the purposes of this issue, the court assumes without deciding that EPA's determination was a "final action" within the meaning of § 7607(b)(1).[6]

As a general rule, there is a presumption against statutory retroactivity. *Landgraf v. USI Film Products,* 511 U.S. 244, 273 (U.S.). However, a court should also strive to apply the law as it is written at the time it renders its decision. *Id.* Under *Landgraf,* the "court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Id.* at 280. If Congress has expressly determined whether a statute is to have retroactive effect, the inquiry ends. In this case, Congress did not specify whether § 7607(b)(1) applies retrospectively. Accordingly, "the court must determine whether the new statute would have retroactive effect,

---

[6] The court doubts whether the EPA's determination was a "final action" within the meaning of § 7607(b)(1), as the determination did not appear in the Federal Register.

*i.e.*, whether it would impair the rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id*. If a statute would operate retroactively, "our traditional presumption teaches that it does not govern." *Id.*

"To assist us in this inquiry, *Landgraf* identified three types of laws which generally do not have retroactive effect: those authorizing prospective relief, those conferring or removing jurisdiction, and those statutes properly characterized as procedural." *TwoRivers v. Lewis,* 174 F.3d 987, 994 (9th Cir. 1999) (citing *Landgraf*, 511 U.S. at 273-74). Jurisdictional statutes generally do not operate retroactively and may be applied retrospectively because "a new jurisdictional rule usually 'takes away no substantive right but simply changes the tribunal that is to hear the case.'" *Landgraf*, 511 U.S. at 274 (quoting *Hallowell v. Commons*, 239 U.S. 506, 508 (1916)). However, the mere fact that a particular statute is jurisdictional, rather than substantive, does not mean that it should be applied retrospectively in every case, or that its retrospective application would not prejudice one of the parties. *TwoRivers*, 174 F.3d at 994 (citations omitted). "In short, courts must look to the nature and posture of an individual case to determine whether the statute has retroactive effect." *Id*. (citation and quotations omitted).

Here, the court finds that § 7607(b)(1) should not be applied retrospectively. EPA made its determination in 1975 and § 7607(b)(1) did not confer jurisdiction on the circuit court until 1977. Were § 7607(b)(1) applied retrospectively, plaintiffs would never have had an opportunity to challenge the EPA's determination in circuit court because § 7607(b)(1) was enacted over sixty days after the EPA's determination.

Conversely, when EPA made its determination, and at present, the CAA's citizen suit

21- OPINION AND ORDER

provisions grant citizens the right to file suit in district court "against any person" for a violation of the Act. *See* 42 U.S.C. § 7604; Pub. L. 91-604, 84 Stat. 1706 (1970). Sierra Club has alleged violations of the PSD permit program, and is entitled to sue under § 7604.

This holding is consistent with Ninth Circuit precedent allowing a citizen suit under the Clean Water Act even when the Washington State Department of Ecology had determined that a permit was not necessary for mussel harvesting activities. *Ass'n to Protect Hammersly, Eld, and Totten Inlets v. Taylor Res. v. Taylor Res.*, 299 F.3d 1007, 1012 (9th Cir. 2002). The Ninth Circuit reasoned that although "EPA or an authorized state agency may be charged with enforcement of the Clean Water Act, neither the text of the Act nor its legislative history expressly grants to the EPA or such a state agency the exclusive authority to decide whether the release of a substance" violates the Act. *Id.* If EPA declines to require a permit, there is nothing that bars "review sought by a citizen" under the citizen suit provisions of the Act. *Id.*

PGE contends that the Clean Water Act and CAA have different judicial review provisions and that *Hammersley* is inapplicable to this case. This court disagrees. The citizen suit provisions in both acts are nearly identical, and grant citizens the right to challenge the actions of companies alleged to be in violation of the law, regardless of whether the government believes them to be in violation of the law. *Compare* 33 U.S.C. § 1365(a)(1) *with* 42 U.S.C. § 7604. Additionally, at the time EPA made its decision in this case, the CAA's judicial review provisions were similar to those in the Clean Water Act and did not provide for judicial review of all final agency actions in circuit court. 33 U.S.C. § 1369. In short, regardless of whether EPA believes, or believed, that PGE had commenced construction in 1975 does not preclude this court from determining whether PGE in fact had commenced construction within the meaning of

the Act.[7]  *See also Ass'n of Irritated Residents v. C&R Vanderham Dairy*, No. CIV F 05-1593, 2006 WL 2644896, *13 (E.D. Cal., Sept. 14, 2006) (concluding that "state permitting agencies are not necessary parties and a defendant, even if told that no [CAA] permit is required by the appropriate agency, may still be subject to a [citizen suit under 42 U.S.C. § 7604]").  Section 7604 confers jurisdiction on this court to hear Sierra Club's fifth and sixth claims, and § 7607(b)(1) does not operate retrospectively to strip this court of jurisdiction.

        3.      PSD Modification Claims (7 and 8)

PGE argues that Sierra Club's seventh and eighth claims regarding PSD modification should be dismissed because they fail to state claims upon which relief may be granted.  PGE asserts that Boardman is subject to OAR 340-224-0020(66)(a)-(b) and that Sierra Club failed to allege facts constituting violations of those provisions.

Under OAR 340-224-0020(66)(a)-(b), a source is subject to PSD modification requirements if there are physical changes, or changes in operation of a source that results in "an increase in the PSEL by an amount equal to or more than the significant emission rate over the netting basis," and "[t]he accumulation of physcial changes and changes in operation since baseline would result in a significant emission rate increase."  In its Complaint, Sierra Club does not allege, and indeed cannot allege, that Boardman has sought or needed an increase in its PSEL for any pollutant.  Therefore, PGE argues, claims seven and eight must be dismissed.

Sierra Club responds that Boardman is subject to OAR 340-224-0020(66)(c), that PGE's

_____

    [7]  EPA has acknowledged that it mistakenly exempted Boardman from the PSD program. *See Montana Power v. EPA*, 608 F.2d 334, 347 (9th Cir. 1979).  Neither EPA's original decision, nor its later recantation, is binding on this court.

interpretation of Oregon's SIP is incorrect, and that some of the modifications to Boardman occurred prior to the 2003 revisions to Oregon's PSD program.[8]

Under OAR 340-224-0020(66)(c), "major modification" means "[t]he addition or modification of any stationary source. . . that have cumulative potential emissions greater than or equal to the significant emission rate, excluding any emission decreases."  Subsection (c) only applies to sources "that were permitted to construct and operate after the baseline period [1977-78] and were not subject to New Source Review."  It is undisputed that Boardman did not begin actual operations until after the baseline period, but the parties dispute whether it was *permitted* to construct and operate during the baseline period.

Sierra Club contends that it has alleged Boardman was not permitted to construct and operate until after the baseline period, that Boardman has not satisfied PSD requirements, and that therefore, Sierra Club has alleged facts sufficient to survive PGE's Motion to Dismiss.  This court is compelled to agree.

In support of their position, Sierra Club cites an ODEQ Title V Review Report in which ODEQ determined that Boardman "did not operate nor was it permitted to operate during the baseline period."  Ex. E to Pl.'s Surresp. in Opp'n.

PGE responds that it received a site certificate in 1975 that authorized the construction and operation of Boardman.  Moreover, PGE also asserts that it applied for an ACDP in 1977, and that by operation of law, they received a temporary ACDP forty-five days later pursuant to OAR 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(5) (1977) (forty-five days after ODEQ receives notification that an

---

[8] At this time the court does not offer its opinion on the correct interpretation of OAR 340-224-0020(66)(a)-(b).

application for an environmental permit is complete, a temporary conditional permit is deemed to have been granted).

A reading of the site certificate reveals that a number of issues remained unresolved at the time it was issued. Before PGE was authorized to begin construction and operation at Boardman, it was required to submit numerous plan details. Ex. 2 to Def.'s Mot. to Dismiss. It is unclear whether PGE successfully completed all pre-construction and operation requirements before the termination of the baseline period. Additionally, because PGE was not formally issued an ACDP until 1979, and because that ACDP lacked necessary emissions limitations, it is unclear when PGE was permitted to begin operations at Boardman. Without further development of the record, it is impossible to say which subsections of OAR 340-224-0020(66) apply to Boardman. This court must accept Sierra Club's assertions as true.

Because Sierra Club has alleged that PGE was not permitted to construct and operate Boardman until after the baseline period and that PGE has never complied with PSD requirements, it has stated appropriate claims for relief. Sierra Club may proceed with its seventh and eighth claims. However, PGE may renew its objections to plaintiffs' seventh and eighth claims on summary judgment after the record has been adequately developed.

### 4.    SIP Notice Claim (9) and Title V Notice Claim (10)

PGE argues that Sierra Club's ninth claim should be dismissed for failing to state a claim upon which relief may be granted. PGE asserts that Sierra Club failed to allege that any of the modifications identified in the Complaint resulted in an increase in the maximum hourly emissions from Boardman. PGE is mistaken. The Complaint alleges that each of the modifications "increased the maximum hourly emissions achievable at [Boardman]." Compl.¶

25- OPINION AND ORDER

165.

PGE also argues that the SIP notice claim should be dismissed as derivative of substantive PSD modification claims.  Because this court has determined that Sierra Club's PSD modification claims are not subject to dismissal at this time, this argument is rejected.

PGE similarly argues that Sierra Club's tenth claim should be dismissed as derivative of the seventh and ninth claims.  Because this court has determined that both the seventh and ninth claims are not subject to dismissal, this argument is rejected as well.

### C.    Pre-Suit Notice Requirement

PGE argues that Sierra Club's SIP reporting claim (11) and Title V reporting claim (12) should be dismissed because Sierra Club failed to comply with the CAA's pre-suit notice requirements.

Under the CAA's citizen suit provision, before a citizen may file suit, the citizen must provide sixty days' "notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order."  42 U.S.C. § 7604(b)(1)(A).  The notice letter must contain:

> sufficient information to permit the recipient to identify the specific standard, limitation, or order which has allegedly been violated, the activity alleged to be in violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name and address of the person giving the notice.

40 C.F.R. § 54.3(b).  "The giving of a sixty-day notice is not simply a desideratum; it is a jurisdictional requirement."  *Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009) (citations omitted).  The purpose of the CAA's notice requirement "is

26- OPINION AND ORDER

not to *prove* violations, it is to inform the polluter about what it is doing wrong, and to allow it an opportunity to correct the problem." *Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 920 (9th Cir. 2004)(quotations and citations omitted).[9]  "Although the notice must be sufficiently adequate so that the recipients can identify the basis for the complaint, 'the citizen is not required to list every specific aspect or detail every alleged violation.'" *Bosma Dairy*, 305 F.3d at 951; (quoting *Pub. Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir. 1995)).

PGE argues that Sierra Club's notice letter is so broad as to be meaningless.  PGE relies heavily on out of circuit precedent, including the Eleventh Circuit's *Nat'l Parks-Alabama*, 502 F.3d at 1328 (holding that a notice letter identifying violations of Subpart Da was not specific enough because it did not identify the particular pollutants complained of).  Such reliance is misplaced, as the Ninth Circuit has adopted a more permissive approach.

Under Ninth Circuit precedent, notice letters "require no more than reasonable specificity." *San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1158 (9th Cir. 2002)(quotations and citations omitted).  In creating the notice requirement, "Congress did not intend to unduly burden citizens by requiring them to basically carry out the job of the agency." *Bosma Dairy*, 305 F.3d at 953.  Even so, the Ninth Circuit "has never abandoned the requirement that there be a true notice that tells a target precisely what it did wrong, and when." *Marina Point*, 566 F.3d at 800.

---

[9] The Clean Water Act's citizen suit provision is similar to the CAA's and cases involving one, may be used to interpret the other. *Ashoff v. City of Ukiah*, 130 F.3d 409, 413 (9th Cir. 1997).

In *Marina Point*, the Ninth Circuit found that the notice letters at issue did not meet the requirements of 40 C.F.R. § 54.3(b). 566 F.3d at 802. The notice letters complained of violations of § 404 of the Clean Water Act for activities at a lake that began on June 17, 2003. However, plaintiffs later filed claims under § 402 of the Clean Water Act and sued for activities at a wetland not mentioned in the notice letters. *Id*. The court found that the "notices are questionable regarding § 404 violations and insufficient regarding wetlands and any claimed § 402 violations." *Id*. at 803.

However, in *Bosma Dairy*, the Ninth Circuit allowed a citizen suit to proceed where the "complaint listed violations that were not specifically listed in the notice." *Id*. at 951. In *Tosco*, the notice letter alleged that defendants had spilled petroleum coke while loading it onto boats and that violations took place after September 1, 1994, on each day loading operations took place. 309 F.3d at 1158. The notice letter also stated that coke had impermissibly blown into the water "'on each day when the wind has been sufficiently strong to blow coke from the piles into the slough.'" *Id*. The Ninth Circuit found the notice letter to be adequate reasoning that the defendant "is obviously in a better position than [the plaintiff] to identify the exact dates, or additional dates, of its own ship loading." *Id*. "The notice regulation does not require [a plaintiff] . . . to provide the exact dates of alleged violations; rather, it requires only that [a plaintiff] provide 'sufficient information to *permit* the recipients to identify . . . the date or dates.'" *Id*. at 1158-59; (quoting 40 C.F.R. § 135.3(a)).

Sierra Club's notice letter in this case identified specific provisions of Oregon's SIP that PGE is alleged to have violated by failing to submit required reports. Ex. 1 of Compl. at 7-9. The letter states in relevant part that between 2003 and 2008, "PGE did not submit all [of the

previously identified] reports, and the reports it did submit were vague and incomplete," and that

Boardman's "Title V reports (including, but not limited to, event-specific excess emissions

reports, quarterly excess emissions reports for the main boiler, permit deviation reports,

semi-annual reports, and annual reports) have not met the detailed requirements set forth in

Permit Conditions 54 through 62." *Id*. at 8. While Sierra Club did not specifically identify the

dates when reports were due, the letter does not run afoul of 40 C.F.R. § 54.3(b). Sierra Club's

notice letter provided PGE with enough information to allow PGE to identify "the nature of the

alleged violations, as well as the likely dates of those violations." *Id*. at 1159. As the permit

holder, PGE is best able to identify specific dates when specific reports were due. Sierra Club's

notice letter provided PGE with sufficient information to do this. Accordingly, Sierra Club may

proceed with its eleventh and twelfth claims.

PGE also contends that Sierra Club should be limited to pursuing claims regarding the

seven modifications alleged in the notice letter, and should not be able to modify its claims upon

discovering additional modifications. As discussed above, a plaintiff may add supplementary

claims once additional violations of the CAA are discovered so long as those violations are

contemplated by the language of the notice letter. *Bosma Dairy*, 305 F.3d at 953.

## <u>CONCLUSION</u>

For the foregoing reasons, defendant's Motion to Dismiss [21] is GRANTED IN PART

and DENIED IN PART.

IT IS SO ORDERED.

DATED this___30___ day of September, 2009.

29- OPINION AND ORDER

/s/ Ancer L. Haggerty
Ancer L. Haggerty
United States District Judge