**AUBREY BALDWIN, OSB No. 060414**
abaldwin@lclark.edu
**ALLISON LAPLANTE, OSB No. 02361**
laplante@lclark.edu
**TOM BUCHELE, OSB No. 081560**
tbuchele@lclark.edu
Pacific Environmental Advocacy Center
10015 SW Terwilliger Blvd.
Portland, OR 97219
(503) 768-6929, (503) 768-6727, (503) 768-6736
(503) 768-6642 (fax)

**GEORGE E. HAYS, Cal. Bar No. 119904**
georgehays@mindspring.com
Attorney at Law
236 West Portal Avenue #110
San Francisco, CA 94127
(415) 566-5414

Attorneys for All Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **SIERRA CLUB**, a non-profit corporation, **NORTHWEST ENVIRONMENTAL DEFENSE CENTER**, a non-profit corporation, **FRIENDS OF THE COLUMBIA GORGE**, a non-profit corporation, **COLUMBIA RIVERKEEPER**, a non-profit corporation, and **HELLS CANYON PRESERVATION COUNCIL**, a non-profit corporation, | Civil No.:08-1136-HA |
| Plaintiffs, | [PROPOSED] **FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND CIVIL PENALTIES** |
| v. | (Violations of Clean Air, 42 U.S.C. § 7604(a)). |
| **PORTLAND GENERAL ELECTRIC COMPANY**, an Oregon corporation, | |

Defendant.

_____

## INTRODUCTION

1.  This is a Complaint for injunctive and declaratory relief and civil penalties under the federal Clean Air Act, 42 U.S.C. §§ 7401–7671q.  The Sierra Club, the Northwest Environmental Defense Center, Friends of the Columbia Gorge, Columbia Riverkeeper, and Hells Canyon Preservation Council (collectively, "Plaintiffs") bring this citizen suit under Sections 304(a)(1) and (3) of the Clean Air Act ("CAA"), 42 U.S.C. § 7604(a)(1) and (3), against Portland General Electric Company ("PGE" or "Defendant") for past and continuing violations of the CAA, the State of Oregon's federally-approved State Implementation Plan ("SIP"), and PGE's CAA permit.  These violations occurred at PGE's coal-fired power plant, located in Boardman, Oregon (hereinafter "Boardman" or "the plant").

2.  PGE has violated and is violating the emission limitations and compliance demonstration, monitoring, reporting and recordkeeping provisions of Subpart Da of the New Source Performance Standards ("NSPS") for power plants.  CAA § 111(e), 42 U.S.C. § 7411(e).

3.  PGE has violated and is violating the opacity requirements of the NSPS, Oregon's SIP, and the plant's Title V Permit.  40 C.F.R. §§ 60.40(a) & (c), 60.42(a)(2); OAR 340-021-0015; 2001 Title V Permit Conditions 4 and 10.

4.  PGE has violated and is violating the CAA and Oregon's SIP by constructing, modifying, and operating the Boardman plant without complying with the CAA's Prevention of Significant Deterioration ("PSD") requirements.  CAA § 165, 42 U.S.C. § 7475; 40 C.F.R. §§ 51.166(a)(7)(iii), 52.21(a)(2)(iii); OAR Chapter 340, Divisions 28 and 31 (1997); OAR Chapter 340, Division 224 (2003).

Exhibit 1 - page 2

5.  PGE has violated and is violating the provisions of Oregon's SIP and the plant's Title V Permit requiring notification, approval, and permitting prior to construction and/or modification. OAR 340-210-0230 - 0250 (2003); OAR 340-216-0020 (2003), OAR 340-224-0030 (2003); 2001 Title V Permit Conditions G18, 19.

6.  PGE has violated and is violating the reporting requirements of Oregon's SIP and PGE Boardman's Title V Permit.  OAR 340-028-1440; 2001 Title V Permit Conditions 54–62. These requirements oblige PGE to submit periodic (quarterly, semi-annual, and annual) compliance certification reports, event-specific reports of all excess emissions, and any deviations from permit requirements.  *Id*.  PGE did not submit all of the required reports, and many of the reports it did submit are vague and incomplete.

7.  Plaintiffs seek declaratory and injunctive relief and the imposition of civil penalties for these violations.  Plaintiffs also request that, pursuant to 42 U.S.C. § 7604(g), this Court order that $100,000 of the civil penalties imposed for these violations be used in local beneficial mitigation projects to enhance public health and the environment.  Plaintiffs also seek an award of costs and attorneys' fees pursuant to 42 U.S.C. § 7604(d).

## JURISDICTION AND VENUE

8.  Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 7604(a) (CAA jurisdiction).  The requested relief is proper under 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 7604(a).

9.  As required by CAA § 304(b), 42 U.S.C. § 7604(b), on January 15, 2008, Plaintiffs sent PGE a sixty-day notice of intent to sue for violations of the CAA, Oregon's SIP and the plant's Title V permit (attached as Exhibit 1).  Pursuant to 40 C.F.R. § 54.2, Plaintiffs also sent copies of the sixty-day notice letter to officers of the Oregon Department of Environmental

Quality ("DEQ") and the U.S. Environmental Protection Agency ("EPA"), as well as to Oregon Governor Ted Kulongoski. More than sixty days have passed since Plaintiffs sent their notice of intent to sue. Defendant has not remedied the violations alleged in this Complaint. Therefore, a present and actual controversy exists between the parties.

10. Venue is properly vested in this Court pursuant to CAA § 304(c), 42 U.S.C. § 7604(c), because the PGE Boardman facility is located in Morrow County, at 73334 Tower Road, Boardman, Oregon 97818. Decisions regarding the PGE Boardman facility also occurred at PGE headquarters, in Multnomah County, at 121 S.W. Salmon St., Portland, Oregon 97204. Both Morrow County and Multnomah County are located in the District of Oregon.

11. According to the District of Oregon Local Rule of Civil Practice 3.3, the Portland Division of the Court includes Multnomah County and the Pendleton Division includes Morrow County. Under Local Rule 3.4(a)(1), cases arising in counties within either the Portland or Pendleton divisions must be filed in Portland.

## **PARTIES**

12. Plaintiff SIERRA CLUB is a non-profit corporation with a worldwide membership of approximately 800,000 people, and a local office at 1821 SE Ankeny St., Portland, Oregon 97214, that serves over 20,000 Oregonians. The Sierra Club's core mission is to explore, enjoy, and protect the wild places of the earth. Sierra Club promotes responsible use of the earth's ecosystems and resources, educates people to protect and restore the quality of the environment, and uses all lawful means to carry out these objectives. The Sierra Club is dedicated to safeguarding air quality and human health in Oregon.

13. Plaintiff NORTHWEST ENVIRONMENTAL DEFENSE CENTER ("NEDC") is an Oregon non-profit corporation with its principal place of business at 10015 SW Terwilliger

Blvd., Portland, Oregon 97219.  NEDC was founded in 1969, and is dedicated to the preservation and protection of the Pacific Northwest's natural resources.  NEDC's members are lawyers, scientists, students, and citizens committed to preserving and protecting natural resources across the region.  NEDC staff and volunteers have devoted substantial resources to address harms to the region's air, land, and water caused by industrial pollution.

14.  Plaintiff FRIENDS OF THE COLUMBIA GORGE ("Friends") is an Oregon non-profit corporation that has worked for decades to protect the unique scenic, natural, cultural, and recreational resources of the Columbia River Gorge.  Friends is headquartered at 522 SW Fifth Avenue, Suite 720, Portland, Oregon 97204.  Poor air quality in the region contributes to acid deposition in the Gorge, impairs visibility, harms ecosystems, damages Native American petroglyphs and pictographs, and threatens human health.  Friends works diligently to remedy this situation and enhance air quality in the Gorge.  Friends is particularly focused on reducing ambient mercury, nitrogen oxides, and sulfur dioxide levels, and their attendant harms, in the Gorge.

15.  Plaintiff COLUMBIA RIVERKEEPER ("CRK") is an Oregon non-profit corporation working to restore and protect the ecological integrity of the Columbia River and its surrounding community through local outreach programs and public involvement.  CRK's main office is at 724 Oak St., Hood River, Oregon 97031.  CRK educates the public about the Columbia River and what citizens can do to protect it.  As part of that effort, CRK works to reduce pollution to improve life in and around the Columbia River.  One of CRK's key goals is to ensure that environmental laws are enforced, and to uphold basic public trust responsibilities in the Columbia River basin.

16.   Plaintiff HELLS CANYON PRESERVATION COUNCIL ("HCPC") is an Oregon non-profit corporation that defends and restores the unique habitats and biodiversity of the Hells Canyon-Wallowa and Blue Mountains ecosystems.  HCPC's address is P.O. Box 2768, La Grande, Oregon 97850.  HCPC is dedicated to developing, promoting, and enforcing public policies that will protect the unique resources of the Hells Canyon-Wallowa and Blue Mountains for all time.  Breathable air and clear vistas are crucial to this mission.

17.   Defendant PORTLAND GENERAL ELECTRIC COMPANY ("PGE") operates and owns a 65 percent share in PGE Boardman, an approximately 618 megawatt ("MW") coal-fired power plant.  This facility, in operation since 1980, has emitted and continues to emit massive amounts of, among other pollutants, sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), carbon dioxide ($CO_2$), particulate matter (PM), and mercury.  PGE Boardman lacks modern technology to control these pollutants.

18.   PGE Boardman is the largest stationary source of $CO_2$ in Oregon, releasing as much as 4.9 million tons of $CO_2$ in a year.  The heat-trapping gases that cause global climate change, including $CO_2$, come largely from burning fossil fuels.  The effects of global climate change have been and will continue to be experienced in Oregon, including increased frequency and intensity of storms, more frequent and severe heat waves, droughts, and floods.  In addition, glaciers are rapidly retreating, and snowpack in the Cascade Range is melting earlier and faster each spring.  These changes in the water cycle threaten crops, salmon, recreation, fishing, and water supplies.  Global climate changes also adversely affect the reproductive success, range, and diet of vulnerable species, threatening the survival of species endemic to the Columbia Gorge.

19.  PGE Boardman is the single largest source of $SO_2$ emissions in Oregon, releasing as much as 17,821 tons of $SO_2$ in a year.  According to EPA, PGE Boardman accounts for 65% of Oregon's stationary $SO_2$ emissions and emits almost six times the amount of $SO_2$ emitted from the next highest point source in Oregon.  $SO_2$ pollution is "a medically recognized threat to human health" and "high levels of pollution sustained for periods of days can kill."  *Ohio Power Co. v. US EPA*, 729 F.2d 1096, 1097–98 (6th Cir. 1984).  When sulfur dioxide emitted from power plant stacks reacts with other elements in the atmosphere, it forms sulfates, sulfuric acid mist, and other chemical derivatives that tend to stay airborne for days and affect areas at great distances downwind.  Like other airborne pollutants, $SO_2$ aggravates respiratory illnesses.  $SO_2$ also contributes to acid deposition by forming sulfuric acid, which falls to earth as acid rain, snow, fog, and by dry deposit.  Acid deposition accelerates the decay of buildings, statues, petroglyphs, and other irreplaceable parts of our region's cultural heritage.  Sulfate particulates are the major cause of haze throughout the country, including in national parks, wilderness areas, and the Columbia River Gorge National Scenic Area.

20.  PGE Boardman is the largest stationary source of $NO_x$ in Oregon, releasing as much as 10,768 tons of $NO_x$ in a year.  According to EPA, the plant is responsible for about 35% of $NO_x$ emissions statewide and emits over five times as much $NO_x$ as the next highest emitting source.  $NO_x$ contributes to acid rain, diminishes water quality, and impairs visibility.  $NO_x$ is among the main ingredients of ground-level ozone, or smog, which can trigger serious respiratory problems.  $NO_x$ emissions exacerbate atmospheric ozone depletion, and cause eutrophication of water bodies.  In addition, $NO_x$ contributes to global climate change.

21.  PGE Boardman is a major source of particulate matter, or "soot."  Particulate matter consists of many different solid or liquid particles in the air that vary widely in size, including

fine particles ($PM_{2.5}$, or particles 2.5 micrometers or smaller in diameter) and coarse dust ($PM_{10}$, or particles less than 10 micrometers in diameter). PGE has released as much as 164 tons of $PM_{2.5}$ and 239 tons of $PM_{10}$ in a year. Breathing particulate pollution causes many adverse health effects, including premature death, heart attacks, strokes, birth defects, asthma attacks, and lung damage. Particulate pollution has also been linked to Sudden Infant Death Syndrome and low birth weight. The elderly, children, and those with respiratory illnesses are especially sensitive to particulate pollution. Particulate pollution impairs visibility (by contributing to haze) and alters nutrient balances in waters and soils.

22. PGE Boardman's particulate matter emissions contain many toxic heavy metals, including mercury. The plant has released as much as 221 pounds of mercury in a year. By accumulating on cloud droplets or precipitation, particulate mercury can migrate to waterways. Even in dry weather, particulate mercury may dry deposit onto plants, land, or other structures. Mercury pollution from PGE Boardman is of particular concern because the plant is located just a few miles from the Columbia River, home to species of threatened and endangered fish and fish consumed by people and wildlife. Mercury is a potent neurotoxin, and is linked to a number of negative biological effects on human health, including effects on fetuses, developmental delays in children, retardation, and autism. Mercury does not dissipate in the environment – it bioaccumulates in fish and wildlife populations, persisting indefinitely.

23. Plaintiffs' members, staff and volunteers live, work, recreate, own property, fish, study and pursue spiritual practices in the regions most immediately affected by the PGE Boardman plant's emissions. This area encompasses, for example, the Columbia River, the Columbia River Gorge National Scenic Area, Mount Hood, Mount Rainier, the Hells Canyon National Recreation Area, the Blue Mountains and Wallowas, the Eagle Cap Wilderness, and

Page 8- FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND CIVIL PENALTIES

Exhibit 1 - page 8

other unique natural areas throughout Oregon.  PGE's emissions also negatively effect nearby urban areas, like the City of Portland.  PGE Boardman's illegal emissions of pollutants into Oregon's air have injured Plaintiffs' members, staff and volunteers' aesthetic, recreational, environmental, spiritual, economic, educational and health-related interests in these areas.  Unless the relief requested herein is granted, PGE Boardman's violations of the CAA will continue to harm these interests because pollution emitted from Boardman degrades air quality.  Poor air quality injures human health, fish and wildlife, vegetation, visibility, water quality, cultural resources, and property in areas used by Plaintiffs' members.

24.  Plaintiffs' members, volunteers and staff have seen the PGE Boardman smoke stack and pollution leaving the stack as they travel and recreate in Eastern Oregon.  Plaintiffs' members, volunteers and staff find the plant, its stack, and the pollution that leaves the stack aesthetically displeasing and ugly.  Moreover, they are aware of the health and environmental impacts associated with the pollution leaving the stack and are concerned about harm to their health and the surrounding environment, including the natural resources they use and enjoy, caused by PGE Boardman's pollution.

25.  Plaintiffs' members, volunteers and staff are concerned about the impacts of $NO_x$ emissions from Boardman on their health and the natural and cultural resources they use and enjoy.  $NO_x$ emitted from PGE Boardman contributes to the formation of very fine particles that penetrate deeply into sensitive parts of the lungs and damage human health.  $NO_x$ pollution causes premature death, breathing problems, and damage to lung tissue, and can cause or worsen emphysema, bronchitis and heart disease.  Moreover, $NO_x$ forms ground-level ozone, which causes other health problems and damages plants.  $NO_x$ also spoils visibility by contributing to regional haze, contributes to excess nitrogen deposition that harms plants and aquatic

Exhibit 1 - page 9

ecosystems, and contributes to acid rain which damages plants and cultural resources. $NO_x$ also forms compounds with common organic chemicals and ozone that are toxic, some of which cause biological mutations, such as nitrate radicals, nitroarenes, and nitrosamines.

26. $NO_x$ pollution from PGE Boardman exacerbates ozone depletion in the upper atmosphere, decreasing protection from harmful UVA and UVB sun rays. One component of $NO_x$, nitrous oxide, is also a potent "greenhouse gas" that accumulates in the atmosphere and, along with other such gases (e.g. $CO_2$), gradually raises global temperatures. The millions of tons of $CO_2$ the PGE plant emits each year also contribute to worldwide climate change, with regional impacts on Oregon's environment and economy. For example, as noted above, the Cascade snowpack is melting earlier and faster each spring, threatening important economic resources such as cropland, salmon, and winter recreation businesses. Plaintiffs' members use these at-risk resources, including the Cascade mountains, the Columbia River, the Willamette River, and reasonably fear the severe consequences of PGE Boardman's continued illegal emissions.

27. Plaintiffs' members, volunteers and staff are concerned about the impacts of $SO_2$ emissions from Boardman on their health and the natural and cultural resources they use and enjoy. $SO_2$ emitted from PGE Boardman causes a wide variety of health problems, including premature death, respiratory problems like asthma, and aggravation of heart disease. People with asthma who are active outdoors, children, the elderly and people with heart or lung disease are particularly susceptible to the health effects of $SO_2$. $SO_2$ emitted from Boardman also degrades visibility by forming regional haze, and it contributes to acid rain, fog, snow and dry particles that can travel hundreds of miles. Acid rain damages forests and crops, changes the makeup of soil and makes lakes and streams acidic and unsuitable for fish. Continued exposure to acid rain

can change the natural variety of plants and animals in the ecosystem.  These effects injure Plaintiffs' members' interests in their health and the health of the places they live, work, recreate, own property, grow crops, study and pursue spiritual practices.

28.  PGE Boardman's illegal and excessive discharges of pollution injure Plaintiffs' members' diverse interests.  These interests include, but are not limited to, 1) breathing air free from PGE Boardman's excessive pollutant emissions, 2) eating fish free from contaminants attributable to PGE Boardman's pollution, 3) enjoying the natural ecology of the region free from air pollution-related impacts, including hiking, and viewing and photographing plants and wildlife, 4) viewing scenery unimpaired by the plant and its pollution, or by the smog, haze, and other aesthetic damage caused (in whole or in part) by PGE Boardman's emissions, 5) preventing excessive health care costs and other economic damages caused by or contributed to by PGE Boardman's pollutant discharges, 6) enjoying the region's cultural and spiritual resources that are susceptible to $NO_x$ and $SO_2$ pollution-related impacts, 7) using resources such as the Cascade mountains, Pacific Coastal areas, the Columbia River, and the Willamette River that Plaintiffs reasonably fear will be adversely affected by pollution from PGE Boardman, and 8) benefiting from economic resources such as crop and timber land, salmon, and winter recreation businesses that Plaintiffs reasonably fear will be adversely impacted by PGE Boardman's pollution.  Plaintiffs' members' interests have been, and unless the relief requested herein is granted, will continue to be, adversely affected by PGE Boardman's violations of the CAA.

29.  Plaintiffs' members, staff and volunteers also suffer procedural harm from PGE Boardman's failure to satisfy notification and approval procedures mandated by PGE's Title V permit and Oregon's SIP, and failure to satisfy the PSD review requirements at Boardman.  Such

Exhibit 1 - page 11

a review must include, *inter alia*, analysis of, and compliance with, Best Available Control Technology ("BACT") emissions limits, demonstration that the source will not cause or contribute to a violation of the national ambient air quality standards ("NAAQS") or increment, demonstration that the source will not impair visibility in federally protected parks and wilderness areas, and opportunities for public participation.  PGE's failure to comply with these important obligations, which sustain the CAA's core goals, forecloses Plaintiffs and Plaintiffs' members from participating in these critical processes.

30.  Plaintiffs' members, staff and volunteers also suffer informational harm due to PGE Boardman's failure to comply with the reporting requirements of the CAA, Oregon's SIP, and its Title V operating permit.  These provisions aim to provide regulatory agencies and the public with the information they need to effectively oversee a polluting entity's activities, and the CAA explicitly gives citizens the right to sue to enforce the clean air requirements against violators. Plaintiffs rely on full and accurate reporting of information mandated by the CAA to fulfill these oversight and enforcement roles, plan their activities effectively, communicate with government officials, and disseminate facts to others.  Without this Court's intervention, Plaintiffs will be unable to adequately participate in ongoing and future regulatory processes involving the PGE Boardman plant.

## **LEGAL BACKGROUND**

31.  The CAA is designed "to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population."  CAA § 101(b)(1), 42 U.S.C. § 7401(b)(1).

32.  The CAA establishes various programs to meet its objective.  Five of the Act's components are relevant to this case: (1) New Source Performance Standards ("NSPS"); (2)

Exhibit 1 - page 12

Prevention of Significant Deterioration ("PSD"); (3) the Oregon State Implementation Plan ("SIP"); (4) Title V operating permits; and (5) enforcement provisions.

## I.   New Source Performance Standards

33.  New Source Performance Standards ("NSPS") are nationwide uniform technology-based standards for new or modified stationary sources.  CAA § 111, 42 U.S.C. § 7411.  EPA has promulgated NSPS for electric steam generating units.  40 C.F.R. §§ 60.40-60.46 (Subpart D) & 40 C.F.R. §§ 60.40Da-60.52Da (Subpart Da).

34.  After the effective date of a performance standard, it is unlawful for any owner or operator of any "new source" to operate such source in violation of an applicable NSPS.  CAA § 111(e), 42 U.S.C. § 7411(e).  Thus, a violation of an NSPS is a violation of Section 111(e) of the CAA.

35.  A "new source" is "any stationary source the construction *or modification* of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance . . . applicable to such source."  CAA § 111(a)(2), 42 U.S.C. § 7411(a)(2); 40 C.F.R. § 60.1 (emphasis added).  A "stationary source" is "any building, structure, facility, or installation which emits or may emit any air pollutant."  CAA § 111(a)(3); 42 U.S.C. § 7411(a)(3); 40 C.F.R. § 60.2.  "Modification" is "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant [to which a standard applies] emitted by such source or which results in the emission of any air pollutant [to which a standard applies] not previously emitted."  CAA § 111(a)(4), 42 U.S.C. § 7411(a)(4); 40 C.F.R. § 60.2.

36.  Generally, a modification is any physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any pollutant to which a

standard applies.  40 C.F.R. § 60.14(a).  Specifically, for existing electric utility steam generating units, a modification is any physical or operational change if the change increases the maximum hourly emissions achievable at the unit above the maximum hourly emissions achievable at that unit during the five years prior to the change.  40 C.F.R § 60.14(h).

37.  Upon modification, an existing facility becomes an "affected facility" for which any applicable NSPS must be satisfied.  40 C.F.R. § 60.14(a).

38.  EPA has promulgated general NSPS regulations at 40 C.F.R. Part 60, Subpart A, §§ 60.1-60.19, governing compliance, monitoring, testing, reporting, and recordkeeping.  These general provisions apply to the owner or operator of any stationary source which contains an affected facility.  40 C.F.R. § 60.1(a).

39.  An "affected facility" is defined as "any apparatus to which a [performance] standard is applicable."  40 C.F.R. § 60.2.

40.  Before making any physical or operational change to a facility which may increase the emission rate of any air pollutant to which a standard applies, an owner or operator of an affected facility subject to NSPS must notify EPA in writing of the change.  40 C.F.R. § 60.7(a).  This notice must "be postmarked 60 days or as soon as practicable *before* the change is commenced[, with] information describing the precise nature of the change, present and proposed emission control systems, productive capacity of the facility before and after the change, and the expected completion date of the change." 40 C.F.R. § 60.7(a)(4) (emphasis added).

## A.    Subpart D NSPS for Electric Steam Generating Units

41.  The NSPS regulations of Subpart D apply to every fossil fuel-fired steam generator constructed or modified after August 17, 1971, of more than 73 megawatts of heat input rate (250 million Btu/hour).  40 C.F.R. §§ 60.40(a) & (c).

42.  Subpart D includes standards for particulate matter, at 40 C.F.R. § 60.42, commonly known as "opacity limitations."  Under these standards, no owner or operator subject to Subpart D "shall cause to be discharged into the atmosphere from any affected facility any gases that . . . exhibit greater than 20 percent opacity except for one six-minute period per hour of not more than 27 percent opacity."  40 C.F.R. § 60.42(a)(2).

**B.      Subpart Da NSPS for Electric Steam Generating Units**

43.  The NSPS regulations of Subpart Da apply to every fossil fuel-fired steam generator constructed, modified, or reconstructed after September 18, 1978, and capable of combusting more than 73 megawatts (250 million Btu/hour) heat input of fossil fuel (either alone or in combination with any other fuel).  40 C.F.R. § 60.40Da(a).

44.  The owner or operator of an affected facility that is an electric utility steam generating unit must conduct a performance test in accordance with 40 C.F.R. 60.48Da within 60 days after achieving the maximum production rate at which the affected facility will be operated, but not later than 180 days after initial startup of the facility.  40 C.F.R. § 60.8.  The owner or operator must submit to EPA a written report of the results of the performance test.  *Id*.

45.  Subpart Da of the NSPS regulations includes emissions limitations for particulate matter, sulfur dioxide, and nitrogen oxides.  40 C.F.R. §§ 60.42Da, 60.43Da, 60.44Da.  Subpart Da also includes specific compliance demonstration, monitoring, reporting, and recordkeeping provisions.  40 C.F.R. §§ 60.7, 60.8, 60.11, 60.13, 60.48Da, 60.49Da, 60.50Da, & 60.51Da.

Exhibit 1 - page 15

46. Subpart Da includes the same opacity limitation as Subpart D. Thus, violations of Subpart D's opacity limitation that occur at an affected source constructed or modified after Subpart Da's trigger date of September 18, 1978, are also violations of Subpart Da. 40 C.F.R. § 60.42Da(b).

47. The owner or operator of an electric utility steam generating unit subject to Subpart Da may not cause to be discharged into the atmosphere from any affected facility any gases that contain sulfur dioxide in excess of 1.20 lb/mmBtu heat input and 10 percent of the potential combustion concentration (90 percent reduction), or 30 percent of the potential combustion concentration (70 percent reduction) when emissions are less than 0.60 lb/mmBtu heat input. 40 C.F.R. § 60.43Da(a)

48. A source subject to Subpart Da must demonstrate compliance with the particulate matter, sulfur dioxide, and nitrogen oxide emission limitations according to the provisions of 40 C.F.R. §§ 60.8, 60.11, 60.48Da(e)-(h), 60.50Da(a)-(e).

## II. Prevention of Significant Deterioration

49. The CAA contains specific provisions to ensure that areas with relatively clean air are protected from industrial expansion that will compromise air quality. CAA § 160–169B, 42 U.S.C. §§ 7470–7492. Collectively, these provisions are known as the prevention of significant deterioration ("PSD") program.

50. The PSD program is designed to protect public health and welfare from actual or potential adverse effects that may reasonably be anticipated to occur from air pollution in areas that are attaining the National Ambient Air Quality Standards ("NAAQS") set by EPA. CAA § 160(1), 42 U.S.C. § 7470(1). Further, the PSD program is intended to ensure that economic growth will occur in a manner consistent with the preservation of existing clean air resources,

Exhibit 1 - page 16

and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process.  CAA §§ 160(3)-(5), 42 U.S.C. §§ 7470(3)-(5).

51.  The PSD program also aims to "to preserve, protect, and enhance the air quality in national parks, national wilderness areas, national monuments . . . and other areas of special national or regional natural, recreational, scenic or historic value."  CAA § 160(2), 42 U.S.C. § 7470(2).  To that end, the permitting authority must notify the federal official charged with direct responsibility for management of any federally protected parks and wilderness areas designated as "Class I" of any PSD permit application from a major emitting facility. CAA § 165(d)(2)(A), 42 U.S.C. § 7475(d)(2)(A).  If a federal land manager demonstrates that emissions from such a facility will have an adverse impact on the air quality related values of the federal lands, "a permit shall not be issued."  CAA § 165(d)(2)(C)(ii), 42 U.S.C. § 7475(d)(2)(C)(ii).

A.      Construction and Modification of Major Sources

52.  The CAA prohibits the construction, modification, and subsequent operation of a new or modified "major emitting facility" in an attainment area unless the facility has received a permit that satisfies Section 165 of the CAA, 42 U.S.C. § 7475.  42 U.S.C. § 7475(a).  Section 165 requires that the facility be subject to the best available control technology ("BACT") for each CAA regulated pollutant it emits.  42 U.S.C. § 7475(a)(4).

53.  A "major emitting facility" is either 1) any one of a category of listed stationary sources that emits, or has the potential to emit, 100 tons per year or more of any air pollutant; or 2) any other source with the potential to emit 250 tons per year or more of any air pollutant. CAA § 169(1), 42 U.S.C. § 7479(1).

54.  A "stationary source" is "any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle."  CAA § 302(z), 42 U.S.C. § 7602(z).

55.  "Construction" includes "modification" as defined in Section 111(a) of the CAA. CAA § 169(2)(C), 42 U.S.C. § 7479(2)(C).  A "modification" is "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."  CAA § 111(a)(4), 42 U.S.C. § 7411(a)(4).

56.  As set forth at 40 C.F.R. §§ 52.21(k), 51.166(a)(7), and 51.166(j)-(r), the PSD program generally requires a person who wishes to construct or modify a major emitting facility in an attainment area to demonstrate that it will not cause or contribute to air pollution in violation of any ambient air quality standard or any specified incremental amount.

57.  The provisions of 40 C.F.R. §§ 52.21(i) and 51.166(a)(7)(iii), prohibit the construction or major modification of a major stationary source in any attainment area unless a PSD permit has been issued that meets the requirements of 40 C.F.R. §§ 52.21(j)-(r) and 51.166(j)-(r).  Echoing the statutory definition of "major emitting facility" at Section 169 of the CAA, 42 U.S.C. § 7479, the term "major stationary source" is defined by regulation  to include, among other things, 1) any fossil-fuel fired steam electric plant of more than 250 million Btu/hour that emits or has the potential to emit 100 tons per year of any air pollutant subject to regulation under the CAA, 2) any other facility that emits, or has the potential to emit, 250 tons per year or more of any air pollutant subject to regulation under the CAA.  40 C.F.R. §§ 52.21(b)(1)(i), 51.166(b)(1)(i).

58.  The regulations define "construction" to include "any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification or an emissions unit) that would result in a change in emissions."  40 C.F.R. §§ 52.21(b)(8), 51.166(b)(8).

59.  The regulations define "potential to emit," for purposes of determining whether the construction of a stationary source will trigger the preconstruction review requirements. "Potential to emit" means "the maximum capacity of a stationary source to emit a pollutant under its physical and operational design."  40 C.F.R. §§ 52.21(b)(4), 51.166(b)(4).

60.  "Major modification" is defined at 40 C.F.R. §§ 52.21(b)(2) and 51.166(b)(2)(i) as "any physical change in or change in the method of operation of a major stationary source" that results in a significant net emissions increase of any pollutant subject to regulation under the CAA.  In turn, "significant" is defined at 40 C.F.R. §§ 52.21(b)(23) and 51.166(b)(23) to mean "a rate of emissions that would equal or exceed" the limits set out therein. Those limits are 40 tons per year for sulfur dioxide and nitrogen oxides, 25 tons per year for particulate matter, and 15 tons per year of particulate matter with a diameter of 10 micrometers or less (known as "$PM_{10}$").  40 C.F.R. § 52.21(b)(23).

**B.      The PSD Program's "Grandfather" Provisions**

61.  In 1974, EPA promulgated an initial set of regulations, effective January 6, 1975, to prevent the significant deterioration of air quality.  39 Fed. Reg. 42,510 (Dec. 5, 1974); 40 C.F.R. § 52.21 (1975) (superceded).  Those regulations included a "grandfather" clause, excluding certain plants from PSD review and permitting.  The regulations provided that the PSD requirements therein applied to any plant that "has not commenced construction or expansion prior to June 1, 1975."  39 Fed. Reg. at 42,516.  The regulations defined

"construction" as "fabrication, erection or installation of an affected facility," and defined "commenced" as when the facility has "undertaken a continuous program of construction or modification or . . . has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or modification." *Id.* at 42,515.

62.  In 1977, Congress amended the CAA to create the statutory PSD provisions, effective August 7, 1977.  This Congressionally-created program superseded the existing administrative program found in EPA's regulations.  CAA Amendments of 1977, Pub. L. No. 95-95 § 127(a), 91 Stat. 685 (1977).  Like EPA's regulations, Congress included a "grandfather" clause in the PSD amendments.  The 1977 amendments defined "commenced" construction of a plant as when a source has "obtained all necessary preconstruction approvals or permits required by Federal, State, or local air pollution emissions and air quality laws or regulations and either has (i) begun, or caused to begin, a continuous program of physical on-site construction of the facility or (ii) entered into binding agreements of contractual obligations, which cannot be cancelled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time." *Id*.

63.  The 1977 amendments also defined "necessary preconstruction approval or permits" as "those permits or approvals, required by the permitting authority as a precondition to undertaking any activity under clauses (i) and (ii) of" the statutory definition of "commenced." *Id*.  These statutory provisions have remained unchanged since 1977.  *See* CAA § 169(2)(A) & (B), 42 U.S.C. § 7479(2)(A) & (B).

**C.    The Oregon PSD Program**

64.  After public notice and comment, each state must adopt and submit to EPA for approval an implementation plan (the SIP) that provides for the attainment and maintenance of

the NAAQS promulgated by EPA.  CAA § 110(a), 42 U.S.C. § 7410(a).  The CAA and EPA's regulations at 40 C.F.R. Part 51, set forth detailed requirements that SIPs must satisfy to obtain EPA approval.  Among other requirements, SIPs must include enforceable emissions limitations and other control measures, specific schedules and timetables for compliance with NAAQS, a plan for monitoring and analyzing air quality data, and a program for regulating the construction or modification of stationary sources of air pollution.  CAA § 110(a)(2), 42 U.S.C. § 7410(a)(2).  Once approved by EPA, after notice and comment, state regulations comprising the SIPs are incorporated by reference at 40 C.F.R. Part 52.

65.  Under this cooperative federalism scheme, states can elect to develop and administer PSD programs for sources within the state.  State PSD programs must contain emission limitations and other such measures as may be necessary (as determined under EPA regulations promulgated pursuant to these provisions) to prevent significant deterioration of air quality in attainment areas.  CAA § 161, 42 U.S.C. § 7471.

66.  A state may comply with this requirement by gaining EPA-delegated authority to issue permits and enforce the federal PSD regulations set forth at 40 C.F.R. § 52.21, or by promulgating its own PSD regulations that are at least as stringent as those set forth at 40 C.F.R. § 51.166, and approved as part of its SIP by EPA.

67.  Oregon opted to promulgate its own PSD regulations, currently codified at OAR 340, Division 224 of its SIP.  EPA approved these current portions of Oregon's PSD program as part of the Oregon SIP on January 22, 2003.  68 Fed. Reg. 2891, 2897 (Jan. 22, 2003).  These provisions became federally-effective on March 24, 2003.  *Id*. at 2891.  Before March 24, 2003, the federally-approved PSD provisions were codified at OAR Chapter 340, Divisions 28 and 31.  62 Fed. Reg. 10,457, 10,461 (Mar. 7, 1997).  Because this Complaint alleges violations during

both periods, OARs cited in this section will be followed by either "1997" or "2003" to denote the relevant period.

### 1.    The Oregon PSD Program Before March 24, 2003

68.  The federally-effective PSD provisions of Oregon's SIP in effect before March 24, 2003, prohibit the construction or major modification of stationary sources unless the source has first obtained an Air Contaminant Discharge Permit ("ACDP") and otherwise met the requirements of applicable law, including PSD requirements.  OAR 340-028-1900(1) (1997). PSD requirements include the duty to operate in compliance with BACT emission limits.  OAR 340-028-1940 (1997).  This duty is ongoing.  OAR 340-028-1910(2)(a), (c) (1997).

69.  The Oregon SIP's definition of "major modification" prior to March 24, 2003 provided in pertinent part:

'Major modification' means any physical change or change of operation of a source that would result in a net significant emission rate increase for any regulated air pollutant.  This criteria [sic] also applies to any pollutants not previously emitted by the source.  Calculations of net emission increases shall take into account all accumulated increases and decreases in actual emissions occurring at the source since the baseline period, or since the time of the last construction approval issued for the source pursuant to the New Source Review Regulations . . . for that pollutant, whichever time is more recent.

OAR 340-028-0110(57) (1997).

70.  The Oregon SIP's definition of "major source" prior to March 24, 2003 was "a source which emits, or has the potential to emit, any regulated air pollutant at a Significant

Exhibit 1 - page 22

Emission Rate [defined in a table at OAR 340-028-0110(110) (1997)]," including emissions from "insignificant activities."  OAR 340-028-0110(58) (1997).

### 2.    The Oregon PSD Program After March 24, 2003

71.  The current federally-effective PSD provisions of Oregon's SIP, in place since March 24, 2003, prohibit the construction or major modification of stationary sources unless the source has first obtained an Air Contaminant Discharge Permit ("ACDP") and otherwise met the requirements of applicable law, including PSD requirements.  OAR 340-224-0010(2) (2003).

72.  The current Oregon SIP defines "major modification," for new or modified major sources that were permitted to construct and operate after the baseline period and were not subject to New Source Review, to include "[t]he addition or modification of any stationary source or sources after the initial construction that have cumulative potential emissions greater than or equal to the significant emission rate, excluding any emission decreases."  OAR 340-200-0020(66)(c)(B) (2003).

73.  The term "stationary source" means "any building, structure, facility, or installation at a source that emits or may emit any regulated air pollutant."  OAR 340-200-0020(131) (2003).

74.  The term "federal major source" means "a source with potential to emit any individual regulated pollutant, excluding hazardous air pollutants listed in OAR 340 division 244, greater than or equal to 100 tons per year if in a source category listed below, or 250 tons per year if not in a source category listed."  OAR 340-200-0020(53) (2003).  Moreover, "[p]otential to emit calculations must include emission increases due to a new or modified source."  *Id*.

75.  Proposed new federal major sources or major modifications at federal major sources located in attainment areas must meet the requirements of OAR 340-224-0070 (2003).  These

include the requirement to operate in compliance with a BACT emission limit, provide an air quality analysis, and conduct ambient air quality monitoring.  OAR 340-224-0070 (2003).

### III.    Other Relevant Provisions of the Oregon State Implementation Plan

76.  On May 31, 1972, EPA approved initial SIPs for 50 states, including Oregon.  37 Fed. Reg. 10,842 (May 31, 1972).  Since 1972, Oregon has submitted numerous SIP revisions.

77.  All SIP provisions approved by EPA are federally-enforceable.  CAA § 304(f)(4), 42 U.S.C. § 7604(f)(4).

78.  In addition to the SIP provisions discussed above, regarding PSD, the Oregon SIP includes a number of provisions intended to ensure maintenance of the NAAQS in Oregon.

### A.    Oregon SIP Opacity Limitations

79.  EPA approved the limits on opacity currently found in Oregon's SIP in 1997.  62 Fed. Reg. 8385 (Feb. 25, 1997).  Codified at OAR 340, Division 21, those provisions are now, and have been throughout the period relevant to this Complaint, the federally-enforceable opacity limitations of Oregon's SIP.  These SIP opacity provisions do not supplant the federal NSPS standards for electric steam generating units, but are an additional requirement imposed on those sources.

80.  Oregon's SIP imposes opacity limitations (termed "visible air contaminant limitations") on all "new sources" in the state.  OAR 340-021-015(2).  Oregon rules define "new sources" as "air contaminant source[s] installed, constructed, or modified after June 1, 1970." OAR 340-021-0005(6) (1997); OAR 340-208-0010(6) (2003).  Under the Oregon SIP, "[n]o person shall cause, suffer, allow, or permit the emission of any air contaminant into the atmosphere from any new air contaminant source . . . for a period or periods aggregating more than three minutes in any one hour," air contaminants which are as dark or darker in shade than

that designated as No.1 on the Ringlemann Chart, or equal to or greater than 20 percent opacity. OAR 340-021-015(2).  The Ringlemann Chart is used in making subjective estimates of the amount of solid matter emitted by smoke stacks.

### B.    Oregon SIP Stationary Source Notification Requirements

81.  EPA approved Oregon's current SIP stationary source notification requirements in 2003.  68 Fed. Reg. 2891, 2895 (Jan. 22, 2003).  These provisions require all stationary sources (except those exempt under OAR 340-210-0205(2)) to follow various notification and approval procedures prior to construction of a new stationary source of air pollution, modification of an existing source, and operation of the new or modified source.  Codified at Chapter 340, Division 210 of the Oregon Administrative Rules, those provisions are now, and have been since March 24, 2003, the federally-enforceable notification and approval requirements of Oregon's SIP.

82.  These notification and approval requirements apply to "all stationary sources" in Oregon.  Under these rules, "[n]o person is allowed to make a physical change or change in operation of an existing stationary source that will cause an increase, on an hourly basis at full production, in any regulated pollutant emissions without first notifying [DEQ] in writing."  OAR 340-210-0215(2).  Further, "[n]o person is allowed to construct or modify any air pollution control equipment without first notifying [DEQ] in writing."  OAR 340-210-0215(3).

83.  Oregon's SIP specifies different notification and approval procedures for construction or modifications of stationary sources (or air pollution control equipment) according to which of four "Types" the changes fall under.  OAR 340-210-0225.

84.  Type 1 changes are "truly *de minimis*."  68 Fed. Reg. 2891, 2895 (Jan. 22, 2003). These changes include construction or modification that would not increase emissions above certain thresholds, as described at OAR 340-210-0225(1)(a)–(e).

Exhibit 1 - page 25

85.  Type 2 changes are "changes that are more than *de minimis*, but less than significant."  68 Fed. Reg. 2891, 2895 (Jan. 22, 2003).

86.  Type 3 changes are "changes that are significant, but not new major sources or major modifications."  68 Fed. Reg. 2891, 2895 (Jan. 22, 2003).

87.  Type 4 changes are "changes that are significant and may be new major sources or major modifications."  68 Fed. Reg. 2891, 2895 (Jan. 22, 2003).  These include construction or modification "where such a change or changes would increase emissions above the P[lant] S[ite] E[mission] L[imit] or Netting Basis of the source by more than the significant emission rate."  OAR 340-210-0225(4).

88.  Any person proposing a Type 1 or 2 change must notify Oregon DEQ in writing (including all applicable information as set out at OAR 340-210-0230(1)(a)-(o)) before constructing or modifying a stationary source or air pollution control equipment.  OAR 340-210-0230(1).

89.  "Any person proposing a Type 3 or 4 change must submit an application for either a construction ACDP, a new permit, or permit modification, whichever is appropriate."  OAR 340-210-0230(2).

90.  In addition to initial notification or application, the owner or operator must keep DEQ informed of corrections or revisions in construction or modification plans.  OAR 340-210-0230(3).

91.  Oregon's SIP also sets out specific requirements for DEQ approval of the proposed construction or modification.  These requirements, at OAR 340-210-0240, vary according to which type of change the owner or operator proposes.  For Type 1 and Type 2 changes, the

Exhibit 1 - page 26

owner or operator may proceed with construction or modification after a specified waiting period.  OAR 340-210-0240(1)(a), (b).

92.  For Type 3 and 4 changes, mere notice and a waiting period is insufficient.  Type 3 changes require the owner or operator to obtain either a Construction ACDP or a new or modified Standard ACDP in accordance with OAR 340, Division 216.  OAR 340-210-0240(1)(c).  For Type 4 changes, the owner or operator must obtain a new or modified Standard ACDP.  OAR 340-210-0240(1)(d).  The ACDP permitting provisions, at OAR 340, Division 216, mandate that sources comply with Division 210's notification and approval provisions prior to modifying or operating a source.  OAR 340-216-0020(3)-(4).

93.  Beyond obtaining approval to construct or modify a stationary source or air pollution control equipment, Oregon's SIP further requires owners or operators to obtain DEQ approval before operating the source.  OAR 340-210-0250.  For sources currently operating under an Oregon Title V Permit, approval to operate Type 1, 2, 3, or 4 changes must be in accordance with the Title V permit revision rules, at OAR 340-218-0190(2).  OAR 340-210-0250(2)(d) & (3)(c).

### C.    Oregon SIP Reporting Requirements

94.  EPA approved Oregon's current SIP reporting requirements in 1997.  62 Fed. Reg. 8385 (Feb. 25, 1997).  Codified at OAR 340, Division 28, those provisions are the federally-enforceable reporting requirements of Oregon's SIP.  OAR 340-028-1400-1450 (1997).  These reporting provisions apply to "any source which emits air contaminants in excess of any applicable air quality rule or permit condition resulting from the breakdown of air pollution control equipment or operating equipment, process upset, startup, shutdown, or scheduled maintenance."  OAR 340-028-1400 (1997).

Exhibit 1 - page 27

95.  The purpose of these rules is to 1) ensure that, where applicable, sources immediately report all excess emissions, 2) require sources to submit information about conditions which resulted or could result in excess emissions, and 3) identify criteria for the Oregon DEQ to use in assessing whether to take enforcement action.  OAR 340-028-1400(1)-(3) (1997).

96.  Oregon DEQ may require owners or operators of sources subject to the requirements of Division 28 to submit, within fifteen days of the event, a written excess emissions report for each calendar day of the event.  OAR 340-028-1440(1) (1997).  This report must include: 1) the date and time the event was reported to DEQ, 2) whether the event occurred during startup, shutdown, maintenance, or as a result of a breakdown or malfunction, 3) information to aid DEQ in assessing whether the incident was avoidable and whether enforcement action is warranted, 4) the final resolution of the cause of the excess emissions, and 5) evidence supporting any claim that emissions in excess of technology-based limits were due to an emergency pursuant to OAR 340-028-1460.  OAR 340-028-1440(1)(a)–(e) (1997).

97.  If Oregon DEQ waives this written report requirement, the owner or operator of the source must still record the event in an upset log.  OAR 340-028-1440(2) (1997).  All owners or operators of air pollution emitting facilities must keep an upset log of all planned and unplanned excess emissions, and the log must include specified information and be maintained for five years.  OAR 340-028-1440(3) (1997).  Owners or operators must submit a copy of the upset log entries for the reporting period at least annually.  OAR 340-028-1440(4) (1997).

98.  Where excess emissions may result from planned startup or shutdown, or from the "shutdown, by-pass or operation at a reduced efficiency" of air pollution control equipment during scheduled maintenance, an owner or operate must furnish DEQ with current procedures to minimize emissions during such periods.  OAR 340-028-1410 and 340-028-1420 (1997).  Each

year, along with the annual upset logs required by OAR 340-028-1440(4), an owner or operator subject to OAR 340-028-1410 or 1420 must annually submit its current procedures, and "specify in writing whether these procedures are new, modified, or have already been approved by the Department."  OAR 340-028-1440(4)(b) (1997).

99.  PGE Boardman's Title V Permit imposes similar reporting requirements, discussed below.

## IV.   CAA Title V and PGE Boardman's Title V Permit

100.  In 1990, Congress added Title V to the CAA.  *See* CAA §§ 501–507, 42 U.S.C. §§ 7661-7661f.  Title V permits must include enforceable emission limitations and standards, a schedule of compliance, a requirement that the permittee submit the results of any required monitoring to the permitting authority at least every six months, and "such other conditions as are necessary to assure compliance" with the CAA and the SIP.  CAA § 504(a), 42 U.S.C. § 7661c(a).

101.  Section 502(d)(1) of the CAA, 42 U.S.C. § 7661a(d)(1), authorizes EPA to approve state permit programs that meet Title V's requirements.  After the effective date of any permit program approved or promulgated under Title V, no source subject to Title V may operate except in compliance with a Title V Permit that assures the source's compliance with all applicable requirements.  CAA § 502(a), 42 U.S.C. § 7661a(a); 40 C.F.R. §§ 70.1(b), 70.2, 70.7(b).

102.  EPA granted full approval to Oregon's Title V operating permit program on September 28, 1995.  60 Fed. Reg. 50,106 (Sept. 28, 1995).  The program became effective on November 27, 1995.

103.  PGE Boardman received its first Title V Permit ("Permit") on July 1, 1996.  PGE Boardman's last permit, issued July 1, 2001, expired by its terms on July 1, 2006.  On June 22,

2005, PGE Boardman submitted an application to renew its Title V Permit.  As of the date of this Complaint, Oregon DEQ has not issued a final renewed Title V Permit, and the terms of the 2001 Title V Permit remain in effect.

104.  PGE's Title V Permit imposes opacity limitations on the plant as a means of controlling particulate matter emissions.  Incorporating the opacity limitations of Oregon's SIP, OAR 340-021-0015, Permit Condition 4 prohibits PGE from "caus[ing] or allow[ing] the emissions of air contaminant[s] into the atmosphere from any activities or emissions units for a period or periods aggregating more than three minutes in any one hour which is equal to or greater than 20% opacity."  The Permit cites to OAR 340-208-0110(2) and (3)(a), the current state-effective opacity provisions, which, but for the renumbering, are principally the same as the federally-approved SIP opacity provisions.

105.  Permit Condition 10 requires that PGE not "cause to be discharged into the atmosphere from the main boiler . . . any gases which exhibit greater than 20 percent opacity except for one six-minute period per hour of not more than 27 percent opacity."  This Permit limitation must be "in accordance with 40 C.F.R. [§] 60.42(a)(2)," which is the NSPS opacity requirement.

106.  Thus, through the Permit, Oregon's SIP opacity requirements (Condition 4) apply plant-wide and the federal NSPS opacity requirements (Condition 10) apply to the main boiler.

107.  PGE's Title V Permit mandates various reporting obligations, closely tracking similar requirements codified in the Oregon SIP.  These Title V reporting requirements, set forth in Permit Conditions 54 through 62, became effective on the date the permit was issued.

108.  Permit Conditions 54 and 55 require PGE to submit semi-annual and annual compliance certification reports, specifying when those reports are due and what information

Exhibit 1 - page 30

they must contain.  Permit Condition 56 requires PGE to submit quarterly excess emissions reports for the main boiler, including a log of all planned and unplanned excess emissions with detailed information (Conditions 56.a through 56.g) about the events.  Permit Condition 58 details the requirements for excess emissions reporting, specifying that the permittee "shall report all excess emissions in accordance with OAR 340-214-0300 through 340-214-0360." Permit Condition 59 requires PGE to "promptly report deviations from permit requirements that do not cause excess emissions," as well as their probable cause and any corrective actions or preventative measures taken.

109.  PGE's Title V Permit also requires the facility to follow certain notification and approval procedures before modifying the plant.  Through General Permit Condition G18, the Permit incorporates the stationary source notification requirements of Division 210 of Oregon's SIP.

110.  Condition G18 provides that "[n]o permitee shall construct or make modifications required to be reviewed under OAR 340-218-0190, the construction/operation modification rules, without receiving a Notice of Approval in accordance with OAR 340-218-0190."  In turn, OAR 340-218-0190(1) specifies that "the owner or operator of a major stationary source must obtain approval from [DEQ] prior to construction or modification of any stationary source or air pollution control equipment in accordance with OAR 340-210-0200 through OAR 340-210-0250."  Thus, under Condition G18 of PGE's Title V Permit, PGE must comply with the stationary source notification requirement of Division 210.  Additionally, OAR 340-218-0190(2)(d) provides that "[w]here an existing Oregon Title V Operating Permit would prohibit such construction or change in operation, the owner or operator must obtain a permit revision before commencing operation."

Exhibit 1 - page 31

111.   Condition G19 of PGE's Title V Permit prohibits constructing or making
modifications requiring review under the New Source Review provisions of Division 224.   OAR
340-224-0030(2)(d) provides that "[w]here an existing Oregon Title V Operating Permit would
prohibit construction or change in operation, the owner or operator must obtain a permit revision
before commencing construction or operation."

### V.      Enforcement Provisions

112.   Section 304(a)(1) of the CAA, 42 U.S.C. § 7604(a)(1), authorizes "any person" to
bring an action against any person alleged to have violated (if there is evidence that the alleged
violation has been repeated) or be in violation of an emission standard or limitation under the
CAA.   An emission standard or limitation is defined to include "any condition or requirement of
a permit under part C of subchapter I of this chapter," Section 304(f)(3) of the CAA, 42 U.S.C. §
7604(f)(3), and "any other standard, limitation, or schedule established under any permit issued
pursuant to subchapter V. . . or under any applicable State implementation plan approved by the
Administrator, any permit term or condition, and any requirement to obtain a permit as a
condition of operations . . . which is in effect under this chapter . . . or under an applicable
implementation plan."   Section 304 (f)(4) of the CAA, 42 U.S.C. § 7604(f)(4).   Thus, citizens
may bring suit against any person who has violated or is violating New Source Performance
Standards, the PSD program, or relevant conditions of a SIP or a Title V Permit, and against any
person who fails to obtain the proper permit.

113.   Additionally, under Section 304(a)(3) of the CAA, 42 U.S.C. § 7604(a)(3), any
person may file suit in federal district court against any person who proposes to construct or who
constructs a major emitting facility without a PSD permit and without complying with the

Exhibit 1 - page 32

requirements of the PSD program.  Construction is defined to include modification.  42 U.S.C. §
7479(2)(C).

114.  Section 302(e) of the CAA, 42 U.S.C. § 7602(e), defines "person" to include,
among other things, an individual, corporation, partnership, and association.  Under this
definition, all of the Plaintiffs and the Defendant are "persons" within the meaning of 42 U.S.C.
§ 7602(e).

115.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b), amended in part by the Debt
Collection Improvement Act of 1996, authorizes injunctive relief and civil penalties of up to
$27,500 per day for each violation occurring before March 15, 2004, and $32,500 per day for
each violation occurring after March 15, 2004.  28 U.S.C. § 2461; 31 U.S.C. § 3701; 40 C.F.R.
Part 19.

## FACTUAL BACKGROUND

I.    **The PGE Boardman Plant**

116.  The PGE Boardman plant is a fossil fuel-fired electricity generating facility.  The
plant burns pulverized coal in a single boiler, and the resulting steam then passes through a
turbine generator to ultimately produce electricity.  The plant typically burns relatively low
sulfur sub-bituminous coal transported by train from the Powder River Basin in Wyoming and
Montana, and uses an older electrostatic precipitator ("ESP") to collect some particulate matter
pollution from the coal combustion.  The plant has no other pollution controls to address other
pollutants such as mercury, nitrogen oxides, sulfur dioxide or carbon dioxide.

117.  The Boardman plant is located several miles southwest of Boardman, Oregon and
south of Interstate 84.  The plant is approximately 160 miles east of the city of Portland.

Exhibit 1 - page 33

118.  PGE owns a 65 percent share of the Boardman plant.  Idaho Power, Pacific Northwest Generating, and General Electric Credit Corporation own the remaining shares.  PGE is the sole operator of the plant.

119.  The plant first generated electricity on July 12, 1980, and began commercial operation on August 3, 1980.

120.  According to PGE's 1995 Title V permit application, the maximum hourly generating capacity of the Boardman plant was 538 megawatts.  According to PGE's 2000 Title V permit application, the maximum hourly generating capacity of the plant was 580 megawatts.  According to PGE's 2006 Title V permit application, the maximum hourly generating capacity of the Boardman plant was 615 megawatts.

121.  On February 28, 1973, PGE filed a site certificate application with the Nuclear and Thermal Energy Council ("NTEC," predecessor to the Energy Facility Siting Council "EFSC") for one nuclear-fueled and two coal-fired power plants at the Boardman site.  Of these, only one coal-fired plant, the present Boardman facility, was actually built.  This initial application was merely a rough sketch of plans, and lacked details as to site design and operations.

122.  On July 31, 1974, Oregon DEQ recommended that NTEC issue the site certificate, with several requested conditions.  Among those conditions was an understanding that Boardman would be subject to EPA's then-pending 1974 PSD regulations.

123.  On February 27, 1975, NTEC submitted an initial Site Certification Agreement for the Boardman site for the Oregon Governor's approval.  The Governor signed the Agreement on March 24, 1975.  The Agreement certified Oregon's approval of "the construction and operation of thermal power plants and associated facilities at the Boardman site," each of which would have a net electric capacity of 550 megawatts, "plus or minus 50 megawatts."  The agreement

Exhibit 1 - page 34

bound the state and local governments "as to the approval of the site and the construction and operation of the plants or associated facilities," subject to the conditions of the agreement. The Site Certificate included some initial air quality requirements, based on recommendations by Oregon DEQ. However, the agreement specifically lists thirteen categories of "approvals, permits, licenses or certificates by governmental agencies . . . necessary to construction or operations of the thermal power plants" that PGE had yet to apply for or obtain. The agreement provided that "nothing in this agreement shall relieve PGE from complying with requirements of federal law and regulations which may be applicable to construction and operation of the thermal power plants." The Site Certificate was subsequently amended several times between 1975 and 1979, for reasons not relevant to this Complaint.

124. On May 1, 1975, PGE requested that EPA make a determination as to whether 40 C.F.R. § 52.21(d) (EPA's 1974 PSD regulations) applied to the Boardman facility. In response, on May 15, 1975, EPA concluded that PGE Boardman was not subject to the 1974 PSD regulations. In its May 15 letter, EPA stated that PGE had "commenced" construction within the meaning of 40 C.F.R. § 52.21(b)(7), based on a March 15, 1974 "letter of intent" between PGE and Westinghouse Electric Corporation for purchase of a turbine generator for the Boardman plant.

125. Following issuance of the site certificate, on August 25, 1975, PGE submitted to Oregon DEQ a "Notice of Construction and Application for Approval." In an October 1, 1975, letter from Oregon DEQ, the agency acknowledged receipt of the notice but advised it would wait to complete its review until PGE also submitted its ACDP application, bid specifications, and detailed plans.

126.  In a meeting on November 12, 1975, EFSC authorized PGE to begin construction. PGE did not actually begin construction at this time, however.  In a letter dated January 8, 1976, EFSC communicated to DEQ its understanding that "PGE plans to start site preparation in January or February, 1976."

127.  As of at least as late as March 5, 1976, Oregon DEQ still deemed construction "not far enough along to indicate compliance with the requirements relative to the site certificate."

128.  PGE first applied for an ACDP for the Boardman facility on April 4, 1977.  PGE did not receive the permit until December 6, 1979.  On December 28, 1979, the Oregon Department of Energy ("DOE") objected to the ACDP, asserting that the permit was not in accordance with the 1975 site certificate.  While ultimately DEQ rejected DOE's objections, DEQ reissued the permit on January 14, 1980 because the original December 6, 1979 permit lacked necessary emissions limits.

129.  PGE received subsequent renewals of the ACDP on November 28, 1990 and July 19, 1995.  After 1995, the Title V operating permit program supplanted the operating ACDP requirement.

130.  PGE applied for its first Title V Operating Permit on September 15, 1995.

131.  PGE applied to renew its Title V Operating Permit on June 9, 2000.  DEQ issued the permit on July 1, 2001.

132.  PGE applied to renew its Title V Operating Permit on June 22, 2005.  Although the current permit expired by its terms on July 1, 2006, DEQ has yet to issue a renewed permit. Until DEQ renews the permit, the 2001 permit remains in effect.

II.     **Modifications of PGE Boardman**

133.  PGE has modified the Boardman plant at various times since initiating commercial operations on August 3, 1980.

134.  PGE has made physical changes to the Boardman plant, including, but not limited to: 1) an upgrade of the main boiler, including the addition of approximately 9,000 tons of tubing, which was completed between 1997-1998, and related projects; 2) the retrofit of both double-flow, low-pressure turbine rotors in 2000, and related projects; 3) a plant turbine upgrade project, about which PGE notified Oregon DEQ on July 25, 2003, and related projects; 4) the retrofit of the high pressure/intermediate pressure rotor and slip ring shaft, the addition of surface area to the reheater area of the boiler, and the addition of safety valves in the boiler in 2004, and related projects; 5) a generator overhaul project in 2004 and 2005, and related projects; 6) steam turbine rotor and generator rotor repairs in 2005 and 2006, and related projects; and 7) low-pressure turbine unit repairs in 2006, and related projects.

135.  PGE may have made other physical changes to the Boardman plant since initiating commercial operations on August 3, 1980.

136.  PGE has never applied for or received a PSD permit nor operated with BACT emissions limits.

137.  The aforementioned modifications significantly increased net emissions of pollutants.  The modifications also increased hourly maximum capacity.

138.  Contrary to Federal NSPS and Oregon SIP notification, monitoring, and reporting requirements, PGE never properly communicated with EPA or Oregon DEQ about modifications at Boardman.  This failure to comply included, but was not limited to, lack of initial notification,

lack of post-startup notification, and lack of subsequent monitoring and reporting communications.

## III.    Opacity Limit Violations

139.  PGE Boardman has repeatedly violated the opacity limits of its Title V permit, the Oregon SIP, and the NSPS Subpart D and/or the Subpart Da opacity limitations.  The plant will continue to repeatedly violate the relevant opacity limits unless enjoined by the Court.

140.  In the past five years, PGE has reported the following opacity limit violations to Oregon DEQ:[1]

| Start Date of Exceedances | Hours in Exceedance | Number of 6-minute Exceedances | Potential Number of 3-minute Exceedances | Maximum Opacity During Exceedance |
|---|---|---|---|---|
| 12/14/03 | 4 | 40 | 80 | 93% |
| 12/31/03 | 22 | 220 | 440 | 93% |
| 1/16/04 | 4 | 40 | 80 | 93% |
| 1/28/04 | 8 | 80 | 160 | 93% |
| 4/30/04 | 1 | 10 | 20 | 81% |
| 7/23/04 | 92 | 920 | 1840 | 94% |
| 7/28/04 | 7 | 70 | 140 | 95% |
| 8/1/04 | 16 | 160 | 320 | 99% |
| 8/7/04 | 15 | 150 | 300 | 99% |
| 8/12/04 | 1 | 10 | 20 | 41% |
| 8/31/04 | 11 | 110 | 220 | 99% |
| 9/26/04 | 7 | 70 | 140 | 99% |
| 11/10/04 | 11 | 110 | 220 | 100% |
| 11/17/04 | 1 | 10 | 20 | 58% |
| 12/26/04 | 18 | 180 | 360 | 100% |
| 3/22/05 | 1 | 10 | 20 | 29% |
| 3/30/05 | 14 | 140 | 280 | 100% |

---

[1] Data compiled from PGE quarterly NSPS excess emissions reports filed with Oregon Department of Environmental Quality.  Number of 6-minute exceedances calculated using DEQ methodology. Potential number of 3-minute exceedances derived from possible number of 3-minute increments during each exceedance. Within each 6-minute period that constitutes a violation of a federal NSPS opacity limit, at least one and perhaps two violations of the Oregon SIP provisions incorporated into PGE Boardman's Title V permit occurred.

Page 38- First Amended Complaint for Injunctive and Declaratory Relief and Civil Penalties

Exhibit 1 - page 38

| Start Date of Exceedances | Hours in Exceedance | Number of 6-minute Exceedances | Potential Number of 3-minute Exceedances | Maximum Opacity During Exceedance |
|---|---|---|---|---|
| 4/29/05 | 1 | 10 | 20 | |
| 5/27/05 | 33 | 330 | 660 | 100% |
| 7/18/05 | 6 | 60 | 120 | 100% |
| 7/21/05 | 1 | 10 | 20 | 35% |
| 7/22/05 | 1 | 10 | 20 | 20% |
| 7/23/05 | 12 | 120 | 240 | 100% |
| 8/21/05 | 15 | 150 | 300 | 100% |
| 10/23/05 | 11 | 110 | 220 | 100% |
| 10/27/05 | 2 | 20 | 40 | 73% |
| 10/31/05 | 44 | 440 | 880 | 100% |
| 11/16/05 | 28 | 280 | 560 | 100% |
| 11/18/05 | 1 | 10 | 20 | 100% |
| 2/5/06 | 36 | 360 | 720 | 88% |
| 5/15/06 | 10 | 100 | 200 | 85% |
| 5/16/06 | 33 | 330 | 660 | 100% |
| 5/22/06 | 16 | 160 | 320 | 100% |
| 5/24/06 | 9 | 90 | 180 | 100% |
| 5/31/06 | 23 | 230 | 460 | 100% |
| 6/1/06 | 4 | 40 | 80 | 100% |
| 6/29/06 | 15 | 150 | 300 | 100% |
| 6/30/06 | 8 | 80 | 160 | 100% |
| 6/30/06 | 11 | 110 | 220 | 100% |
| 7/1/06 | 1 | 10 | 20 | 53% |
| 7/19/06 | 5 | 50 | 100 | 100% |
| 7/27/06 | 1 | 10 | 20 | 35% |
| 9/23/06 | 1 | 10 | 20 | 71% |
| 9/27/06 | 13 | 130 | 260 | 100% |
| 10/17/06 | 1 | 10 | 20 | 33% |
| 10/29/06 | 20 | 200 | 400 | 100% |
| 10/31/06 | 16 | 160 | 320 | 100% |
| 11/25/06 | 1 | 10 | 20 | 99% |
| 11/26/06 | 14 | 140 | 280 | 100% |
| 1/27/07 | 16 | 160 | 320 | 100% |
| 2/19/07 | 14 | 140 | 280 | 100% |
| 4/5/07 | 15 | 150 | 300 | 100% |
| 5/29/07 | 10 | 100 | 200 | 100% |
| 7/24/07 | 4 | 40 | 80 | 100% |

Page 39- First Amended Complaint for Injunctive and Declaratory Relief and Civil Penalties

Exhibit 1 - page 39

| Start Date of Exceedances | Hours in Exceedance | Number of 6-minute Exceedances | Potential Number of 3-minute Exceedances | Maximum Opacity During Exceedance |
|---|---|---|---|---|
| 8/4/07 | 14 | 140 | 280 | 100% |
| 9/9/07 | 1 | 10 | 20 | 43% |
| 9/10/07 | 1 | 10 | 20 | 100% |
| 9/12/07 | 1 | 10 | 20 | 23% |
| 9/23/07 | 7 | 70 | 140 | 100% |
| 10/15/07 | 17 | 170 | 340 | 100% |
| 1/5/04 | 461 | 77 | 154 | 82% |
| 1/6/04 | 719 | 120 | 240 | 100% |
| 1/8/04 | 329 | 55 | 110 | 81% |
| 1/11/04 | 647 | 108 | 216 | 100% |
| 1/12/04 | 311 | 52 | 104 | 100% |
| 1/30/04 | 6 | 1 | 2 | 40% |
| 2/8/04 | 419 | 70 | 140 | 100% |
| 2/29/04 | 365 | 61 | 122 | 100% |
| 3/1/04 | 929 | 155 | 310 | 100% |
| 3/14/04 | 431 | 72 | 144 | 100% |
| 3/17/04 | 6 | 1 | 2 | 39.60% |
| 6/30/08 | 48 | 8 | 16 | Not Specified |
| **Totals** | **5397** | **8040** | **16080** | |

## IV.    Reporting Violations

141.  For the past five years, PGE has failed to submit all of the reports and information required by the Oregon SIP, and PGE Boardman's Title V permit to the appropriate regulatory agency.

142.  The reports and information submitted by PGE pursuant to its obligations under its Title V permit have not met the detailed requirements set forth in Permit Conditions 54 through 62.  Similarly, the reports and information submitted by PGE pursuant to its obligations under the Oregon SIP have failed to comply with the requirements of the SIP provisions.

143.   PGE's Title V reports, including, but not limited to, event-specific excess emissions reports, quarterly excess emissions reports for the main boiler, permit deviation reports, semi-annual reports, and annual reports, have not met the detailed requirements set forth in Permit Conditions 54 – 62.  For example, contrary to the requirements of Permit Condition 54.b, PGE's 2005 and 2006 annual reports do not include excess emissions upset logs or second semi-annual compliance certifications.  Event-specific reports of planned and unplanned excess emissions events, rarely submitted at all, lack crucial details even when PGE submitted them as required.  For example, several "AQ Upset Log and Excess Emissions Report" forms from 2005 are, but for some cursory notations, mostly blank.  The reports variously fail to specify required facts, such as the magnitude and duration of increased emissions over permitted rates, efforts made to minimize the amount/duration of emissions, and the duration or estimated time until return to normal operation.  These omissions are indicative of a broader pattern of incomplete, erratic reporting.

## CLAIMS FOR RELIEF

### Plaintiffs' First Claim for Relief

### NSPS Subpart Da Violations

144.   Plaintiffs reallege all preceding paragraphs.

145.   It is a violation of Section 111(e) of the CAA, 42 U.S.C. § 7411(e), for any owner or operator of a "new source" to operate in violation of an applicable NSPS.

146.   The term "new source" means "any stationary source, the construction or modification of which is commenced after" the publication of applicable NSPS regulations.  CAA § 111(a)(2), 42 U.S.C. § 7411(a)(2).

Exhibit 1 - page 41

147.  A "modification" is "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."  CAA § 111(a)(4), 42 U.S.C. § 7411(a)(4).

148.  NSPS regulations governing compliance, monitoring, testing, reporting, and recordkeeping, 40 C.F.R. §§ 60.1-60.19, apply to the owner or operator of any stationary source "which contains an affected facility, the construction or modification of which is commenced" after the publication date of an applicable NSPS.  40 C.F.R. § 60.1(a).

149.  An "affected facility" includes "any apparatus to which a [performance] standard is applicable."  40 C.F.R. § 60.2.

150.  Upon modification, an existing facility becomes an "affected facility" which must comply with all applicable NSPS.  40 C.F.R. § 60.14.

151.  Any physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any pollutant to which a standard applies is considered a "modification" within the meaning of Section 111 of the CAA, 42 U.S.C. § 7411. 40 C.F.R. § 60.14(a).

152.  Any physical or operation change to an existing electric utility steam generating unit is a "modification" if the change increases the maximum hourly emissions achievable at the unit above the maximum hourly emissions achievable at the unit during the five years prior to the change.  40 C.F.R. § 60.14(h).

153.  Before making any physical or operational change to an affected facility, the owner or operator of such facility must notify EPA of the change in writing.  40 C.F.R. § 60.7(a).

154.  The owner or operator must submit this notification before the change is commenced, and notice must include, among other things, a description of the precise nature of the change, present and proposed emission control systems, productive capacity of the facility before and after the change, and the expected completion date of the change.  40 C.F.R. § 60.7(a)(4).

155.  The owner or operator of an affected facility subject to Subpart Da must conduct a performance test in accordance with 40 C.F.R. § 60.48Da within 60 days after achieving the maximum production rate at which the facility will be operated, but not later than 180 days after initial startup.  40 C.F.R. § 60.8.

156.  A source subject to Subpart Da must demonstrate compliance with the $SO_2$, $NO_x$, and PM emissions limitations, consistent with the provisions of 40 C.F.R. §§ 60.8, 60.11. 60.48Da(e)-(h), 60.50Da(a)-(e).

157.  A source subject to Subpart Da must monitor its $SO_2$, $NO_x$, and PM emissions pursuant to the requirements in 40 C.F.R. §§ 60.13, 60.49Da(a)–(e), (f)(1), (g)–(j), (l), (m) & (s).

158.  A source subject to Subpart Da must report $SO_2$, $NO_x$, and PM emissions performance test data, performance evaluation test data from monitors, and other information as specified by 40 C.F.R. §§ 60.7, 60.8, 60.51Da(a)–(f) & (h)–(k).

159. The Subpart Da $SO_2$ emission limitation forbids the owner or operator of an electric utility steam generating unit subject to Subpart Da from "caus[ing] to be discharged into the atmosphere from any affected facility" any gases that contain $SO_2$ in excess of 1.2 lb/mmBtu heat input and 10 percent of the potential combustion concentration (90 percent reduction), or 30 percent of the potential combustion concentration (70 percent reduction) when emissions are less than 0.60 lb/mmBtu heat input.  40 C.F.R. § 60.43Da(a).

160.  PGE Boardman is an "electric utility steam generating unit" within the meaning of 40 C.F.R. § 60.41Da, and thus subject to the provisions of Subpart Da.

161.  At various times since initiating commercial operations on August 3, 1980, PGE has made physical changes to the Boardman boiler.  These physical changes include, but are not limited to:  an upgrade of the main boiler, including the addition of approximately 9,000 tons of tubing, which was completed between 1997-1998, the addition of surface area to the reheater area of the boiler in 2004, the addition of safety valves in the boiler in 2004, and related projects.

162.  Besides these physical changes, PGE may have made other physical changes to the Boardman boiler since initiating commercial operations on August 3, 1980.

163.  These physical changes constitute  a modification or "modifications" within the meaning of Section 111(a)(4) of the CAA, 42 U.S.C. § 7411(a)(4), thus making PGE Boardman a "new source" (as defined by Section 111(a)(2) of the CAA, 42 U.S.C. § 7411(a)(2)) under the relevant parts of the NSPS program.

164.  The physical changes referred to in Paragraph 161 and 162 increased the emissions rates of $SO_2$, $NO_x$, and PM to the atmosphere, and are thus a modification or "modifications" within the meaning of Section 111 of the CAA, as provided by 40 C.F.R. § 60.14(a).  PGE Boardman is also, therefore, an "affected facility" for purposes of the general NSPS regulations, 40 C.F.R. §§ 60.1-60.19.

165.  The physical changes referred to in Paragraph 161 and 162 also qualified as a modification or "modifications" under 40 C.F.R. § 60.14(h) because each increased the maximum hourly emissions achievable at PGE Boardman's main boiler above the maximum hourly emissions achievable at the main boiler during the five years prior to the change.

166.  PGE never properly notified EPA of any of these modifications before commencing construction, thus violating the requirements of 40 C.F.R. § 60.7.

167.  Contrary to the requirements of 40 C.F.R. § 60.8, PGE never conducted a performance test in accordance with 40 C.F.R. § 60.48Da upon completing each of the modifications described above.

168.  PGE has, on an almost continual basis, caused $SO_2$ in excess of 1.2 lb/mmBtu heat input and 10 percent of the potential combustion concentration (90 percent reduction), or 30 percent of the potential combustion concentration (70 percent reduction) when emissions are less than 0.60 lb/mmBtu heat input, to be discharged into the atmosphere.

169.  Upon completing each of the modifications described above, PGE never demonstrated compliance with the $SO_2$, $NO_x$, and/or PM emissions limitations set forth at 40 C.F.R. §§ 60.8, 60.11. 60.48Da(e)–(h), 60.50Da(a)–(e).

170.  Upon commencing each of the modifications described above, PGE never monitored its $SO_2$, $NO_x$, and/or PM emissions, thus violating the requirements in 40 C.F.R. §§ 60.13, 60.49Da(a)–(e), (f)(1), (g)–(j), (l), (m) & (s).

171.  Upon commencing each of the modifications described above, PGE never reported $SO_2$, $NO_x$, and/or PM emissions performance test data, performance evaluation test data from monitors, and other information as required by 40 C.F.R. §§ 60.7, 60.8, 60.51Da(a)–(f) & (h)–(k).

172.  During the five-year period prior to the date of this Complaint, the violations in paragraphs 166-171 occurred every day that PGE operated the main boiler unit.  Unless enjoined by order of this Court, these violations will continue.

Exhibit 1 - page 45

173.  As provided in Section 304(a) of the CAA, 42 U.S.C. § 7604(a), the violations set forth above subject PGE to injunctive relief and civil penalties for each day on which PGE operated and continues to operate the facility with the above-described modifications, and for each day PGE otherwise remains in violation of the CAA.  The amount of those civil penalties varies according to the date of the violation; PGE is subject to up to $27,500 per day for each violation occurring before March 15, 2004, and $32,500 per day for each violation occurring after March 15, 2004.  28 U.S.C. § 2461; 31 U.S.C. §3701; 40 C.F.R. Part 19.

**Plaintiffs' Second Claim for Relief**

**NSPS Opacity Violations**

174.  Plaintiffs reallege all preceding paragraphs.

175.  No owner or operator "shall cause to be discharged into the atmosphere from any affected facility any gases which exhibit greater than 20 percent opacity . . . except for one 6-minute period per hour of not more than 27 percent opacity."  40 C.F.R. § 60.42Da(b); 40 C.F.R. § 60.42(a).

176.  PGE Boardman has repeatedly exceeded the federal NSPS opacity limits of Subpart D and/or Da, including thousands of times in the last five years.  *See* Table A, above at paragraph 140.  These violations will continue after the date of this Complaint.

177.  Therefore, PGE Boardman has violated, is violating, and will continue to violate the opacity limits of federal NSPS regulations, at 40 C.F.R. §§ 60.42 and/or 60.42Da(b).

178.  As provided in Section 304(a) of the CAA, 42 U.S.C. § 7604(a), the violations set forth above subject PGE to injunctive relief and civil penalties for each day on which PGE failed to comply with the opacity limits of 40 C.F.R. §§ 60.42 and 60.42Da(b), and for each day PGE otherwise remains in violation of the CAA.  PGE is subject to penalties of up to $27,500 per day

for each violation occurring before March 15, 2004, and up to $32,500 per day for each violation occurring thereafter.  28 U.S.C. § 2461; 31 U.S.C. §3701; 40 C.F.R. Part 19.

**Plaintiffs' Third Claim for Relief**

**Oregon SIP Opacity Violations**

179.  Plaintiffs reallege all preceding paragraphs.

180.  Under Oregon's SIP, all "new sources" in the state are subject to the opacity limits set by OAR 340-021-0015(2).  Oregon's rules define the term "new source" to include "air contaminant source[s] installed, constructed, or modified after June 1, 1970."  OAR 340-021-0005(6).

181.  The relevant opacity limit mandates that "[n]o person shall cause, suffer, allow, or permit the emission of any air contaminant into the atmosphere from any new air contaminant source . . . for a period or periods aggregating more than three minutes in any one hour" air contaminants which are "[a]s dark or darker in shade as that designated as No. 1 on the Ringlemann Chart" or "[e]qual to or greater than 20% opacity."  OAR 340-021-0015(2).

182.  PGE Boardman is a "new source" under Oregon's SIP because it is an air contaminant source installed, constructed, or modified after June 1, 1970.

183.  PGE Boardman has repeatedly exceeded the opacity limits of Oregon's SIP, including thousands of times in the past five years.  *See* Table A, above at paragraph 140.

184.  These violations will continue after the date of this Complaint.

185.  Therefore, PGE Boardman has violated, is violating, and will continue to violate the opacity limits of Oregon's SIP, at OAR 340-021-0015(2).

186.  As provided in Section 304(a) of the CAA, 42 U.S.C. § 7604(a), the violations set forth above subject PGE to injunctive relief and civil penalties for each day on which PGE failed

Exhibit 1 - page 47

to comply with the opacity limits of OAR 340-021-0015(2), and for each day PGE otherwise remains in violation of the CAA.  PGE is subject to penalties of up to $27,500 per day for each violation occurring before March 15, 2004, and up to $32,500 per day for each violation occurring thereafter.  28 U.S.C. § 2461; 31 U.S.C. §3701; 40 C.F.R. Part 19.

### Plaintiffs' Fourth Claim for Relief

### Title V Opacity Violations

187.  Plaintiffs reallege all preceding paragraphs.

188.  PGE Boardman's 2001 Title V permit expired by its terms on July 1, 2006.  On June 22, 2005, PGE Boardman submitted an application to renew its Title V Permit.  As of the date of this Complaint, Oregon DEQ has not issued a final Title V Permit, and the terms of the 2001 Title V Permit remain in effect.

189.  Permit Condition 4 prohibits PGE from "caus[ing] or allow[ing] the emissions of air contaminants into the atmosphere from any activities or emissions units for a period or periods aggregating more than three minutes in any one hour which is equal to or greater than 20% opacity."

190.  Permit Condition 4 applies facility-wide, as indicated by the Permit's Table 1 (titled "Facility wide emission limits and standards").  2001 Title V Permit, p. 4.

191.  Permit Condition 10 requires that PGE not "cause to be discharged into the atmosphere from the main boiler . . . any gases which exhibit greater than 20 percent opacity except for one six-minute period per hour of not more than 27 percent opacity in accordance with 40 C.F.R. § 60.42(a)(2)."

192.  Permit Condition 10 applies to the main boiler.

Exhibit 1 - page 48

193.  Permit Condition 10 further states that visible emissions from the main boiler "shall be measured in accordance with Condition 35."  Condition 35 specifies certain monitoring procedures, citing to the general federal NSPS regulations.

194.  PGE Boardman has repeatedly exceeded the opacity limits of its Title V Permit, including thousands of times in the past five years.  *See* Table A, above at paragraph 140.

195.  Therefore, PGE Boardman has violated, is violating, and will continue to violate the opacity limits of its Title V Permit, including Conditions 4 and 10.

196.  As provided in Section 304(a) of the CAA, 42 U.S.C. § 7604(a), the violations set forth above subject PGE to injunctive relief and civil penalties for each day on which PGE failed to comply with the opacity limits of its 2001 Title V Permit, and for each day PGE otherwise remains in violation of the CAA.  PGE is subject to penalties of up to $27,500 per day for each violation occurring before March 15, 2004, and up to $32,500 per day for each violation occurring thereafter.  28 U.S.C. § 2461; 31 U.S.C. §3701; 40 C.F.R. Part 19.

**Plaintiffs' Fifth Claim for Relief**

**Violations of the PSD Program**
**Construction and Operation without the Required Permit**

197.  Plaintiffs reallege all preceding paragraphs.

198.  EPA regulations adopted in 1974 provided that the PSD requirements therein applied to any plant that "has not commenced construction or expansion prior to June 1, 1975." 39 Fed. Reg. 42,510, 42,516 (Dec. 5, 1974); 40 C.F.R. § 52.21(d) (1975) (superceded).

199.  "Construction" meant "fabrication, erection or installation of an affected facility." *Id.* at 42,515.

200.  "Commenced" meant that a facility had "undertaken a continuous program of construction or modification or . . . entered into a binding agreement or contractual obligation to

Exhibit 1 - page 49

undertake and complete, within a reasonable time, a continuous program of construction or modification." *Id.*; 40 Fed. Reg. 25,004 (June 12, 1975).

201. The 1977 CAA Amendments defined "commenced" construction as when a source had "obtained all necessary preconstruction approvals or permits required by Federal, State, or local air pollution emissions and air quality laws or regulations and either has (i) begun, or caused to begin, a continuous program of physical on-site construction of the facility or (ii) entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time." CAA Amendments of 1977, Pub. L. No. 95-95 § 127(a), 91 Stat. 685 (1977).

202. The 1977 amendments further defined "necessary preconstruction approvals or permits" as "those permits or approvals, required by the permitting authority as a precondition to undertaking any activity under clauses (i) and (ii) of" the statutory definition of "commenced." *Id.*

203. These statutory definitions have remained unchanged since 1977. CAA § 169(2)(A) & (B), 42 U.S.C. § 7479(2)(A) & (B).

204. PGE had not, prior to August 7, 1977, obtained all necessary preconstruction approvals and permits required by federal law, the State of Oregon, and local municipalities.

205. Also, PGE had not begun, or caused to begin, a continuous program of physical on-site construction of the facility or entered into binding agreements or contractual obligations to undertake a program of construction of the facility to be completed within a reasonable time before August 7, 1977.

206.  Therefore, because PGE had not "commenced" construction of the Boardman plant within the meaning of either the 1974 regulations or the 1977 statutory amendments, PGE violated the CAA and federal regulations by constructing and operating the Boardman plant without the required PSD permit and without complying with the provisions of Sections 160–169 of the CAA, 42 U.S.C. §§ 7470-7479, and implementing regulations, including the requirement to operate in compliance with BACT emissions limits.

207.  As provided in Section 304(a) of the CAA, 42 U.S.C. § 7604(a), the violations set forth above subject PGE to injunctive relief and civil penalties for each day on which PGE continues to operate the facility in violation of the PSD program, and for each day PGE otherwise remains in violation of the CAA.  The amount of those civil penalties varies according to the date of the violation; PGE is subject to up to $27,500 per day for each violation occurring before March 15, 2004, and $32,500 per day for each violation occurring after March 15, 2004. 28 U.S.C. § 2461; 31 U.S.C. §3701; 40 C.F.R. Part 19.

### Plaintiffs' Sixth Claim for Relief

#### Violations of the PSD Program
#### Failure to Operate in Compliance with BACT Emissions Limits

208.  Plaintiffs reallege all preceding paragraphs.

209.  Section 165 of the CAA requires that a major emitting facility commencing construction or modification after August 7, 1977 be subject to the best available control technology ("BACT") for each CAA regulated pollutant it emits.  42 U.S.C. § 7475(a)(4).

210.  A "major emitting facility" is either 1) any one of a category of listed stationary sources that emits, or has the potential to emit, 100 tons per year or more of any air pollutant; or 2) any other source with the potential to emit 250 tons per year or more of any air pollutant. CAA § 169(1), 42 U.S.C. § 7479(1).

Exhibit 1 - page 51

211.  A "stationary source" is "any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle."  CAA § 302(z), 42 U.S.C. § 7602(z).  An "air pollutant" is any "air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive . . . substance or matter which is emitted into or otherwise enters the ambient air."  CAA § 302(g), 42 U.S.C. § 7602(g).

212.  "Construction" includes "modification" as defined in Section 111(a) of the CAA. CAA § 169(2)(C), 42 U.S.C. § 7479(2)(C).  A "modification" is "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."  CAA § 111(a)(4), 42 U.S.C. § 7411(a)(4).

213. "Commenced" means that the owner or operator has "obtained all necessary preconstruction approvals or permits required by Federal, State, or local air pollution emissions and air quality laws or regulations and either has (i) begun, or caused to begin, a continuous program of physical on-site construction of the facility or (ii) entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time."  42 U.S.C. § 7479(2)(A).

214.  "Necessary preconstruction approvals or permits" are "those permits or approvals, required by the permitting authority as a precondition to undertaking any activity under clauses (i) and (ii) of" the statutory definition of "commenced."  42 U.S.C. § 7479(2)(B).

215.  "Best available control technology" ("BACT") is "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter

Exhibit 1 - page 52

emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental and economic impacts and other costs, determines is achievable for such facility[.]"  42 U.S.C. § 7479(3).

216.  PGE Boardman is a stationary source with the potential to emit more than 250 tons per year of sulfur dioxide, nitrogen oxides and particulate matter, which are pollutants subject to regulation under the CAA.

217.  PGE commenced construction and subsequent modification of the Boardman plant after August 7, 1977.

218.  Therefore, PGE Boardman is required to operate in compliance with BACT emission limits.

219.  No authorized permitting authority has ever determined BACT for Boardman.

220.  Boardman has never operated in compliance with any BACT emission limitations.

221.  By operating without BACT emissions limits, PGE is violating the CAA.

222.  As provided in Section 304(a) of the CAA, 42 U.S.C. § 7604(a), the violations set forth above subject PGE to injunctive relief and civil penalties for each day on which PGE continues to operate the facility without complying with BACT emission limits.  The amount of those civil penalties varies according to the date of the violation; PGE is subject to up to $27,500 per day for each violation occurring before March 15, 2004, and $32,500 per day for each violation occurring after March 15, 2004.  28 U.S.C. § 2461; 31 U.S.C. §3701; 40 C.F.R. Part 19.

### **Plaintiffs' Seventh Claim for Relief**

**Violations of Oregon's SIP Approved PSD Program**
**Illegal Modifications**

223.  Plaintiffs reallege all preceding paragraphs.

224.  The federally-effective PSD provisions of Oregon's SIP before March 24, 2003, prohibit the construction or major modification of stationary sources unless the source has first obtained an Air Contaminant Discharge Permit ("ACDP") and otherwise met the requirements of applicable law, including PSD requirements.  OAR 340-028-1900(1) (1997).  PSD requirements include the duty to operate in compliance with BACT emissions limits.  OAR 340-028-1940 (1997).  This duty is ongoing.  OAR 340-028-1910(2)(a), (c) (1997).

225.  The Oregon SIP's definition of "major modification" prior to March 24, 2003 provided, in pertinent part:

'Major modification' means any physical change or change of operation of a source that would result in a net significant emission rate increase for any regulated air pollutant.  This criteria [sic] also applies to any pollutants not previously emitted by the source.  Calculations of net emission increases shall take into account all accumulated increases and decreases in actual emissions occurring at the source since the baseline period, or since the time of the last construction approval issued for the source pursuant to the New Source Review Regulations . . . for that pollutant, whichever time is more recent.

OAR 340-028-0110(57) (1997).

226.  The Oregon SIP's definition of "major source" prior to March 24, 2003 was "a source which emits, or has the potential to emit, any regulated air pollutant at a Significant Emission Rate [defined in a table at OAR 340-028-0110(110) (1997)]," including emissions from "insignificant activities."  OAR 340-028-0110(58) (1997).

227.  The current federally-effective PSD provisions of Oregon's SIP, in place since March 24, 2003, prohibit the construction or major modification of stationary sources unless the

Exhibit 1 - page 54

source has first obtained an Air Contaminant Discharge Permit ("ACDP") and otherwise met the requirements of applicable law, including PSD requirements. OAR 340-224-0010(2) (2003).

228. The current Oregon SIP defines "major modification," for new or modified major sources that were permitted to construct and operate after the baseline period and were not subject to New Source Review ("NSR"), to include "[t]he addition or modification of any stationary source or sources after the initial construction that have cumulative potential emissions greater than or equal to the significant emission rate, excluding any emission decreases." OAR 340-200-0020(66)(c)(B) (2003).

229. The term "stationary source" means "any building, structure, facility, or installation at a source that emits or may emit any regulated air pollutant." OAR 340-200-0020(131) (2003).

230. The term "federal major source" means "a source with potential to emit any individual regulated pollutant, excluding hazardous air pollutants listed in OAR 340 division 244, greater than or equal to 100 tons per year if in a source category listed below, or 250 tons per year if not in a source category listed." OAR 340-200-0020(53) (2003). Moreover, "[p]otential to emit calculations must include emission increases due to a new or modified source." *Id*.

231. Proposed new federal major sources or major modifications at federal major sources located in attainment areas must meet the requirements of OAR 340-224-0070 (2003). These include the requirement to operate in compliance with BACT emissions limits, provide an air quality analysis, and conduct ambient air quality monitoring. OAR 340-224-0070 (2003).

232. At various times since initiating commercial operations on August 3, 1980, PGE has made physical changes to the Boardman plant. These physical changes include, but are not limited to: 1) an upgrade of the main boiler, including the addition of approximately 9,000 tons

Exhibit 1 - page 55

of tubing, which was completed between 1997-1998, and related projects; 2) the retrofit of both double-flow, low-pressure turbine rotors in 2000, and related projects; 3) a plant turbine upgrade project, about which PGE notified Oregon DEQ on July 25, 2003, and related projects; 4) the retrofit of the high pressure/intermediate pressure rotor and slip ring shaft,  the addition of surface area to the reheater area of the boiler, and the addition of safety valves in the boiler, in 2004, and related projects; 5) a generator overhaul project in 2004 and 2005, and related projects; 6) steam turbine rotor and generator rotor repairs in 2005 and 2006, and related projects; and 7) low-pressure turbine unit repairs in 2006, and related projects.

233.  Additionally, PGE may have made other physical changes to the Boardman plant since initiating commercial operations on August 3, 1980.

234.  Each of these changes that occurred prior to March 24, 2003, resulted in a net significant emission rate increase of $NO_x$, $SO_2$, and/or particulate matter.

235. Each of these changes that occurred after March 24, 2003, resulted in cumulative potential emissions greater than or equal to the significant emission rate.

236.  Therefore, each of these changes was a "major modification" under the Oregon PSD program.

237.  PGE has never applied for or received the necessary ACDP permits from Oregon DEQ for these changes, never determined or operated in compliance with BACT emissions limits, and never conducted required modeling or ambient air quality monitoring.

238.  Therefore, PGE has been operating the Boardman plant in violation of Section 165 of the CAA, 42 U.S.C. § 7475, and the Oregon PSD program.

239.  As provided in Section 304(a) of the CAA, 42 U.S.C. § 7604(a), the violations set forth above subject PGE to injunctive relief and civil penalties for each day on which PGE

operated and continues to operate the facility with the above-described modifications, and for

each day PGE otherwise remains in violation of the CAA.  The amount of those civil penalties

varies according to the date of the violation; PGE is subject to up to $27,500 per day for each

violation occurring before March 15, 2004, and $32,500 per day for each violation occurring

after March 15, 2004.  28 U.S.C. § 2461; 31 U.S.C. §3701; 40 C.F.R. Part 19.

### Plaintiffs' Eighth Claim for Relief

### Violations of Oregon's SIP Approved PSD Program
### Failure to Operate in Compliance with BACT Emissions Limits

240.  Plaintiffs reallege all preceding paragraphs.

241.  Under the Oregon SIP approved PSD program, at all times relevant to this

Complaint, major modifications at federal major sources located in attainment areas must operate

in compliance with BACT emissions limits.  OAR 340-028-1940(1) (1997); and OAR 340-224-

0070 (2003).

242.  The Oregon SIP's definition of "major modification" prior to March 24, 2003

provided, in pertinent part:

> 'Major modification' means any physical change or change of operation of a
> source that would result in a net significant emission rate increase for any
> regulated air pollutant.  This criteria [sic] also applies to any pollutants not
> previously emitted by the source.  Calculations of net emission increases shall
> take into account all accumulated increases and decreases in actual emissions
> occurring at the source since the baseline period, or since the time of the last
> construction approval issued for the source pursuant to the New Source Review
> Regulations . . . for that pollutant, whichever time is more recent.

OAR 340-028-0110(57) (1997).

243. The Oregon SIP's definition of "best available control technology" prior to March 24, 2003 provided, in pertinent part:

> "BACT" means an emission limitation, including, but not limited to, a visible emission standard, based on the maximum degree of reduction of each air contaminant subject to regulation under the Act which would be emitted from any proposed major source or major modification which, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, is achievable for such source or modification …

OAR 340-028-0110(14).

244. The current Oregon SIP defines "major modification," for new or modified major sources that were permitted to construct and operate after the baseline period and were not subject to New Source Review, to include "[t]he addition or modification of any stationary source or sources after the initial construction that have cumulative potential emissions greater than or equal to the significant emission rate, excluding any emission decreases."  OAR 340-200-0020(66)(c)(B) (2003).

245. "Best available control technology" ("BACT") is defined as an "emission limitation, including, but not limited to, a visible emission standard, based on the maximum degree of reduction of each air contaminant subject to regulation under the Act which would be emitted from any proposed major source or major modification which, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, is achievable for such source or modification…"  OAR 340-200-0020(15) (2003).

246.  At various times since May 6, 1997, PGE has made major modifications to the Boardman plant.  These physical changes include, but are not limited to:  1) an upgrade of the main boiler, including the addition of approximately 9,000 tons of tubing, which was completed between 1997-1998, and related projects; 2) the retrofit of both double-flow, low-pressure turbine rotors in 2000, and related projects; 3) a plant turbine upgrade project, about which PGE notified Oregon DEQ on July 25, 2003, and related projects; 4) the retrofit of the high pressure/intermediate pressure rotor and slip ring shaft in 2004, and related projects; 5) a generator overhaul project in 2004 and 2005, and related projects; 6) steam turbine rotor and generator rotor repairs in 2005 and 2006, and related projects; and 7) low-pressure turbine unit repairs in 2006, and related projects.

247.  Additionally, PGE may have made other major modifications to the Boardman plant since May 6, 1997.

248.  Therefore, PGE Boardman is required to operate in compliance with BACT emission limits.

249.  No authorized permitting authority has ever determined BACT for Boardman.

250.  Boardman has never operated in compliance with any BACT emission limitations.

251.  By operating without BACT emissions limits, PGE is violating the CAA.

252.  As provided in Section 304(a) of the CAA, 42 U.S.C. § 7604(a), the violations set forth above subject PGE to injunctive relief and civil penalties for each day on which PGE continues to operate the facility without complying with BACT emission limits.  The amount of those civil penalties varies according to the date of the violation; PGE is subject to up to $27,500 per day for each violation occurring before March 15, 2004, and $32,500 per day for each

Exhibit 1 - page 59

violation occurring after March 15, 2004.  28 U.S.C. § 2461; 31 U.S.C. §3701; 40 C.F.R. Part 19.

### Plaintiffs' Ninth Claim for Relief

#### Violations of the Oregon SIP Stationary Source Notification Requirements

253.  Plaintiffs reallege all preceding paragraphs.

254.  In 2003, EPA approved revisions of the Oregon SIP providing that "[n]o person is allowed to make a physical change or change in operation of an existing stationary source that will cause an increase, on an hourly basis at full production, in any regulated pollutant emissions without first notifying [DEQ] in writing."  OAR 340-210-0215(2) (2003).  Further, "[n]o person is allowed to construct or modify any air pollution control equipment without first notifying [DEQ] in writing."  OAR 340-210-0215(3) (2003).

255.  Oregon's SIP specifies different notification and approval procedures for construction or modifications of stationary sources (or air pollution control equipment) according to which of four "Types" the changes fall under.  OAR 340-210-0225.

256.  Type 1 changes are "truly *de minimis*."  68 Fed. Reg. 2891, 2895 (Jan. 22, 2003). These changes include construction or modification that would not increase emissions above certain thresholds, as described at OAR 340-210-0225(1)(a)–(e).

257.  Type 2 changes are "changes that are more than *de minimis*, but less than significant."  68 Fed. Reg. 2891, 2895 (Jan. 22, 2003).

258.  Type 3 changes are "changes that are significant, but not new major sources or major modifications."  68 Fed. Reg. 2891, 2895 (Jan. 22, 2003).

259.  Type 4 changes are "changes that are significant and may be new major sources or major modifications."  68 Fed. Reg. 2891, 2895 (Jan. 22, 2003).  These include construction or

modification "where such a change or changes would increase emissions above the P[lant] S[ite] E[mission] L[imit] or Netting Basis of the source by more than the significant emission rate." OAR 340-210-0225(4).

260.  Any person proposing a Type 1 or 2 change must notify Oregon DEQ in writing (including all applicable information as set out at OAR 340-210-0230(1)(a)–(o)) before constructing or modifying a stationary source or air pollution control equipment.  OAR 340-210-0230(1).

261.  "Any person proposing a Type 3 or 4 change must submit an application for either a construction ACDP, a new permit, or permit modification, whichever is appropriate."  OAR 340-210-0230(2).

262.  In addition to initial notification or application, the owner or operator must keep DEQ informed of corrections or revisions in construction or modification plans.  OAR 340-210-0230(3).

263.  Oregon's SIP also sets out specific requirements for DEQ approval of the proposed construction or modification.  These requirements, at OAR 340-210-0240, vary according to which Type of change the owner or operator proposes.  For Type 1 and Type 2 changes, the owner or operator may proceed with construction or modification after a specified waiting period.  OAR 340-210-0240(1)(a) & (b).

264.  For Type 3 and 4 changes, mere notice and a waiting period is insufficient.  Type 3 changes require the owner or operator to obtain either a Construction ACDP or a new or modified Standard ACDP in accordance with OAR 340, Division 216.  OAR 340-210-0240(1)(c).  For Type 4 changes, the owner or operator must obtain a new or modified Standard ACDP.  OAR 340-210-0240(1)(d).  The ACDP permitting provisions, at OAR 340, Division

216, mandate that sources comply with Division 210's notification and approval provisions prior to modifying or operating a source.  OAR 340-216-0020.

265.  Beyond obtaining approval to construct or modify a stationary source or air pollution control equipment, Oregon's SIP further requires owners or operators to obtain DEQ approval before operating the source.  OAR 340-210-0250.  For sources currently operating under an Oregon Title V Permit, approval to operate Type 1, 2, 3, or 4 changes must be in accordance with the Title V permit revision rules, at OAR 340-218-0190(2).  OAR 340-210-0250(2)(d) & (3)(c).

266.  At various times since March 24, 2003, PGE has made changes to Boardman that qualify as Type 1, Type 2, Type 3 or Type 4 changes.  These changes include, but are not limited to:  1) a plant turbine upgrade project, about which PGE notified Oregon DEQ on July 25, 2003, and related projects; 2) the retrofit of the high pressure/intermediate pressure rotor and slip ring shaft in 2004, and related projects; 3) a generator overhaul project in 2004 and 2005, and related projects; 4) steam turbine rotor and generator rotor repairs in 2005 and 2006, and related projects; and 5) low-pressure turbine unit repairs in 2006, and related projects.

267.  Additionally, PGE may have made other changes to the Boardman plant since March 24, 2003.

268.  PGE did not inform Oregon DEQ of the changes identified above in compliance with the requirements of the Oregon SIP.  Additionally, PGE failed to obtain approval from Oregon DEQ to operate the changes in compliance with the requirements of Oregon's SIP.

269.  Therefore, PGE repeatedly violated the Oregon SIP.

270.  As provided in Section 304(a) of the CAA, 42 U.S.C. § 7604(a), the violations set forth above subject PGE to civil penalties for each violation.  The amount of those civil penalties

Exhibit 1 - page 62

varies according to the date of the violation; PGE is subject to up to $27,500 per day for each

violation occurring before March 15, 2004, and $32,500 per day for each violation occurring

after March 15, 2004.  28 U.S.C. § 2461; 31 U.S.C. §3701; 40 C.F.R. Part 19.

### Plaintiffs' Tenth Claim for Relief

### Violation of Title V Notification Requirements

271.  PGE's Title V Permit also requires the facility to follow certain notification and

approval procedures before modifying the plant.  Through General Permit Condition G18, the

Permit incorporates the stationary source notification requirements of Division 210 of Oregon's

SIP.

272.  Condition G18 provides that "[n]o permitee shall construct or make modifications

required to be reviewed under OAR 340-218-0190, the construction/operation modification

rules, without receiving a Notice of Approval in accordance with OAR 340-218-0190."  In turn,

OAR 340-218-0190(1) specifies that "the owner or operator of a major stationary source must

obtain approval from [DEQ] prior to construction or modification of any stationary source or air

pollution control equipment in accordance with OAR 340-210-0200 through OAR 340-210-

0250."  Thus, under Condition G18 of PGE's Title V Permit, PGE must comply with the

stationary source notification requirement of Division 210.  Additionally, OAR 340-218-

0190(2)(d) provides that "[w]here an existing Oregon Title V Operating Permit would prohibit

such construction or change in operation, the owner or operator must obtain a permit revision

before commencing operation."

273.  Condition G19 of PGE's Title V Permit prohibits constructing or making

modifications requiring review under the NSR provisions of Division 224.  OAR 340-224-

0030(2)(d) provides that "[w]here an existing Oregon Title V Operating Permit would prohibit

Exhibit 1 - page 63

construction or change in operation, the owner or operator must obtain a permit revision before commencing construction or operation."

274.   At various times since the issuance of the PGE Boardman Title V permit on July 1, 1996, PGE has made changes to Boardman that are prohibited by Condition G18.  These changes include, but are not limited to:  1) an upgrade of the main boiler, including the addition of approximately 9,000 tons of tubing, which was completed between 1997-1998, and related projects; 2) the retrofit of both double-flow, low-pressure turbine rotors in 2000, and related projects; 3) a plant turbine upgrade project, about which PGE notified Oregon DEQ on July 25, 2003, and related projects; 4) the retrofit of the high pressure/intermediate pressure rotor and slip ring shaft in 2004, and related projects; 5) a generator overhaul project in 2004 and 2005, and related projects; 6) steam turbine rotor and generator rotor repairs in 2005 and 2006, and related projects; and 7) low-pressure turbine unit repairs in 2006, and related projects.

275.   Additionally, PGE may have made other changes to the Boardman plant since July 1, 1996.

276.   PGE did not inform Oregon DEQ of the changes identified above in compliance with the requirements of Condition G18 of the PGE Boardman Title V permit.  Additionally, PGE failed to obtain approval from Oregon DEQ to operate the changes identified above in compliance with the requirements of Condition G18 of the PGE Boardman Title V permit.

277.   Therefore, PGE repeatedly violated the PGE Boardman Title V permit.

278.   As provided in Section 304(a) of the CAA, 42 U.S.C. § 7604(a), the violations set forth above subject PGE to civil penalties for each violation.  The amount of those civil penalties varies according to the date of the violation; PGE is subject to up to $27,500 per day for each

violation occurring before March 15, 2004, and $32,500 per day for each violation occurring after March 15, 2004.  28 U.S.C. § 2461; 31 U.S.C. §3701; 40 C.F.R. Part 19.

### Plaintiffs' Eleventh Claim for Relief

### Violations of the Oregon SIP Reporting Requirements

279.  EPA approved Oregon's current SIP reporting requirements in 1997.  62 Fed. Reg. 8385 (Feb. 25, 1997).  Codified at OAR 340, Division 28, those provisions are the federally-enforceable reporting requirements of Oregon's SIP.  OAR 340-028-1400-1450 (1997).  These reporting provisions apply to "any source which emits air contaminants in excess of any applicable air quality rule or permit condition resulting from the breakdown of air pollution control equipment or operating equipment, process upset, startup, shutdown, or scheduled maintenance."  OAR 340-028-1400 (1997).

280.  Oregon DEQ may require owners or operators of sources subject to the requirements of Division 28 to submit, within fifteen days of the event, a written excess emissions report for each calendar day of the event.  OAR 340-028-1440(1) (1997).  This report must include: 1) the date and time the event was reported to DEQ, 2) whether the event occurred during startup, shutdown, maintenance, or as a result of a breakdown or malfunction, 3) information to aid DEQ in assessing whether the incident was avoidable and whether enforcement action is warranted, 4) the final resolution of the cause of the excess emissions, and 5) evidence supporting any claim that emissions in excess of technology-based limits were due to an emergency pursuant to OAR 340-028-1460.  OAR 340-028-1440(1)(a)–(e) (1997).

281.  If Oregon DEQ waives this written report requirement, the owner or operator of the source must still record the event in an upset log.  OAR 340-028-1440(2) (1997).  All owners or operators of air pollution emitting facilities must keep an upset log of all planned and unplanned

excess emissions, and the log must include specified information and be maintained for five years.  OAR 340-028-1440(3) (1997).  Owners or operators must submit a copy of the upset log entries for the reporting period at least annually.  OAR 340-028-1440(4) (1997).

282.  Where excess emissions may result from planned startup or shutdown, or from the "shutdown, by-pass or operation at a reduced efficiency" of air pollution control equipment during scheduled maintenance, an owner or operate must furnish DEQ with current procedures to minimize emissions during such periods.  OAR 340-028-1410 and 340-028-1420 (1997).  Each year, along with the annual upset logs required by OAR 340-028-1440(4), an owner or operator subject to OAR 340-028-1410 or 1420 must annually submit its current procedures, and "specify in writing whether these procedures are new, modified, or have already been approved by the Department."  OAR 340-028-1440(4)(b) (1997).

283.  PGE repeatedly failed to submit required information to Oregon DEQ, including the required upset logs and current procedures to minimize emissions during periods of startup, shutdown, or shutdown, by-pass or operation at a reduced efficiency of air pollution control equipment.

284.  Therefore, PGE repeatedly violated the reporting requirements of the Oregon SIP.

285.  As provided in Section 304(a) of the CAA, 42 U.S.C. § 7604(a), the violations set forth above subject PGE to civil penalties for each violation.  The amount of those civil penalties varies according to the date of the violation; PGE is subject to up to $27,500 per day for each violation occurring before March 15, 2004, and $32,500 per day for each violation occurring after March 15, 2004.  28 U.S.C. § 2461; 31 U.S.C. §3701; 40 C.F.R. Part 19.

**<u>Plaintiffs' Twelfth Claim for Relief</u>**

**<u>Violation of PGE Boardman's Title V Permit Reporting Requirements</u>**

Exhibit 1 - page 66

286.  PGE's Title V Permit Conditions 54 and 55 require PGE to submit semi-annual and annual compliance certification reports, specifying when those reports are due and what information they must contain.  Permit Condition 56 requires PGE to submit quarterly excess emissions reports for the main boiler, including a log of all planned and unplanned excess emissions with detailed information (Conditions 56.a through 56.g) about the events.  Permit Condition 58 details the requirements for excess emissions reporting, specifying that the permittee "shall report all excess emissions in accordance with OAR 340-214-0300 through 340-214-0360."  Permit Condition 59 requires PGE to "promptly report deviations from permit requirements that do not cause excess emissions," as well as their probable cause and any corrective actions or preventative measures taken.

287.  PGE's Title V reports, including, but not limited to, event-specific excess emissions reports, quarterly excess emissions reports for the main boiler, permit deviation reports, semi-annual reports, and annual reports, have not met the detailed requirements set forth in Permit Conditions 54 – 62.

288.  Therefore, PGE has violated its Title V permit repeatedly.

289.  As provided in Section 304(a) of the CAA, 42 U.S.C. § 7604(a), the violations set forth above subject PGE to civil penalties for each violation.  The amount of those civil penalties varies according to the date of the violation; PGE is subject to up to $27,500 per day for each violation occurring before March 15, 2004, and $32,500 per day for each violation occurring after March 15, 2004.  28 U.S.C. § 2461; 31 U.S.C. §3701; 40 C.F.R. Part 19.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A.        Declare that PGE has violated and is violating the Clean Air Act through violations of:

general reporting, testing and monitoring requirements of the New Source Performance

Standards ("NSPS"), the NSPS for sulfur dioxide emissions, the opacity standards contained in

the NSPS, the Oregon SIP, and PGE Boardman's Title V Permit, the Prevention of Significant

Deterioration ("PSD") program, the Oregon SIP approved PSD program, Oregon SIP and Title V

reporting requirements, and Oregon SIP and Title V source construction and modification

provisions;

B.      Permanently enjoin PGE from operating its facility except in accordance with the Clean

Air Act, the Oregon SIP, and PGE Boardman's Title V Permit;

C.      Issue injunctive relief requiring Defendant to remediate the environmental damage and

ongoing impacts resulting from PGE's violations;

D.      Assess civil penalties against PGE of $27,500 per day per violation, for violations

occurring before March 15, 2004, and $32,500 per day per violation occurring thereafter;

E.      Order that $100,000 of the civil penalties assessed against PGE be used in beneficial

mitigation projects to enhance public health and the environment;

F.      Retain jurisdiction of this action to ensure compliance with the Court's Order;

G.      Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

H.      Grant such other relief as the Court deems just and proper.

DATED this 1st day of Novmeber 2010.


              _____*/s/ Aubrey Baldwin*_____
              Aubrey Baldwin
              OSB No. 060414
              (503) 768-6929

              Allison LaPlante
              OSB No. 02361
              (503) 768-6727

Exhibit 1 - page 68

Tom Buchele
OSB No. 081560
(503) 768-6736

Attorneys for All Plaintiffs

Of Counsel:

GEORGE E. HAYS
Cal. Bar No. 119904
(415) 566-5414